UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JAMES FASOLI,**<br>　　　　　　**Plaintiff,**<br><br>**v.**<br><br>**CITY OF STAMFORD, EARNEST**<br>**ORGERA, MICHAEL SCACCO,**<br>**MICHAEL LAROBINA and TANIA**<br>**BARNES,**<br>　　　　　**Defendants.** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**Case Number: 11-cv-767**

## FIRST AMENDED COMPLAINT

1.　　This is an action for declaratory relief, damages and to secure protection of, and to redress deprivation of rights secured by, the First and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000-e <u>et</u> <u>seq.</u>, 42 U.S.C. § 1983, 28 U.S.C § 1343, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.,* 28 U.S.C § 1367, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.,* Conn. Gen. Stat. § 31-51q, Conn. Gen. Stat. § 31-51m and various claims under the common law including intentional and negligent infliction of emotional distress and defamation.

2.　　Equitable and other relief is sought under 42 U.S.C. § 2000e-5(g), 42 U.S.C. § 1981a, 29 U.S.C. §§ 626(b) and (c) or §§ 633a(b) and (c).

### JURISDICTION AND VENUE

3.　　Jurisdiction of this court is invoked under the provisions of Sections 1331, 1343(3), 1367(a) and 2201(a) of Title 28 and Section 2000e of Title 42 of the United States Code.

1

4.    The Plaintiff has complied with all of the procedural prerequisites to suit under the statutes aforementioned having filed a *pro se* administrative complaint with the Connecticut Commission on Human Rights & Opportunities (CHRO) West Central region, and the Equal Employment Opportunity Commission (EEOC), thereby exhausting his administrative remedies and having received a right to sue notice from the proper administrative agencies dated February 15, 2011.

5.    Jurisdiction of this court over state law claims is invoked pursuant to this Court's supplemental jurisdiction, since the Federal causes of action arise out of the same facts and circumstances as do the state causes of action.

6.    Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b) in that the Plaintiff's claims arose in this District, and both the Plaintiff and the Defendants reside in this District.

## PARTIES

7.    James Fasoli (hereinafter referred to as the "Plaintiff") is a sixty-six (66) year old male, born on September 25, 1944, who resides in Stamford, Connecticut.

8.    Upon information and belief, Mr. Fasoli is the oldest employee in the City of Stamford's Vehicle Maintenance Department, with the next youngest employee approximately ten (10) years younger.

9.    Defendant, the City of Stamford (the "City" or "Stamford"), is a municipal corporation organized under the laws of the state of Connecticut, and located in Connecticut.

10.    Defendant, Ernest "Ernie" Orgera, is the Director of Operations for the City of Stamford, and is given the authority to impose discipline on the City employees in the Office of Operations, and is being sued in his individual capacity.  At all times mentioned herein Mr.

2

Orgera was an employee of the City and was acting under color of law, and the Plaintiff reported to Mr. Orgera through Mr. Scacco, his direct supervisor.

11.     The Defendant Orgera is a political supporter of Mayor Michael Pavia.

12.     After Mayor Pavia's election, Defendant Orgera was appointed by Mayor Pavia to be the Director of the Office of Operations.

13.     Defendant, Michael Scacco, is the Fleet Manager for the City of Stamford, with the authority to impose discipline on employees in his department, and is being sued in his individual capacity. Upon information and belief, Defendant Scacco became Fleet Manager in or about February 2008 after applying for the position, and taking a mandated examination. At all times mentioned herein Defendant Scacco was an employee of the City, acting under color of law, and was at material times the Plaintiff's supervisor.

14.     Defendant, Michael Larobina, is the Head of the Office of Legal Affairs for the City, including its Personnel Division (also known as the Human Resources Department) and is the appointed official charged with the administration and supervision of the City's personnel matters, including employee discipline. Defendant Larobina is being sued in his individual capacity.  At all times mentioned herein Defendant Larobina was an employee of the City and was acting under color of law.

15.     Defendant Larobina is a political supporter of Michael Pavia (the current Mayor of Stamford) and served as Mayor Pavia's campaign manager. After Mayor Pavia's election, Defendant Larobina was given a political appointment to Director of the Office of Legal Affair by Mayor Pavia.

16.     Moreover, as Director of the Office of Legal Affairs, Defendant Larobina's responsibilities are defined, *inter alia*, by Sec. C5-20-7 ("Personnel Functions") of the Stamford

City Charter. The section provides "The Director of Legal Affairs or his or her designee shall be responsible for the supervision of all personnel functions of the City, including all labor negotiations and other matters affecting civil service employment, collective bargaining and the employees of the City."

17.    Defendant, Tania Barnes, is a Human Resources Generalist in the City's Human Resources Department, and exercised authority to recommend and impose discipline on the City employees, and is being sued in her individual capacity.   At all times mentioned herein Ms. Barnes was an employee of the City, acting under color of law, and reported to Mr. Larobina.

18.    The Plaintiff was hired by the City of Stamford on or about November 2005 as equipment mechanic in the City's Office of Operation.

19.    The Plaintiff performed his job in a satisfactory manner throughout his employment with the City and at all times he met the City's reasonable expectations.

## GENERAL ALLEGATIONS

20.    Prior to April 2, 2008, the Plaintiff's last performance evaluation was made by Defendant City in 2006, and had rated the Plaintiff as satisfactory or better.

### Fasoli's Objects to the Sexual Harassment of a Female Co-Worker

21.    On or about April 2, 2008, a female co-worker of the Plaintiff -- Charlene MacArthur -- dropped her truck off at the vehicle maintenance facility and the Plaintiff gave her a ride back to her personal vehicle.

22.    When the Plaintiff dropped Ms. MacArthur off, he noticed some magazines or pictures on her car window.

23.    Ms. MacArthur picked up the magazines, which were sexually explicit pornography, and showed them to the Plaintiff.

24.     Ms. MacArthur told the Plaintiff that this was not the first time that this had happened and she was getting sick and tired of it.

25.     On or about April 3, 2008, the Plaintiff wrote a letter to the City to advise them about the sexual harassment experienced by Ms. MacArthur.  The Plaintiff also verbally advised Benjamin Barnes, the City's Director of Operations, and implored him to do something about it.

26.     The Plaintiff also attended two meetings with Ms. MacArthur and the City, and advocated on her behalf with respect to the sexual harassment she was experiencing.

27.     The Plaintiff, when writing the letter on behalf of Ms. MacArthur, and defending her rights to work in an atmosphere free of sexual harassment, was engaged in a protected activity under Title VII of the Civil Rights Act.

28.     The Plaintiff was speaking on a matter of general public concern when he reported the sexual harassment of his female coworker.

29.     As a result of the above, the Plaintiff was targeted, and continues to be targeted, by various individual Defendants, and retaliated against, for speaking out on behalf of his co-worker Charlene MacArthur.

30.     The Plaintiff was put on Defendants' "hit list" and thereafter began to suffer harassment that he had not previously suffered.

31.     Within two months thereafter, the Plaintiff started receiving warnings for insubordination, "stealing time", was threatened with termination and was subjected to summary suspensions during 2008 and 2009.

32.     Such threats were untrue, unfair and unfounded as the Plaintiff was a valuable and productive employee of the City.

## Fasoli Reports Misuse and Theft of City Property in the Office of Operations

33.     During his employment in the Office of Operations, the Plaintiff observed a pattern of illegal and/or improper activity in the Office of Operations -- matters of public concern which included:

   a.   City workers practice of taking surplus and/or scrap metals that rightfully belong to the City, and to sell the metals for cash and to keep the cash for their own private use;

   b.   City employees in the City's Highways Department, under its then-supervisor Ernest Orgera (now the current Director of the Office of Operations), use of cash from the sale of City's surplus/scrap metals to fund employee parties and events;

   c.   Allowing certain City employees -- including Richard Valentine, the cousin of the City's current Director of Public Safety, Health and Welfare, Robert Valentine -- to illegally use City facilities and equipment for non-City side-jobs;

   d.   Allowing private entities owned and/or operated by relatives of current and/or former managers and/or supervisors -- including former Highway Supervisor, Bob Garber -- to use City equipment for private endeavors;

   e.   Unsafe working conditions in the City of Stamford public works;

   f.   Waste and mismanagement of City resources in the Fleet Maintenance Department, particularly with respect to the sale, purchase and repairs of certain trucks in the City's Fleet;

   g.   Questionable transactions surrounding several used 1996 Mac trucks including

questions as to the succession in ownership of them; the prices paid for those trucks; that the Bill of Sales for the used 1996 Mac trucks appeared incomplete when the Plaintiff first saw them but that they were completed after the Plaintiff complained about it to Mr. Scacco; that some trucks were being junked without going through the proper procedures. (Specifically that the procedure calls for the truck to be auctioned first and that if no one bids on the truck that it then can be sold as scrap metal).

34.     The Plaintiff was acting as a citizen when he spoke out publicly on these matters of public concern and reported these activities to one or more of the following public agencies and / or officers:

      a.   Joseph Tarzia, the Chairman of the City's Board of Finance, and a member of its Operations and Audit Committees;

      b.   Salvatore Gabriele, a member of the City's Board of Representatives, and a member of its Operations and Personnel Committees, and;

      c.   Agents of the Federal Bureau of Investigation.

35.     For example, the Plaintiff reported to Mr. Tarzia that certain used 1996 Mac trucks were being purchased by the City's Department of Operations, and that these trucks were mechanically unsafe and not fit for the road. At the same time, the Department sold 1995 trucks that had considerably less mileage and were in better mechanical condition than the 1996 used Mac trucks.

36.     Several months later, special agents from the FBI came to Vehicle Maintenance and interviewed Art Vanzettor (one of the persons who did vehicle registration paperwork and had signed off as an agent of the City of Stamford on the transfer or sale of City equipment).

7

37.     Upon information and belief, Mr. Vanzettor told Mr. Scacco and his co-workers that Mr. Fasoli was responsible for giving the FBI the information that led to the investigation.

38.     On or about May 19, 2010, the Plaintiff attended a Board of Representatives Operations Committee Meeting at which Mr. Scacco was present.

39.     At the meeting the Plaintiff spoke out against the purchase of the 1996 used Mac trucks by the Department, and stated that these trucks were unsafe and in poor mechanical condition.  The Plaintiff also questioned the bill of sales on these vehicles, and the accuracy of the documents that were submitted to the Operations Committee that evening.

40.     In order to discredit the Plaintiff, and in retaliation for speaking out on matters of public concern, Mr. Scacco presented figures that purported to show that the Plaintiff's work as an equipment mechanic cost the Department more than any other employee.

41.     Mr. Scacco retaliated against the Plaintiff by fraudulently inflating the hourly rate (inflated the Plaintiff's hourly rate from the standard rate used to calculate the cost of work for purposes of monitoring costs) applied to the Plaintiff's time spent working on two vehicles in an effort to discredit the Plaintiff's complaints about the used vehicles that the Department had purchased.

42.     This was done in order to unfairly create the perception that the Plaintiff's work performance was costing the Department more than any of the other employees.

43.     Such alternations were fraudulent and were not done to anyone else in the department.

44.     On or about January 5, 2010, the Plaintiff was re-assigned from his worksite at the McGee Avenue location to the Schofield Park worksite, which was generally understood to be

built on a toxic waste site. This re-assignment was done, *inter alia*, to retaliate, intimidate and silence the Plaintiff from speaking out about waste and mismanagement within the City's Office of Operations, and to move him away from the *situs* of the questionable practices he had theretofore observed.

46.     The Plaintiff's job performance was satisfactory at Scofield Park and the Plaintiff did not have any problems or confrontations with his immediate supervisors at that location.

47.     During the Plaintiff's assignment at Scofield Park he was offered overtime by his immediate supervisor, Randy Hunter. The Plaintiff accepted the overtime, but Scacco vetoed the overtime in retaliation for the Plaintiff speaking out on matter so f public concern.

48.     Conversely, the Plaintiff had been repeatedly offered overtime prior to his transfer to Scofield Park, but he turned down those offers -- because of stress due to the harassment he had been suffering.

49.     On or about April 8, 2010, the Plaintiff informed Representative Gabriele that City employees were throwing out City snowplows and selling City scrap metal.

50.     The Plaintiff had previously reported to Mr. Tarzia and Mr. Gabriele that it was common knowledge in the Office of Operations that funds from the sale of the City's metals were used to pay for private employee parties, and this was done with the knowledge and consent of the former Highways Department Supervisor, Ernest Orgera.

51.     In response to the information provided by the Plaintiff, Representative Gabriele contacted the Plaintiff's supervisor at the time, Michael Scacco, and inquired as to whether he was allowing City employees to throw out the snowplows to be used as scrap metal. This email was copied to many members of the City government, including the Mayor and members of the Board of Finance and Board of Representatives.

51.     In response to Representative Gabriele's inquiry, Mr. Scacco denied any knowledge that snowplows were being thrown out, despite the fact that Mr. Scacco was charged with their maintenance, and blamed another city employee, Doug Hoyt, for allowing his men to throw out the snowplows.

52.     At all pertinent times, the City had an exclusive contract with Rubino Brothers, Inc. (the "Rubino Brothers Contacts") to sell the City's surplus and/or scrap metals.

53.     The Rubino Brothers Contract had been in place since November of 2007, and it was common knowledge among the City employees that the sales of surplus and/or scrap metals must be done through Rubino Brothers.

54.     Also, at all pertinent times, a City ordinance was in effect -- Ordinance § 23-18.13 -- which provided that the City's property, including the surplus and/or scrap metals, cannot be sold without the written authorization of the City's Purchasing Agent.

55.     The snowplows were a valuable municipal asset that can only be sold with the written authorization of the City Purchasing Agent pursuant to Ordinance § 23-18.13, and could only be sold as scrap metal to Rubino Brothers, Inc.

56.     The day after Representative Gabriele wrote Defendant Scacco and other members of City government, Peter Iannaccone, the current Highway Supervisor for the City, turned in $3,149.00 in cash along with receipts showing that the City's employees brought two truckloads with a total of 47.46 tons of scrap metal (comprised of the snowplows) to an unauthorized vender in Norwalk, in clear violation of the City's Ordinance and in violation of the contract with Rubino Brothers, Inc.

57.     The City employees sold the snow plows on April 8, 2010, for $66.35/ton.

58.     The Rubino Brothers Contract provides that Rubino Brothers would have pick up the snow plows at their expense, and pay $165/ton, which would have netted the City $7,830.90, an increase of 148% over what the City employees turned in on April 9, 2010.

59.     The amount of metals sold that day indicates that it required a coordinated effort by several City employees, which could not take place without their supervisor's knowledge.

60.     After looking into the matter, Mr. Tarzia made several comments in the press about the suspicious conduct of the Operations Department's workers.   Specifically, it was revealed that the day after the inquiry was made public thousands of dollars in cash was turned into to the City administration.

61.     According to Mr. Tarzia, the City Purchasing Agent, Peter Privitera, told Mr. Tarzia that this was the first time in his memory such a large amount of cash was turned in to him by City workers.

62.     On April 9, 2010, Mr. Privitera wrote Mr. Orgera and reminded him of the Rubino Brothers contract and the ordinance.

63.     On April 16, 2010, Mr. Tarzia wrote Mr. Orgera and asked him to provide documentation on his department's policy & procedures for disposal of scrap metals including any memos notifying the Operations Supervisors of this policy.

64.     On April 19, 2010, Mr. Orgera responded to Mr. Tarzia by stating that there were no policies or procedures in place, despite the fact that 10 days earlier Mr. Privitera reminded him (if he didn't already know) of the ordinance and Rubino Brother contract.

65.     Mr. Orgera, a long time City employee, the former Supervisor of the Highway Department, and the then-current Director of Operations, response to Mr. Tarzia was misleading, as Mr. Orgera knew of the Rubino Brother Contract and Ordinance § 23-18.13.

66.     The Plaintiff's reporting of the mismanagement, misuse and theft of City assets within the Office of Operations was a political embarrassment to Defendant Orgera, the Director of Operations, and to Mayor Pavia who appointed him.

67.     As a result of the inquiries generated by the Plaintiff's whistle-blowing and the City's employee's suspicious conduct, the Board of Finance voted in May of 2010 to hire an outside auditor to conduct a forensic audit of the Operations Department with respect to the sale of City metals (the "Metals Audit").

68.     The Metals Audit generated significant public notoriety. It was rumored among City employees that the Plaintiff provided the information to the public officials that lead to the Audit.  As a result of these rumors, starting in April 2010, and continuing through October 2010, the Plaintiff became the subject of disparaging remarks by City employees, including over the department's two-way vehicle radio system, calling the Plaintiff a "whistleblower" and a "rat".

69.     Indeed, epithets of "whistleblower" and "rat", and the like, were directed at the Plaintiff on many occasions by City employees after the scrap metal thefts were uncovered publicly.

70.     According to statements made by Mr. Tarzia to the press, the preliminary result of the Metals Audit revealed widespread municipal corruption in the Office of Operations.

71.     Mr. Tarzia also publicly stated his concerns for the safety of the individuals who came forward to help with the Metals Audit, which was a reference to the Plaintiff's involvement, out of concern that the Plaintiff may suffer retaliation.

72.     In May of 2010, shortly after the City' metals scandal was made public, Mr. Scacco filed an ethics complaint against Mr. Tarzia and Mr. Gabriele, *inter alia*, making false claims against them in retaliation for their efforts in bringing the City's Metals scandal to light.

73.     Mr. Scacco claimed in his ethics complaint that Mr. Tarzia's and Mr. Gabriele's requests for information from him with respect to the theft of City metals, and the possible waste and mismanagement in the City's Fleet, were not legitimate public inquiries, but were really a "campaign of harassment" against him.

74.     Mr. Scacco's ethics complaint was filed in retaliation against Mr. Tarzia, Mr. Gabriele, and the Plaintiff, in response to their exposing waste and mismanagement in Mr. Scacco department and the theft of City metals, and to intimidate them, other employees and elected officials from future inquires into his department and the Office of Operations.

75.     Mr. Scacco's ethics complaint also intentionally cast the Plaintiff in a false light in retaliation for the Plaintiff's activities as a whistleblower, and Mr. Scacco intentionally published and/or disclosed to the public portions of the Plaintiff's private personnel files to the Ethics Board without the Plaintiff's knowledge or permission. Such act was an invasion of the Plaintiff's privacy.

76.     As a result of the publicity of the mismanagement in their department and the theft of City surplus/scrap metals, Mr. Scacco and Mr. Orgera conducted a pattern of intimidation and retaliation in order to discourage and /or discredit the Plaintiff. The short term goal of this intimidation and retaliation was to dissuade the Plaintiff from provision testimony should he be called to testify as a witness in the ethics complaint against Mr. Tarzia and Mr. Gabriel.

77.     On October 14, 2010, Mr. Orgera issued an Official Notification of Re-assignment transferring Plaintiff from the Scofield Town Yard to the back to the McGee Avenue

Vehicle Maintenance, in furtherance of their plans to intimidate and retaliate against the Plaintiff as the Plaintiff would now have to report directly to Mr. Scacco again.

79.     On or about November 1, 2010, Plaintiff began his first day of work at McGee Avenue worksite, with Mr. Scacco as his direct supervisor. While the Plaintiff was at the Scofield Town Yard, he did not have any conflicts or problems with his supervisor.

80.     Shortly after his transfer to the McGee Avenue worksite, the Plaintiff was made the subject of intimidation and retaliation within the Department. Such intimidation and retaliation included, but was not limited to:

      a.   Anonymous sexually explicit innuendos were written on the lunchroom white board pertaining to "whistleblowers" and "rats".

      b.   Replica rats were placed on the Plaintiff's toolbox.

      c.   The Plaintiff was called a "rat" by several of his co-workers, on numerous occasions, and in front of the Plaintiff at meetings in which many of Plaintiff's co-workers were present.

      d.   Statement by co-worker Richard Valentine at a union meeting in September 2010 that the Plaintiff should be thrown out of the union because the Plaintiff was a "rat."

81.     As the date for the Ethics Board Hearings against Representative Gabriel approached, the intimidation of the Plaintiff by Mr. Scacco, Ms. Barnes and Mr. Orgera intensified. The Plaintiff was threatened with being terminated and / or suspended without pay for vague accusations of "poor work performance" and for not working while on the clock.

### Fasoli Objects to Nepotism in the Office of Legal Affair's Personnel Division

82.     The Plaintiff also observed the special treatment given to the friends and family of Defendant Tania Barnes, a Human Resources Generalist, the wife of the former Director of Operations, Benjamin Barnes, and a personal friend of Mr. Orgera and Mr. Scacco.

83.     Defendant Barnes is politically connected at both the City and State levels.

84.     Defendant Barnes' husband was named in November 2010 by now Governor Malloy (formerly the Mayor of Stamford until becoming Governor in January 2011) to serve as the Secretary of the Office of Policy and Management in State Government.

85.     In February of 2010, the Plaintiff came to learn that a position opened up for a Traffic Violations Officer (TVO) with Special Police Powers, and was filled on a "provisional" basis by Tania Barnes' brother, George Rodriguez.

86.     Due to the Plaintiff's involvement with his Union, he was aware that any "provisional" hiring for the position was supposed to go to a member of his union under the collective bargaining agreement.

87.     The Plaintiff was also aware that a requirement of the position of a TVO with Special Police Powers was that the employee must possess a state police certificate.

88.     The opening for the TVO position was never made public, and as a result the only person who knew of and applied for the job was Defendant Barnes' brother, George Rodriguez.

89.     Nepotism and favoritism with respect to City employment is a mater of public concern, and the Plaintiff reported this matter to Mr. Tarzia and Mr. Gabriel as elected officials on their Board's respective Operations Committees.

90.     Mr. Tarzia and Mr. Gabriel then publicly called for an investigation of the Personnel Division and its hiring practices under Defendant Larobina, who oversees the Personnel Division as the head of the Official of Legal Affairs.

91.     The City's Board of Finance also commissioned a Hiring Audit of the Personnel Division of the Office of Legal Affairs.

92.     According to public statements made by members of the Board of Finance, the Hiring Audit has since stalled due to a lack of cooperation by Mayor Pavia's administration.

93.     Under Mr. Larobina's direction and supervision, Defendant Barnes' hiring of her brother violated the City Charter, the City Ordinances, the Classified Service Rules and the collective bargaining agreement.

94.     For example, Defendant Barnes violated the 19-5.A of the City's Ethics Code, which prohibits the participation of any City employee in a matter involving a family member.

95.     Defendant Barnes violated the § 19-5.B of the Ethics Code, in that she granted her brother special consideration and treatment, in that he was the only person who knew of the position and applied for the job, and he was hired even though he was not qualified.

96.     Ms. Barnes signed the payroll action form ("PAF") for her brother's hiring as the "personnel director," without prior written approval from the Director of Human Resources, which was a violation of the City Charter, § C5-20-14.

97.     Defendant Barnes participated in the hiring of her bother as a "provisional" employee that according to § C5-20-10(6) of the City Charter, can only be done in cases of an "emergency," and there was no emergency in this case.

98.     Defendant Barnes signed the PAF for her brother as the Personnel Director and certified that it complied with the Charter and all ordinances, when in fact the hire violated the

Classified Civil Service Rules and the collective bargaining agreement, which provide that a union member must work in a "provisional" position.

99.    Defendant Barnes hired her brother for a position that required a state police certificate even though he was not qualified, and it was her responsibility as a Human Resources Generalist to ensure employees had the qualifications for the position.

100.    As part of Mr. Tarzia's investigation into nepotism and Mr. Rodriguez's hiring, on April 19, 2010, the Administrative Staff for the Board of Finance asked for and received a copy of Mr. Rodriguez's PAF directly from the City's Office of Policy and Management (OPM).

101.    The version of the PAF received by the Board of Finance on April 19, 2010 was signed by Defendant Barnes as the "Personnel Director" on January 27, 2010, and was also signed by a member of the OPM's staff on January 29, 2010.

102.    On about April 20, 2010, Joseph Tarzia wrote the Acting Director of Personnel Division, Defendant Larobina, and called for an investigation into the hiring of George Rodriguez and nepotism generally in the Human Resources Department.

103.    The next day, April 21, 2010, Mr. Tarzia received a different copy of George Rodriguez's PAF, but this one was from the Human Resources Department (which was under Defendant Larobina's supervision), and was back-dated by Defendant Larobina to make it appear that his signature was there "as of" January 28, 2010, which could not be the case since the copy of the PAF received two days earlier from the OPM showed that Defendant Larobina's signature was not there on January 29, 2010.

104.    Defendant Larobina's back-dated signature was an apparent effort to cover up the illegal hiring of Mr. Rodriquez by Defendant Larobina's Personnel Department, and in order to avoid the controversy with respect to nepotism in the Human Resources Department that was

created when the Plaintiff brought this issue to the public's attention through Mr. Tarzia and Mr. Gabriele.

104.    During a public hearing in an ethics complaint against Joseph Tarzia brought by Defendant Barnes, she testified that she had nothing to do with her brother's hiring.

105.    Upon information and belief, information which is now public record, including subsequent articles published by the Stamford Advocate, showed this to be false.

106.    Defendant Barnes also testified that she had the authority under the Charter to sign the PAF for her brother.  Subsequent public statement by the current Director of Human Resources, Emmet Hibson, to the Board of Representatives showed this testimony to be false.

107.    On or about Wednesday, March 16, 2011, a Stamford Advocate reporter contacted Defendant Barnes to ask questions about her involvement in the hiring of her brother.

108.    The next morning, on or about Thursday, March 17, 2011, a plastic replica of a rat was placed on the Plaintiff's toolbox in a clear effort to harass and intimidate the Plaintiff.

109.    As a result of publicly calling for investigation into nepotism in the Human Resources Department, Barnes and Larobina were political enemies of Tarzia and Gabriel.

110.    Defendants Barnes and Larobina regarded the Plaintiff as a political ally of both Tarzia and Gabriel, and as such had political animus against the Plaintiff.

111.    The exposure of the nepotism in the Human Resources Department by the Plaintiff caused political embarrassment to Defendant Larobina, and to Mayor Pavia, who appointed Mr. Larobina to be the Director or the Office of Legal Affairs.

112.    As a result of the extreme emotional and physical stress caused by the continuing pattern of retaliation and harassment, the Plaintiff took a sick-day on Friday, March 18, 2011.

114.     The following Monday morning, March 21, 2011, without any prior notice, the Plaintiff was summoned into Defendant Scacco's office, where he was confronted by Defendants Barnes and Scacco.  This was in direct response to the inquires made by the Stamford Advocate and in retaliation for the Plaintiff's "whistleblowing" with respect to the nepotism in the Personnel Division,  the misuse and theft of City property and the sexual harassment of female coworkers within the Office of Operations.

115.     To the Plaintiff's knowledge this was the first and only time that a Human Resources Generalist (ie. Defendant Barnes) came to the City garage as part of employee's discipline, and it could not have taken place without the knowledge and support of Ms. Barnes' supervisors (including Defendant Larobina), and this was the direct result of the media's recent investigation into the illegal hiring of Ms. Barnes brother that the Plaintiff brought to light.

116.     The meeting was also called as a pretext to intimidate and /or discredit the Plaintiff before testifying at Representative Gabriel's upcoming ethics hearing.

117.     Defendants Barnes' and Mr. Scacco's tone at the meeting was abusive and menacing, and they wrongly accused the Plaintiff of failing to perform his job, and threatening more unjustified discipline. Defendant Scacco also falsely claimed that the Plaintiff was not working for an hour.

118.     As a result of Defendant Barnes and Defendant Scacco's abusive language, untrue allegations and harassing demeanor, the Plaintiff became ill, dizzy, had trouble breathing, and felt pain in his chest.

119.     The Plaintiff tried to leave, but believing that he was having a heart attack, Emergency Medical Services were called and the Plaintiff was brought to Stamford Hospital where he underwent diagnostic testing to determine whether he was having a heart attack.  The

Plaintiff was subsequently diagnosed with having an anxiety attack, which was directly caused by the belligerent actions of Defendants Barnes and Scacco.

120. The Plaintiff was confined to the hospital the entire rest of the day and was not released until the early afternoon of March 22, 2011.

121. After being released from the hospital on March 22, 2011, the Plaintiff did not return to work but returned home due to his recent hospitalization.

122. On March 24, 2011 Defendant Scacco, Fleet Manager, issued a pre-disciplinary notice to the Plaintiff for a hearing that would take place on March 30, 2011.

123. Defendant Scacco and gave the Plaintiff a pre-disciplinary notice because he failed to call in sick on March 22, 2011, when Defendant Scacco and the City's Personnel Division, including Defendant Barnes and Defendant Larobina, knew that the Plaintiff had been hospitalized the day before for an apparent heart attack.

124. The pre-disciplinary notice given to the Plaintiff falsely alleged violations of the time and attendance policy and for poor work performance.

125. On April 14, 2011, Defendant Scacco issued a five (5) day suspension for failing to come into work on March 22, 2011, when Defendant Scacco knew that the Plaintiff had been picked up from work by an ambulance and had been taken to the emergency room on March 21, 2011.

126. Although the Plaintiff had time left for personal and sick days, his salary was deducted for the day he went to the hospital, and for doctor's appointment(s) thereafter.

**Fasoli Suffers Continued Harassment in an Effort to Intimidate Him And Such Wrongful Acts Have Caused Him Harm**

127. The pattern of harassment against the Plaintiff continues to the present.

128.    Indeed, in a clear effort to, *inter alia*, prevent the Plaintiff from providing testimony at the ethics hearing regarding Sal Gabriel, the intensity of harassment against the Plaintiff has increased in both severity and number since he was first singled out by the Defendants.

129.    The pattern of harassment, personal attacks, intimidation and flagrant disregard of the Plaintiff's rights by the Defendants, have caused the Plaintiff undue stress, anxiety and depression, resulting in the Plaintiff's seeking professional medical treatment and care on a regular basis -- treatment which he did not require previously.

130.    The pattern of harassment, personal attacks, intimidation and flagrant disregard of the Plaintiff's rights by the Defendants have caused the Plaintiff undue stress, anxiety and depression, resulting in the Plaintiff receiving treatment, including medications, which he did not require previously.

131.    The Defendants City and Larobina are responsible for the improper handling of the Plaintiff's personnel file, including public access to documents revealing personal medical information, confidential communication regarding the Plaintiff's well being, and treatment. The unauthorized disclosure of personal medical information and treatment pertaining to the Plaintiff is in violation of HIPPA. The Plaintiff's personnel file has intentionally and purposefully been left in a common area of the Stamford Municipal building for several weeks and at present is ongoing. The Plaintiff's Counsel has been contacted by the Stamford Advocate after a reporter accessed said documents in a publicly accessible area of the Stamford Municipal building.

132.    In violation of City regulations, Defendant Scacco has maintained a separate file on the Plaintiff in part and parcel to his harassment and retaliation of the Plaintiff. A copy of the same eventually made its way into the official personnel file of the Plaintiff and as such casts the

Plaintiff in a false light because Defendant Scacco's self-serving documents received absolutely no review by the City's Human Resources or Legal Department.

133.    After commencement of this suit, the pattern of harassment has not only continued, it has accelerated in frequency and intensity.

134.    On or about June 16, 2011, Defendant Scacco concocted a scheme to discipline the Plaintiff. On a brake repair job, the Plaintiff conferred with Defendant Scacco about use of a brake pad that had been cleaned after grease got on it. In compliance with procedure, the pad was cleaned, and the Plaintiff confirmed with Defendant Scacco that he would proceed using that part. After the Plaintiff left work, Defendant Scacco proceeded to gather false evidence and witnesses in order to frame the Plaintiff for improperly using a defective part (the cleaned brake pad).

135.    On June 27, 2011, a pre-disciplinary hearing was held with Director of Human Resources Emmett Hibson, who heard testimony on the alleged disciplinary action. During that hearing it was revealed that Defendant Scacco had lied about not knowing the use of the cleaned brake pads, and had concocted a scenario to create a disciplinary action against the Plaintiff.

136.    No discipline or other resolution had been made since the June 27, 2011 pre-disciplinary hearing.

137.    Due to the wrongful acts of the various Defendants the Plaintiff has been severely harmed emotionally, thus causing him great pain and suffering. Such acts have compelled the Plaintiff to seek medical advice and treatment which he did not need previously, and has been prescribed medication where he did not need previously.

138.    Due to the wrongful acts of the various Defendants the Plaintiff's ability to eventually seek employment elsewhere has been negatively affected.

139.    Due to the wrongful acts of the various Defendants, the Plaintiff, a private person, has been defamed.

### Count One: 1983 First Amendment Retaliation for Exercise of Free Speech

The Plaintiff re-alleges and incorporates Paragraphs 1 through 139 as if more fully set forth herein.

140.    As a result of the Plaintiff's whistleblowing activity, the Plaintiff was retaliated against by the Defendants.

141.    Under controlling law, liability for conspiracy to violate § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

142.    Defendants Mr. Scacco and/or Mr. Orgera conspired to violate the Plaintiff's rights from 2009 and afterwards, up until the present, in violation of 42 USC §1983. Part and parcel to the pattern of harassment, the Plaintiff was wrongly accused, on multiple occasions, of poor work performance.

143.    The Plaintiff was exercising his right of free speech on matters of public concerns with respect to:

a.   The sexual harassment of a female coworker.

b.   Nepotism and favoritism with respect to employment in the City's Human Resources Department and Office of Operations;

    c.   The theft of City metals by its employees in violation of the City ordinances and the City's contract with Rubino Brothers, Inc.;

    d.   Illegal use of City facilities and equipment by City employees and/or their relatives and/or friends for private purposes;

    e.   Waste and mismanagement in the City's Fleet Maintenance Department.

    f.   Anticipated testimony in either the Gabriel or Tarzia Board of Ethics hearings on the question of whether the Plaintiff ever went to either of them to request that they intervene on his behalf.

    144.   The Defendants, Michael Scacco and/or Ernest Orgera, who were the Plaintiff's most immediate supervisors, and are agents/employees of the City, violated the Plaintiff's clearly established right to free speech, in retaliation for the Plaintiff's statements on matters of public concern and reporting these concerns to public agencies, elected officials and the Federal Bureau of Investigation, when they:

    a.   Refused to allow him to participate in Union grievance hearings for co-workers;

    b.   Engaged in a incessant pattern of harassment and intimidation, in that they:

        i.   Falsely accusing the Plaintiff of:

            1.   Insubordination;

            2.   Improperly taking coffee breaks;

            3.   Poor work performance;

            4.   Failing to work productively and complete assignments on time;

            5.   Improperly invoking his rights as a member of the union, and;

            6.   "Stealing time";

        ii.   Disciplined the Plaintiff without just cause;

iii.   Wrongly suspended the Plaintiff from work without pay;

iv.   Treated the Plaintiff in a disparate way when compared to his coworkers in that the Defendants imposed punishment in excess of that given to co-workers, created work requirements that the Plaintiff must follow that were not imposed on his coworkers, and altered the rate at which the Plaintiff's work was billed;

v.   Gave co-workers preferential treatment and more desirable assignments;

vi.   Involuntarily transferred the Plaintiff to work in City yard thought to be a toxic waste dump, when no other mechanics have ever been sent there against their will;

vii.   Created and fostered an atmosphere of intimidation and harassment when they allowed City employees to engage in the following acts without discipline from their supervisors:

1.   City employees, when expressly referring to the Plaintiff, called him a "rat";

2.   City employees would speak at meetings in front of the Plaintiff and his co-workers and supervisors, and when looking directly at the Plaintiff would refer to the "rat in the shop";

3.   City employees referred to the Plaintiff in disparaging ways over the City's two-way radio system, which reaches the entire Office of Operations, and publicly stated that they blamed him for the fact that they could not use the money from the theft of the City's metals to fund their private parties;

25

    4.  City employees wrote on a white board where the Plaintiff worked that there was a "Rat" in the department and made a sexual innuendo, and the Plaintiff reasonably understood that they were referring to him;

    5.  On several occasions City employees left plastic rats on the Plaintiff's tool box;

    6.  City employees have created a hostile work environment that has caused the Plaintiff extreme emotional and physical distress.

  c.  Failed to protect the Plaintiff from harassment by others.

145.    In retaliation for the Plaintiff's engaging in free speech on matters of public concern, the Defendants, Michael Scacco, as the Fleet Maintenance Supervisor, Ernest Orgera, as the Director of Operations, Michael Larobina, as the head Office of Legal Affairs Personnel Division, and Tania Barnes, as a Human Resources Generalist in the Personnel Division, were all aware of the retaliatory acts against the Plaintiff, had a duty to protect him from this illegal harassment and retaliation, yet ignored his complaints, failed to discipline the City employees involved, and / or encouraged the aforesaid conduct, and / or participated in the aforesaid conduct, and purposefully failed to conduct an investigation in to the Plaintiff's complaints, as a result of, and in retaliation for, the Plaintiff's "whistleblowing" actions. As such, all these Defendants conspired to violate the Plaintiff's rights in violation of, *inter alia*, 42 USC §1983.

146.    In fact, Mr. Scacco openly mocked the Plaintiff by claiming that he had put the plastic rats on the Plaintiff's toolbox himself.

147.    Mr. Scacco also openly displayed the rats in the window of his office overlooking where the Plaintiff worked, in an obvious effort to continue to harass and intimidate the Plaintiff

and encourage the Plaintiff's co-workers to do the same.

148.    Defendants Barnes (and her supervisor, Defendant Larobina) and Scacco also violated the Plaintiff's clearly established right to free speech when, in retaliation for the Plaintiff's statement on matters of public concern, they confronted him in the City garage on or about March 21, 2011, and threatened him with unjustified punishment, which caused him to suffer severe emotional and physical stress.

149.    The Plaintiff brought to the attention of the City, including the City's Human Resources Department, the pattern of harassment by, and the menacing tone of, his co-workers. The Plaintiff's complaints were ignored.

150.    Pursuant to § C5-20-7, Defendant Larobina is responsible for enforcing the "City of Stamford and Stamford Board of Education ZERO TOLERANCE WORKPLACE VIOLENCE POLICY" (the "Anti-Violence Policy").

151.    The Anti-Violence Policy provides that "[t]he City/Board will not tolerate any acts of violence committed by or against City/Board employees, or members of the public, while on City of Stamford/Board of Education property or while performing City of Stamford/Board of Education business at other locations. The City values its employees and with this Policy the City and Board affirm their commitment to providing a workplace that is free from potential violence."

152.    The Anti-Violence Policy defines "violence" in part as:

    a.  Focused on a grudge, grievance, or romantic interest in another person, and reasonably likely to result in harm or threats of harm to persons or property;

    b.  Consists of a communicated or reasonably perceived threat to harm another individual or in any way endanger the safety of an individual;

    c.  Would be interpreted by a reasonable person as conveying potential harm to the individual;

    d.  Is a behavior, or action, that a reasonable person would perceive as menacing;

153.   The aforementioned treatment of the Plaintiff by his coworkers and Supervisors violated the Anti-Violence Policy, as it was focused on a grudge caused by his whistle-blowing, was reasonably perceived as a threat to harm and was perceived as menacing.

154.   In retaliation for the Plaintiff's engaging in free speech on matters of public concern, and due to their personal and political animus caused by the political embarrassment created by the Plaintiff's whistle-blowing, the Defendants, Michael Scacco, as the Fleet Maintenance Supervisor, Ernest Orgera, as the Director of Operations, Michael Larobina, as the head Office of Legal Affairs its Personnel Division, and Tania Barnes, as a Human Resources Generalist in the Personnel Division, were personally in the unconstitutional retaliation against Plaintiff in that they were:

    a.  Aware of the retaliatory acts against the Plaintiff, had a duty to protect him from this illegal harassment and retaliation, yet ignored his complaints;

    b.  Purposefully failed to conduct an investigation in to the Plaintiff's complaints;

    c.  Failed to remedy a wrong after being informed through a report or appeal;

    d.  Failed to discipline the City employees involved;

    e.  Failed to act on information indicating that unconstitutional acts were occurring;

    f.  Encouraged the aforesaid conduct, created an atmosphere where such conduct was condoned and/or and acquiesced to the conduct by their silence, and;

    g.  Were grossly negligent in supervision of subordinates who harassed the

Plaintiff.

155.    The aforementioned acts and omissions of the Defendants, Mr. Scacco, Mr. Orgera, Mr. Larobina, and Ms. Barnes, constituted an adverse employment action against the Plaintiff, and such conduct was motivated by evil motive or intent, and/or showed a reckless or callous indifference to the federally protected rights of others

156.    The Plaintiff's speech on the matters of public concern was a substantial or motivating factor in the adverse employment action he suffered.

### Count Two: Violation of Conn. Gen. Stat § 31-51q Against Municipal Defendant

The Plaintiff re-alleges and incorporates Paragraphs 1 through 156 as if more fully set forth herein.

157.    Conn. Gen. Stat. § 31-51q provides that an employer who subjects an employee to discipline on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or Sections 3, 4 or 14 of Article First of the Constitution of this State shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

158.    The City violated the Plaintiff's state law rights under Conn. Gen Stat. § 31-51q, when they subjected him to the aforementioned pattern of harassment and discipline on account of his exercise of rights guaranteed by the First Amendment to the United States Constitution and/or section 3, 4 or 14 of the Constitution of the State of Connecticut.

159.    As a result of the City's retaliation against the Plaintiff for engaging in free speech, the Plaintiff has suffered losses, harm and damages.

**Count Three: Violation of Conn. Gen Stat. § 31-51m Against Municipal Defendant**

The Plaintiff re-alleges and incorporates Paragraphs 1 through 159 as if more fully set forth herein.

160.    Conn. Gen. Stat. § 31-51m provides that no employer shall discharge, discipline or otherwise penalize any employee because the employee, reports a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action. This prohibition also applies to municipal employers.

161.    The pattern of retaliation and harassment of the Plaintiff by the City as detailed above constitutes a violation of Conn. Gen Stat. § 31-51m.

162.    Said retaliation and harassment has caused the Plaintiff damages.

163.    Upon information and belief, the Plaintiff has exhausted administrative remedies.

164.    Additionally, under Conn. Gen Stat. § 31-51m, the Plaintiff is entitled to an award of reasonable attorneys fees in connection with this action.

**Count Four: Retaliation Under Title VII Against Municipal Defendant**

The Plaintiff re-alleges and incorporates Paragraphs 1 through 164 as if more fully set forth herein.

165.    The aforementioned adverse employment actions were a result of the Plaintiff's engaging in protected activity under Title VII in defense of his female co-workers, and as a result the Plaintiff suffered adverse and material change in the terms and conditions of his employment as described above, to the point where the City's actions could well dissuade a reasonable worker from making or supporting a charge of discrimination.

166.    As result of this illegal conduct, the Plaintiff has suffered losses, harm and damages.

167.    The Plaintiff seeks compensatory and punitive damages as a result of City's unlawful conduct.

## Count Five: State Law Retaliation Under Conn. Gen. Stat. § 46a-60(a)(4) Against Municipal Defendant

The Plaintiff re-alleges and incorporates Paragraphs 1 through 167 as if more fully set forth herein.

168.    The City violated the Plaintiff state law rights under Conn. Gen. Stat. § 46a-60-(a)(4) when, as a result of his engaging in protected activity in defense of his female co-workers, the Plaintiff suffered adverse and material change in the terms and conditions of his employment as described above, to the point where the City's actions could reasonably be anticipated to dissuade a reasonable worker from making or supporting a charge of discrimination.

169.    As result of this illegal conduct, the Plaintiff has suffered losses, harm and damages.

170.    The Plaintiff seeks compensatory and punitive damages as a result of City's s unlawful conduct.

## Count Six: Violation of ADEA for Retaliation Against Municipal Defendant

The Plaintiff re-alleges and incorporates Paragraphs 1 through 170 as if more fully set forth herein.

171.    The Plaintiff, age 66, was a member of the protected class of age.

172.    The Plaintiff was qualified for the position he held at Defendant the City of Stamford.

173.    The Plaintiff worked successfully at The City of Stamford for over five (5) years.

174.    Mr. Scacco, the Plaintiff's direct supervisor, was approximately ten (10) years younger than Plaintiff.

175.    The City's employees would harass and ridicule Plaintiff, singling Plaintiff out because of his age.

176.    The City disciplined Plaintiff and entered false accusations into the Plaintiff's personnel file, that the Plaintiff was not satisfactorily performing his job, in order to harass the Plaintiff.

177.    On more than one (1) occasion, the Defendants knowingly created and published incorrect disciplinary records that falsely reflect poorly on Plaintiff's performance.

178.    Defendant Michael Scacco prohibited Plaintiff from working over time hours because of his age.

179.    All the above actions were part of an artifice and scheme to terminate Plaintiff's employment because of his age.

180.    The Plaintiff protested what he viewed as age discrimination by his employer by complaining to his supervisor and to the City's Human Resources Department.

181.    On August 25, 2009, the Plaintiff filed a complaint with the CHRO regarding the basis for this Complaint.

182.    Mr. Scacco manufactured inaccurate reports in an attempt to set the perception that Plaintiff's performance was lacking in its response to the CHRO.

183.    After the filing of his complaint with the CHRO, the Plaintiff's work environment

had worsened, and the pace and severity of the harassment against the Plaintiff by the Defendants.

184.     The City failed to remedy, address or correct the retaliation, and instead worsened its treatment of the Plaintiff.

185.     The Plaintiff was subjected to discrimination due to his opposition of the Defendant's aforementioned conduct.

186.     This conduct is in violation of the ADEA.

187.     As a result of this on-going harassment, the Plaintiff has suffered and will continue to suffer damages including but not limited to, economic damages as well as, emotional, physical and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

188.     The Plaintiff seeks compensatory and punitive damages as a result of City's unlawful conduct.

## Count Seven: Age Discrimination In Violation of Federal Law Against Municipal Defendant

The Plaintiff re-alleges and incorporates Paragraphs 1 through 188 as if more fully set forth herein.

189.     Under the ADEA, 29 U.S.C. § 623(a)(1), it is unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

190.     The Plaintiff is 66 years old, and is therefore within the class of those protected by

the ADEA.

191.    The Plaintiff was and is qualified for the job he has held with the City, and currently holds with the City.

192.    Mr. Scacco, the Plaintiff's immediate supervisor, is approximately ten (10) years younger than the Plaintiff.

193.    The Plaintiff has suffered repeated adverse employment actions.

194.    Defendants, including Mr. Scacco, have harassed, intimidated and ridiculed, and treated him differently because of his age.

195.    Mr. Scacco created false performance reports on the Plaintiff because of his age.

196.    Defendants, including Mr. Scacco, have made false statements regarding the Plaintiff because of his age.

197.    Defendants, including Mr. Scacco, have unreasonably refused the Plaintiff's request for overtime because of his age.

198.    The Defendants have refused to promote the Plaintiff due to his age when, *inter alia*, his application for the position now held by Mr. Scacco was ignored.

199.    In addition to the various efforts at retaliation and intimidation of the Plaintiff, circumstances surrounding these events give rise to an inference of age discrimination as the Plaintiff was by far the oldest employee in the department, that he has been singled out for mistreatment, that his work was fraudulently calculated at a rate higher than all other employees in the department, and that, in part due to his age, the Defendants believed that the Plaintiff was an easy target for intimidation.

200.    The Plaintiff has suffered adverse employment actions as a result of the age

discrimination he suffered in that he was transferred to a toxic waste site.

201.   All of the above actions were part of an artifice and scheme to terminate the Plaintiff's employment because of his age.

202.   Such behavior is in violation of the ADEA.

203.   As a result of this ongoing harassment, the Plaintiff has suffered and will continue to suffer, damages including but not limited to economic damages as well as emotional, physical and psychological distress, stress, anxiety and the loss of the ability to enjoy life's pleasures and activities.

204.   As a result of the foregoing conduct, the Plaintiff seeks compensatory and punitive damages due to the City's unlawful conduct.

**Count Eight: Age Discrimination In Violation of State Law Against Municipal Defendant**

The Plaintiff re-alleges and incorporates Paragraphs 1 through 204 as if more fully set forth herein.

205.   The Plaintiff, at the age of 66, was a member of the protected class.

206.   The Plaintiff was qualified for the positions he held with the City.

207.   The Plaintiff worked successfully with the City for several years.

208.   Mr. Scacco, the Plaintiff's direct supervisor, was approximately ten years younger than the Plaintiff.

209.   Defendants, including Mr. Scacco, have harassed, intimidated and ridiculed, and treated him differently because of his age.

210.   Mr. Scacco created a false performance report on the Plaintiff because of his age.

211.   Defendants, including Mr. Scacco, have made false statements regarding the

Plaintiff because of his age.

212.    Defendants, including Mr. Scacco, have unreasonably refused the Plaintiff's request for overtime because of his age.

213.    The Defendants have refused to promote the Plaintiff, *inter alia*, due to his age when his application for the position now held by Mr. Scacco was ignored.

214.    Moreover, the Plaintiff scored as good, or better, than Mr. Scacco on the civil service exam, and yet the Plaintiff was passed over for the position regardless.

215.    All of the above actions were part of an artifice and scheme to terminate Plaintiff's employment because of his age.

216.    Such behavior is in violation of Conn. Gen. Stat. 46a-60(a)(1).

217.    As a result of this ongoing harassment, the Plaintiff has suffered and will continue to suffer, damages including but not limited to economic damages as well as emotional, physical and psychological distress, stress, anxiety and the loss of the ability to enjoy life's pleasures and activities.

218.    As a result of the foregoing conduct, the Plaintiff seeks compensatory and punitive damages due to the Defendants' unlawful conduct.

**Count Nine: Invasion of Privacy Against the Municipal Defendant and Defendant Scacco**

The Plaintiff re-alleges and incorporates Paragraphs 1 through 218 as if more fully set forth herein.

219.    The disclosure of portions of the Plaintiff's personnel file, without prior notice to the Plaintiff, and the information contained therein, was highly offensive to the Plaintiff, and would likewise be found offensive to a reasonable person.

220.   The Plaintiff has a protected interest in keeping his personnel files private, and the Defendants Scacco and the City violated that interest when they published portions of the Plaintiff's personnel files without his knowledge or permission.

221.   The Defendants Scacco and the City had a duty not to disclose the Plaintiff's personnel file for dissemination to the public, and they violated that duty when they published portions of the Plaintiff's personnel files without his knowledge or permission.

222.   The information contained in the Plaintiff's personnel file was not, and is not, of legitimate concern to the public.

223.   As a result of the foregoing conduct alleged in this Complaint, the Plaintiff has suffered and will continue to suffer damages including but not limited to emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

**Count Ten: Intentional Infliction of Emotional Distress Against All Defendants**

The Plaintiff re-alleges and incorporates Paragraphs 1 through 223 as if more fully set forth herein.

224.   The Defendants' conduct was intended to inflict emotional distress and/or they knew or should have known that emotional distress was the likely result of their conduct.

225.   The Defendants' conduct was extreme and outrageous.

226.   The Defendants' conduct was the cause of the Plaintiff's distress.

227.   The emotional distress sustained by the Plaintiff was severe.

228.   As a result of the foregoing conduct alleged in this Complaint, the Plaintiff has suffered and will continue to suffer damages including but not limited to emotional and

psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

**Count Eleven: Indemnification by the City for Damages Caused by Individual Defendants Conn. Gen Stat. §§ 7-101a and 7-465**

The Plaintiff re-alleges and incorporates Paragraphs 1 through 228 as if more fully set forth herein.

229.    The City is obligated to compensate the Plaintiff for the losses, damages and harm caused by the City's employees and the individual Defendants as set forth herein by operation of Conn. Gen. Stat. §§ 7-101a and/or 7-465.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff claims judgment against the Defendants as follows:

1.    A judgment declaring that the Defendants retaliated against the Plaintiff in violation of 42 U.S.C § 2000e et seq.; Conn. Gen. Stat. § 46a-60 et seq., and § 31-51q;

2.    A money judgment representing compensatory damages, including back pay, front pay and interest;

3.    A money judgment urged in punitive damages for willful violations of the Civil Rights Act of 1964;

4.    A money judgment representing punitive damages for violation of Plaintiff's First Amendment rights pursuant to 42 U.S.C. §1983;

5.    A money judgment representing punitive damages for willful violations of  § 31-51q;

6.      A money judgment to recoup any tax loss suffered by the Plaintiff as result of receiving a lump sum award of back and front pay rather than having received wages over a period of time;

7.      An award of the Plaintiff's reasonable attorney fees, and the costs of this action;

8.      Such other relief as this Court should consider fair and equitable.

**CLAIM FOR TRIAL BY JURY**

The Plaintiff claims trial by jury of the issues in this case.

Please enter the appearance of the undersigned on behalf for the Plaintiff, James Fasoli, in the above captioned matter.

Dated: July 22, 2011

The Plaintiff, James Fasoli

Richard N. Freeth (CT26253)
Freeth & Clay, LLP
1 Atlantic Street, Suite 320
Stamford, CT 06901
Phone: (203) 569-2020
Fax:    (203) 569-2039
Email: rfreeth@freethfirm.com