UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JAMES FASOLI,** | **:** | |
| | **:** | **CIVIL NO.** |
| **Plaintiff,** | **:** | **3:11-CV-00767 (CSH)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **CITY OF STAMFORD, et al.,** | **:** | |
| | **:** | **November 20, 2013** |
| **Defendants.** | **:** | |

**DEFENDANT MICHAEL SCACCO'S MEMORANDUM OF LAW IN**

**SUPPORT OF SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.   STATEMENT OF FACTS ................................................................................................ 1

   A.   Background Facts ............................................................................................... 1

   B.   Difficulties With James Fasoli Prior to Scacco's Hiring ................................ 3

   C.   Difficulties With Fasoli – 2008-2009 .............................................................. 4

   D.   Joseph Tarzia Intervenes to Get Fasoli Transferred ................................... 16

   E.   Difficulties With Fasoli After He Returns to Fleet Maintenance: .............. 17

   October 14, 2010 – July 2011 ................................................................................. 17

   F.   Fasoli Made Good On His Promise to Bury Scacco in Grievances ........... 24

   G.   Fasoli's Contentions About Protected Activities ........................................ 25

      1.   Plaintiff's Allegations Regarding Sexual Harassment of a Female Co-Worker ...... 25

      2.   Plaintiff's Allegations Regarding Scrap Metal Issues .................................. 27

      3.   The Purchase of the Six Used Trucks in November 2008 ............................. 28

      4.   Plaintiff's Allegations Regarding Nepotism In The Personnel Division .............. 35

      5.   Mr. Scacco's Ethics Complaint ....................................................................... 35

II.   DISCUSSION .............................................................................................................. 38

   A.   Standard of Review on a  Motion for Summary Judgment ....................... 38

   B.   First Amendment Retaliation for Exercise of Free Speech (Count One)................ 39

      1.   Plaintiff's Alleged Speech is Not Subject to First Amendment Protection ......... 39

      2.   A Public Employee's Speech is not Protected by the First Amendment when his Speech is not a Matter of Public Concern ..................................................... 40

      3.   The City of Stamford's Interest in the Efficient Fulfillment of its Responsibilities to the Public Outweigh Plaintiff's Interest in Freely Speaking his Mind on a Matter of Public Concern ............................................................................................... 42

      4.   Plaintiff Can Demonstrate No Causal Connection Between Any of His Speech and Any of the Alleged Retaliatory Conduct ........................................................... 44

      5.   Scacco is Entitled to Qualified Immunity .................................................... 50

   C.   Invasion of Privacy (Count Nine) ................................................................. 52

      1.   The Connecticut Personnel Files Act, Conn. Gen. Stat. §31-128f Does Not Provide For a Private right of Action ........................................................................ 53

      2.   Plaintiff's Claim for Invasion of Privacy ..................................................... 53

   D.   Intentional Infliction of Emotional Distress (Count Ten) ......................... 57

      a.   Legal Standard ................................................................................................ 57

**b.** **The Undisputed Factual Allegations in the Instant Case Fall Short of the Legal Threshold to Bring a Claim of Intentional Infliction of Emotional Distress**...................................................64

**c.** **Plaintiff's Intentional Infliction of Emotional Distress Claim is Precluded by His Collective Bargaining Agreement**....................................................................................................66

**III.** **CONCLUSION**...........................................................................................................................69

# TABLE OF AUTHORITIES

## Cases

*Siena v. Aetna, Inc.*, 2006 Conn. Super LEXIS 2614, CV040832550S (Conn. Super. Ct. Aug, 29, 2006).................................................................................................................................... 54

*Ackiefi v. Town of Bloomfield*, 2007 Conn. Super. LEXIS 395 (Conn. Super. Ct. Feb. 9, 2007) 56

*Alexandru v. Dowd*, 79 Conn. App. 434 (2003) ................................................................ 57, 69

*Andino v. Fischer*, 698 F. Supp. 2d 362 (S.D.N.Y. 2010) .......................................................... 46

*Appleton v. Board of Education*, 254 Conn. 205 (2000) ................................................ 62, 64, 65

*Armstead v. Stop & Shop Cos.,* No. 3:01 CV 1489(JBA), 2003 WL 1343245 at *4-5 ............... 67

*Avitable v. 1 Burr Road Operating Company II, LLC*, No. FSTCV095012806S, 2010 WL 2926242 (Conn. Super Ct. June 4, 2010) .......................................................................... 67

*Brink v. Muscente*, 2013 U.S. Dist. LEXIS 137880 (S.D.N.Y. Sept. 25, 2013).......................... 47

*Carbone v. Diez*, 2011 Conn. Super. LEXIS 3129, at *28 ......................................................... 57

*Carone v. Mascolo*, 3:06CV01094(DJS), 2007 WL 2318818 (D. Conn. Aug. 14, 2007)............ 68

*Colona v. Baron Institute of Technology, Inc.*, No. HHDCV094042637S, 2011 WL 590880, (Conn. Super. Ct. Jan. 26, 2011) ........................................................................... 65, 66

*Connick v. Myers*, 461 U.S. 138, n 7 ...................................................................................... 40

*Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2000)..................................................... 47

*Day v. Seacorp*, 2002 Conn. Super LEXIS 2744, CV 550385 (Conn. Super. Ct. Aug. 13, 2002) ................................................................................................................................ 54, 58

*Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004) ................................................................ 45

*Diorio v. Waterbury Hosp., Inc.*, 2007 WL 2080305 (Conn. Super. Ct.  2007)........................... 63

*Dollard v. Bd. of Educ.,* 63 Conn. App 550, 554 (2001) ............................................................ 62

*Dollard v. Board of Education of the Town of Orange*, 63 Conn. App 500 (2001) .............. 64, 65

*Edwards v. Horn*, 2012 U.S. Dist. LEXIS 30968 (S.D.N.Y. 2012) ............................................ 46

*Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) ................................................................ 52

*Gagnon v. Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 847 (2006)... 60

*Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ................................................................ 39, 40

*Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 131 (1982)....................... 55

*Handler v. Arends*, 1995 Conn. Super. LEXIS 660, at *28 (Conn. Super. Ct. 1995) ........... 58, 59

*Honon v. Dimyan*, 52 Conn. App. 123, 132-33, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999) ............................................................................................................... 55, 57

*Weintraub v. Board of Educ.*, 593 F. 3d 196, 205 (2d Cir. 2010)............................................... 40

*Johnson v. Cheseborough-Pond's USA Co.,* 918 F. Supp. 543, 551 (D. Conn. 1996) ................. 68

*Kelley v. Bonney*, 221 Conn. 549, 566  (1992) ......................................................................... 56, 57

*Little v. Yale*, 92 Conn. App. 232, 239-40, 884 A. 2d 427 (2005), *cert. denied* 276 Conn. 936, 891 A. 2d 1(2006). ....................................................................................................... 63

*Peluso v. Town of Greenwich*, No.FSTCV226011270S, 2012 Conn. Super. LEXIS 3058, 2012 WL 6846546, at *9 (Conn. Super. Ct. Dec. 14, 2012)......................................................... 72

*Perodeau v. City of Hartford*, 259 Conn. 729 (2002) .................................................. 61

*Peytan v. Ellis* 200 Conn. 243, 253 (1986) ............................................................... 60

*Pickering v. Board of Ed. of Township H.S. Dist. 205, Will County*, 391 U.S. 563, 568-69 (1968) ............................................................................................................. 40, 43

*Rankin v. McPherson*, 483 U.S. 378, 388 (1987) ...................................................... 43

*Rock v. Mott Metallurgical Corp.,* No. CV990492215S, 2001 WL 100307 at *5-8 (Conn. Super. Ct. Jan. 10, 2001) ................................................................................................... 62

*Roman v. Department of Corrections*, 2006 WL 2556376 (Conn. Super. Ct. 2006) ................. 63

*Roman v. Velleca*, 2012 U.S. Dist. LEXIS 136946, 25-26 (D. Conn. 2012) ............................ 42

*Ross v. Breslin*, 693 F.3d 300, 304 (2d Cir. 2012) ...................................................... 42

*School Administrators Association of New Haven v. Dow*, 200 Conn. 376, 382 (1986) ............. 71

*Serrato v. Bowling Green State Univ.,* 252 F. Supp. 2d 550, 555 (N.D. Oh. 2003) ................... 42

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. N.Y. 2001) ............................ 45

*Smith v. Branford,* 777 F. Supp. 2d 340 (D. Conn. 2011) ............................................. 46

*Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) ........................................................ 41

*Sobczak v. Board of Education,* 88 Conn. App. 99, 109 (2005) .......................................... 71, 72

*Thomas v. St. Francis Hosp. & Med. Ctr.,* 990 F. Supp. 81, 92 (D. Conn. 1998) ........................ 68

*Tiltti v. Weise,* 155 F.3d 596, 602-03 (2d Cir. 1998) ..................................................... 41

*Tracy v. New Milford Public Schools*, 101 Conn. App. 560, (2007) ...................................... 60, 66

*Valentine v. Labow*, 95 Conn. App. 436, 448, *cert. denied,* 280 Conn. 933, 909 (2006) ............. 61

*Vinci v. Quagliani*, 889 F. Supp. 2d 348, 353-354 (D. Conn. 2012) ...................................... 38, 39

*Washington v. County of Rockland*, 373 F.3d 310, 320-321 (2d Cir. 2004) ................................ 45

## Statutes

42 U.S.C. § 1983................................................................................................. 41

Conn. Gen. Stat. § 31-128f .................................................................................... 54

Conn. Gen. Stat. §52-417*et seq.* ............................................................................ 68

Conn. Gen. Stat. §7-4659(e) ................................................................................. 68

FMCSA Regulations §396.3 *et seq*............................................................................ 13

## Other Authorities

Restatement (Second), Torts § 652D ........................................................................ 55

Plaintiff James Fasoli brings this action against Defendants City of Stamford, Ernest Orgera, Michael Larobina, and Michael Scacco. The Defendant Michael Scacco moves for summary judgment on all counts brought against him, namely, Count 1, alleging retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983, Count 9, alleging invasion of privacy, and Count 10, alleging intentional infliction of emotional distress. A copy of the Amended Complaint is attached as *Exhibit* 1.  As set forth below, Plaintiff's claims against Scacco are not supported by any evidence and should be summarily dismissed.

## I.      STATEMENT OF FACTS

### A.  Background Facts

The City of Stamford Fleet Maintenance Department is responsible for maintaining the fleet of vehicles and equipment of the Stamford Operations Division and several other departments in a road worthy condition.  *See* Affidavit of Michael Scacco, ("Scacco Aff.")  ¶ 3, attached as *Exhibit* 2.  The Department consists of several mechanics, an inventory clerk, a foreman, and a Fleet Manager.   The defendant, Michael Scacco, became the Manager of Fleet Maintenance in March 2008.  Ex. 2, Scacco Aff. ¶ 2.

Prior to Scacco's hiring, the Fleet Maintenance Department was not running efficiently. In 2007, the City had conducted both an internal and an outside audit of Fleet Maintenance led by Mercury Consultants ("Mercury Report"), which made numerous recommendations about modernization of Fleet Maintenance.  *See* City of Stamford, Office of Policy and Management, Vehicle Maintenance Operational Review and Audit, dated April 12, 2007 ("Internal Audit"), attached as *Exhibit* 5;  Mercury Report, attached as *Exhibit* 6.  *See* Affidavit of Alexander Tergis, ("Tergis Aff."), ¶ 10, 11, attached as *Exhibit* 3.

1

The Internal Audit noted, among other things, that Fleet Maintenance suffered from: poor record management; work was not properly documented; no written inventory in the parts department; the parts in stock were not properly stored in a secure location; the vehicle repair reports were hand written; the vehicle inventory reports lacked data on the specific work performed and the time spent on the repair; the fleet management software was not functional; there was no proper documentation of preventive maintenance on the fleet vehicles. The Department lacked internal controls and accountability. *See* Ex. 5, Internal Audit; Ex. 3, Tergis Aff. ¶ 11.

In addition, the Mercury Report further noted that the other departments whose vehicles were serviced by Fleet Maintenance were very unhappy with the services provided, and found Fleet Maintenance to be erratic and disorganized. Many of the other departments maintained their own mechanics on staff to perform their own maintenance on their vehicles. Ex. 6, Mercury Report, pp. 1-3; Ex. 3, Tergis Aff. ¶ 11.

The Mercury Report made a number of recommendations. It suggested that Fleet Maintenance software needed to be fully operational, so that repair and time records could be maintained with much greater specificity. The parts operation had to be completely overhauled. Photographs of the condition of the Parts Department prior to Scacco's hiring are attached as *Exhibit* 7. Management of preventive maintenance had to be dramatically improved. *See* Ex. 6, Mercury Report, pp. 1-4.

It recommended that Fleet Maintenance had to operate as an Internal Service Fund. This meant that the parts and services provided by Fleet Maintenance were charged back, for budget purposes, to the various departments whose fleets were serviced. This was impossible without more accurate documentation of the work and repairs performed. Ex. 6, Mercury Report, pp. 44

2

– 48.   After the Mercury Report was issued, Steve Saltzgiver and Dave Tetreau, both Mercury

employees, served as the interim managers of Fleet Maintenance.  Ex. 3, Tergis Aff.  ¶ 12.

**B.   Difficulties With James Fasoli Prior to Scacco's Hiring**

James Fasoli has been a mechanic in the City's Office of Operation since 2005. Ex. 1,

Compl. ¶ 18.   Fasoli was at the center of many of the ongoing problems at Fleet Maintenance.

Before Scacco was hired, Fasoli was written up for taking an excessive amount of time on

projects.  *See* Memorandum of Steve Saltzgiver, October 8, 2007, attached as *Exhibit* 8; Ex. 3,

Tergis Aff. ¶ 16.

Fasoli was argumentative.  He was insubordinate. He was a poor performer.  Fasoli was

resistant to the changes that the Mercury consultants were trying to implement.  He did not take

direction well from his supervisors.  One time he threatened to report his Supervisor, Steven

Saltzgiver to the IRS because he lived out of state and worked in Connecticut.  Before Scacco

had started at Fleet Maintenance many of his co-workers were already complaining that he was

difficult to get along with.  His disruptive behavior interfered with the work and efficiency of the

Fleet Maintenance Department.   *See* Affidavit of Steve Frycz ("Frycz Aff."), ¶¶ 8- 11, attached

as *Exhibit* 4.   Alexander Tergis, was the Public Services Bureau Chief at the time.  He oversaw

several departments, including Fleet Maintenance.  Tergis received numerous complaints from

Fasoli's co-workers and his supervisors that Fasoli was disruptive, argumentative, and

insubordinate.  Ex. 3, Tergis Aff. ¶ 17.  On October 19, 2007, Steve Saltzgiver sent a

Memorandum to Alexander Tergis documenting an argument that arose between Fasoli and two

co-workers during a shop staff meeting.  In the Memo, Saltzgiver recommended that Fasoli be

disciplined for "his negative attitude, constant complaining, combativeness, and constant

3

complaining about shop personnel, conditions and management.". *See* Memo from Steve

Saltzgiver to Alexander Tergis, dated October 19, 2007, attached as *Exhibit* 9.

In the Memo, Saltzgiver noted:

> This is just one of many ongoing confrontations that I have personally witnessed between Fasoli, Perkins, and others during my short tenure at the City. . .In my opinion, Fasoli spends more time trying to disrupt the operation and get out of work rather than just accepting the assignments he's given.  As previously mentioned, Fasoli is a disruptive influence in the shop and I believe this situation needs to be remedied immediately to restore the harmony and morale to the fleet operation.

Ex. 9; Ex. 3, Tergis Aff. ¶¶ 18-19.  The defendant Michael Scacco did not create the problems

with James Fasoli.  He inherited them.

### C.  Difficulties With Fasoli – 2008-2009

Michael Scacco was hired by the City of Stamford in March 2008 to address the

problems of the department.  Ex. 2, Scacco Aff.  ¶ 5. Scacco came to the Department with

excellent credentials.  He had nearly twenty years of experience in fleet management in the

private sector.  *See* Resume of Michael Scacco, attached as *Exhibit* 10.  James Fasoli claims he

applied for the position.  Deposition Excerpts of James Fasoli, dated June 6, 2012 ("Fasoli Depo,

IV"), attached as *Exhibit* 49, p. 680.[1]

In the five years since Scacco started overseeing Fleet Maintenance, he has taken

dramatic strides to upgrade and modernize the Department.  He eliminated the second shift for

---

[1] Mr. Fasoli has been deposed over the course of five days.  For ease of reference, excerpts from the various depositions have been attached as separate exhibits as follows:
1. Ex. 46, Fasoli Deposition November 21, 2011, Fasoli Depo I.
2. Ex. 16, Fasoli Deposition December 2, 2011, Fasoli Depo. II.
3. Ex. 22, Fasoli Deposition February 17, 2012, Fasoli Depo. III.
4. Ex. 49, Fasoli Deposition June 6, 2012, Fasoli Depo. IV.
5. Ex. 47, Fasoli Deposition January 15, 2013, Fasoli Depo. V.

Fleet Maintenance, which he felt was unsupervised and lacked productivity.  Ex. 2, Scacco Aff.,
¶¶ 6-7 .

He implemented a new software, "Roadbase."  This allowed the Department for the first
time to track the productivity of its employees, determine costs per vehicle, and particular
vehicle systems, and the causes of vehicular breakdowns.  It led to better tracking and scheduling
of vehicle maintenance.  Through this, Scacco discovered that many of the fleet vehicles were
not given regular maintenance requiring reactive rather than preventative maintenance.
Eliminating this inefficiency saved the city thousands of dollars in labor and parts.  Ex. 2, Scacco
Aff., ¶ 8.

Prior to Scacco's arrival, there had been no centralized list of data on City vehicles.  Each
department kept its own records, and there was great variance in the quality and accuracy of the
records.  For the first time, Scacco implemented a system for Fleet Maintenance to more
accurately track the history of each vehicle.  Each vehicle was assigned a "birth certificate" that
tracked the vehicle's history from the date that it was initially acquired.  Ex. 2, Scacco Aff., ¶¶ 9-
10.

Scacco overhauled the parts room.  It was computerized, and for the first time allowed
Fleet Maintenance to maintain an accurate inventory of what is in stock and predict inventory
needs in advance.  Scacco greatly reduced the inventory overstock, saving the City hundreds of
thousands of dollars.  *See* Photographs of Parts Department after Scacco's arrival, attached as
Exhibit 7a; Ex. 2, Scacco Aff., ¶ 11.

Scacco initiated an internal budget change for maintenance expenses, implementing an
Internal Service Fund for parts, as recommended by the Mercury Report.  Since repairs, parts,
and the cause of repairs were better documented, Fleet Maintenance could now charge back the

costs to the Department whose vehicles were repaired.  This led to greater accountability.
Departments whose drivers were not careful and caused damage to their vehicles could reduce
their costs by better oversight.  When specific types of vehicles were demonstrated to be less
reliable and more prone to breaking down, each department could reduce costs by procuring
better replacement vehicles or systems.  Ex. 2, Scacco Aff., ¶12-13.

Scacco was proactive in solving problems in Fleet Maintenance.  For example, he
observed that many fleet vehicles had an excessive amount of rust.  An investigation was
conducted, and it was determined that the undercarriage of the vehicles was mistakenly being
washed with salt water due to a problem with the water recycling system.  Once that was fixed,
the rust problem was alleviated, and there were fewer problems with the vehicles.  Ex. 2, Scacco
Aff., ¶ 14.

Scacco also requested the authority from the City to buy gas for its Fleet six-nine months
in advance, and to use the internet to purchase from non-local dealers.  This enabled him to get
the lowest price and lock it in.  He saved the City thousands of dollars.  Ex. 2, Scacco Aff, ¶ 15.

Scacco also developed new revenue streams for the City.  Each year, hundreds of
abandoned vehicles are found in Stamford.  Previously, the City contracted with Rubino Bros., a
local salvage company, to tow away the abandoned vehicles.  Rubino Bros. paid the city $8.00
per vehicle.  Under Scacco, the abandoned vehicles were towed to Fleet Maintenance, and
Scacco either auctioned off the vehicles on the internet or sold them for scrap metal.  This
brought in far greater revenues for the City.  Ex. 2, Scacco Aff. ¶ 16.

In addition, Scacco has expanded the use of internet auctions as a source of revenue for
the City.  In addition to the abandoned vehicles, all vehicles and equipment being taken out of
service by the City are now being sold via internet auction.  Prior to that, the materials were sold

at private auctions for very low prices.  The transition to internet auctions has brought in several hundred thousand dollars of additional revenue to the City.  Ex. 2, Scacco Aff. ¶ 17.

James Fasoli resisted Scacco's efforts to modernize and upgrade the department at every single step of the way.  When Scacco started at Fleet Maintenance, he had meetings to provide technical hand-outs to the employees.  In addition, he engaged in team-building exercises with them.  At times, he gave motivational books to his employees.   Fasoli's attitude towards Mr. Scacco's efforts and in the meetings was always very negative and pessimistic.  Fasoli consistently expressed the view that nothing new proposed by management would ever work, and that nothing Scacco did mattered.   For example, on May 16, 2008, Michael Scacco brought in pizza at one of these meetings.   Jim Fasoli was disruptive and interfered with the meeting.  On June 6, 2008, Scacco had another meeting where he had his staff engage in certain team building exercises relating to proper communication.  Mr. Fasoli responded negatively to Mr. Scacco's efforts on that day as well, and his behavior disrupted the meeting.  As a result of Fasoli's negative and disruptive behavior during the staff meetings, Scacco had no more team building meetings.  Ex. 2, Scacco Aff. ¶¶ 19-23.  Scacco had discussed these issues with his immediate supervisor at that time, and Tergis told him that he should document Fasoli's behavior.  Ex. 2, Scacco Aff. ¶ 24.  Ex. 3, Tergis Aff. ¶ 23.

On June 18, 2008, Mr. Scacco observed Mr. Fasoli taking too much time doing a repair of a vehicle.  Mr. Scacco assigned another employee, John Perkins, to assist Fasoli with the repair.  Fasoli insisted that two persons performing a repair on the same truck would be unsafe.  *See* Scacco Memo to James Fasoli and Mike Romaniello, dated June 18, 2008 ("Scacco 6/18/2008 Memo"), attached as *Exhibit* 11.   Later that day, John Perkins came to Mr. Scacco and indicated that he had spoken to Fasoli and another union member, Mike Romaniello, and

7

they had told him that he could not "direct" the work of another union member, and felt uncomfortable supervising Fasoli.  *See* Ex. 11, Scacco 6/18/08 Memo.

The following day, Scacco did some investigation, and determined that there was no existing safety policy or practice that prohibited two employees from working on the same vehicle.  He told Mr. Fasoli to work with Steve Frycz on the vehicle.  Mr. Fasoli stated that if anything happened to him, he would hold Scacco personally liable. *See* Scacco Memo, 6/19/08, attached as *Exhibit* 12.  Ex. 2, Scacco Aff. ¶¶ 25-26.

Earlier that morning, June 19, 2008, Mr. Fasoli was also written up for insubordination by Douglas Arndt, the Supervisor of Highways for the City of Stamford.  Arndt had requested that one of his employees, Todd Johnson come to his office for a disciplinary meeting.  Fasoli insisted on accompanying Johnson to the meeting on behalf of the union.   Arndt told Fasoli that a union representative from his Department would be present to represent Johnson, and that he continue his work on his assignment.  Fasoli insisted on accompanying Johnson, and stated that he was a union official and had the right to attend any and all union business.  *See* Arndt Memorandum, dated 6/23/08, attached as *Exhibit* 13.   It is clear that Fasoli was trying to take advantage of his union position in order to avoid the work that Scacco had ordered him to do the day before.  This was an interference with the productivity at Fleet Maintenance.

Over the next several months Mr. Fasoli repeatedly questioned Mr. Scacco's decisions and authority.  He repeatedly stated that he had powerful friends.  Ex. 4, Frycz Aff. ¶ 17;  Ex. 2, Scacco Aff. ¶ 27.

One of Mr. Scacco's first tasks as Fleet Manager was inspecting the condition of all Fleet Vehicles.  He determined that many of the vehicles that were being used were lightweight vehicles that were unsuitable for their intended uses.  As a result there were higher incidences of

breakdown.  As a result of this, many unsafe fleet vehicles were removed from service.  As winter approached, there was pressure to obtain replacement vehicles.  Scacco worked with his supervisors Alexander Tergis, Public Service Bureau Chief, and Benjamin Barnes, Director of Operations for the City of Stamford, to acquire vehicles in time for the City's winter snow removal.  They acquired six used trucks from the Pennsylvania Turnpike Authority in November 2008.  Almost immediately thereafter, Fasoli started questioning the wisdom of the truck purchase.  Ex. 2, Scacco Aff. ¶ 28.

At around the same time, Michael Scacco was assigned a fleet vehicle.  Again, Fasoli stated that Scacco did not need a car.  Ex. 2, Scacco Aff. ¶ 29.

In January, 2009, Fasoli questioned why Scacco was not present during a snowstorm.  Fasoli also questioned why the foreman, Steve Frycz was given extra time to complete his Automotive Service Excellence ("ASE") certification.  Ex. 2, Scacco Aff.  ¶ 30.[2]

On February 4, 2009, work was distributed to the Fleet Maintenance crew at 7:00 am.  At 7:15 am, Steve Frycz, the foreman for Fleet Maintenance and Michael Scacco observed Mr. Fasoli taking an unscheduled break in the coffee room.   When they confronted Mr. Fasoli, he said "you caught me.  I guess you're going to have to write me up."  Ex. 4, Frycz Aff.  ¶ 22.  Scacco stated to Fasoli that he was stealing company time, and that he was going to write him up.  Fasoli responded that he was going to bury them with paperwork.  Scacco Memorandum, dated 2/4/2009, attached as *Exhibit* 14.  Ex. 2, Scacco Aff. ¶ 32.  On February 18, 2009, Mr. Fasoli was given a one day suspension.    This was the first disciplinary action taken by Scacco

---

[2]     A pattern emerged in all of these complaints.  Shortly after Fasoli questioned something Scacco or the City did, a request for information on the same subject would come from either Joseph Tarzia, a Member of the Board of Finance of the City of Stamford, or Salvatore Gabriele, a Representative on the Stamford Board of Representatives.  Scacco Aff. ¶ 31.

against Fasoli.  *See* Scacco Memorandum to Fasoli, dated February 18, 2009, attached as *Exhibit* 15.  Ex. 2, Scacco Aff. ¶ 33.

On February 13, 2009, Fasoli approached Steve Frycz, the shop foreman, about a repair. Frycz noticed that Fasoli had improperly disconnected a hydraulic hose that resulted in oil squirting into his face.  Fasoli also had not been wearing safety glasses.  Frycz made sure that Fasoli received the proper counseling, and then counseled him on the use of safety goggles and how to do the procedure correctly.  Fasoli's attitude towards Frycz was resistant and defensive. Ex. 4, Frycz Aff. ¶ 23.

On February 24, 2009, Michael Scacco documented that Mr. Fasoli had taken over fourteen hours on a job that Scacco believed should have taken only 2-3 hours. Scacco and Frycz provided counseling in the presence of union representative.  Ex. 2, Scacco Aff. ¶ 34; Ex. 4, Frycz Aff.  ¶ 24.   Fasoli conceded in his deposition that if management feels that an employee is taking too much time on a particular assignment, it's appropriate for management to engage the employee on the fact that they're taking too much time. *See* Deposition Excerpts of James Fasoli, dated December 2, 2011, ("Fasoli Depo, II") attached as *Exhibit* 16, p. 274.

On March 18, 2009, Frycz discovered that some files were missing from his office.  At a staff meeting, Frycz stated that whoever took the files should just give them back, no questions asked.  If the files were not returned, he would assume that they had been stolen.  Although Frycz never identified anyone by name, Fasoli became angry and stated that he believed that he was being accused of taking the files.  *See* E-mail from Frycz to Scacco, dated March 18, 2009, attached as *Exhibit* 61. Later that day, Fasoli filed a report with the Stamford Police Department, indicating that he believed that he was being set up.  Ex. 4, Frycz Aff.  ¶ 25; Stamford Police Incident Report, dated, 3/18/09, attached as *Exhibit* 17.

On May 13, 2009, Frycz observed Fasoli writing up a grievance (against him) during work hours.  Frycz indicated to Fasoli that he was free to write up grievances, but should do it after work or on breaks rather than company time.  Ex. 4, Frycz Aff. ¶26.

On June 30, 2009 Scacco again documented Fasoli failing to work while he was on the clock, and issued him a written warning.  When Scacco advised Fasoli that he was receiving a written warning, Fasoli told Scacco that he was incompetent.   *See* Fasoli Employee Warning Notice, dated 6/30/09, attached as *Exhibit* 18; Ex. 2, Scacco Aff. ¶ 35.

Under Federal Motor Carrier Safety Administration regulations, the Fleet Maintenance Department was obligated to fill out Vehicle Inspection Report Forms for each day that a truck was in their custody.  *See* FMCSA Regulations §396.3 *et seq.*  Despite this mandated federal requirement, Fasoli repeatedly refused to fill out the form.  When Scacco finally showed him the regulations, Fasoli signed it "under duress."  *See* Vehicle Safety Inspection Report Form, dated 7/8/09, attached as *Exhibit* 19; Ex. 2, Scacco Aff. ¶ 36.

Between July 10 – July 21, 2009, Steve Frycz, Fasoli's foreman, documented that it took Mr. Fasoli over 40 hours to repair a hydraulic hose leak on a single truck.  Frycz has over 40 years experience as a mechanic.  He estimates that it should have taken Fasoli at most 5-6 hours to complete the work.  Frycz and Scacco each contacted outside sources to verify that the time to complete the repair was excessive.  Although Scacco believed that further discipline was warranted, Human Resources determined that Fasoli would only receive a written warning for this documented excessive time on the vehicle.  *See* E-mail from Steve Frycz to Michael Scacco, re Unit #120, dated 7/22/09, attached as *Exhibit* 20; Memorandum from Fred Manfredonia to James Fasoli, dated 8/5/2009 attached as *Exhibit* 21; Ex. 2, Scacco Aff. ¶ 37; Ex. 4, Frycz Aff.  ¶ 28.

In addition to being inefficient and unwilling to account for his work, Fasoli was a poor diagnostician. Ex. 2, Scacco Aff. ¶ 38. He had difficulty and often took a great deal of time determining the cause of problems on vehicles.  This sometimes led to his doing greater repairs than warranted.   He would replace parts on trucks that would not have needed to be replaced if he had more accurately and narrowly diagnosed the issue.  Ex. 2, Scacco Aff. ¶  38.

Maintaining accurate data on the fleet vehicles and the work performed by the mechanics was critical to Scacco's efforts to upgrade Fleet Maintenance.  Mr. Fasoli rarely input his daily work time into the computerized system.   This was discussed repeatedly with him, and he was given a warning for this performance issue on August 5, 2009.  Ex. 21, Manfredonia Memo, 8/5/2009;  Ex. 2, Scacco Aff.  ¶ 39.

In July, one of the mechanics at Fleet Maintenance committed suicide.  On July 14, 2009, the City of Stamford Employee Assistance Program held a grief counseling session with the Fleet Maintenance staff.  During the session, Fasoli accused management for the City of Stamford of being responsible for the employee's suicide.  Ex. 2, Scacco Aff. ¶ 40.

Scacco was aware that Fasoli owned numerous guns.  *See* Excerpts of Deposition of James Fasoli, dated February 17, 2012 ("Fasoli III"),  pp. 371-72, attached as *Exhibit* 22.  Fasoli had a tool box that was full of holes.  Ex. 22, Fasoli III, p. 371.  Scacco believed that the holes were bullet holes.  Ex. 2, Scacco Aff. ¶ 41.   Fasoli's behavior was so extreme around the time of the suicide that Scacco was concerned for Steve Frycz and his safety.  *See* Email of Michael Scacco to Alexander Tergis, dated July 14, 2009, attached as *Exhibit* 23.  This concern about potential violence was reinforced several days later.  Alexander Tergis ran into Fasoli at the Fleet Maintenance shop, and Fasoli stated that he was under extreme stress, and that he blamed management for creating an environment "where someone is going to be hurt or killed."  Human

12

Resources refused to act on Tergis' concerns.   *See* Memorandum from Alexander Tergis to Fred

Manfredonia, dated July 23, 2009, attached as *Exhibit* 24.  On August 4, 2009, Fasoli was

referred by the Employee Assistance Program to see therapist Jamie Klintberg. *See* Klintberg

records, attached as *Exhibit* 64.

During July, Scacco had a minor accident with his City vehicle.  Although it had nothing

to do with his work responsibilities, Fasoli made many comments about the accident.    While it

was being repaired, Scacco was driving a city-owned pick-up truck.  Fasoli made comments

about the impropriety of Scacco driving the pick-up truck.   Ex. 2, Scacco Aff. ¶ 42.[3]

In November 2009, a new Mayor, Michael Pavia, was elected, replacing Dannel Malloy,

and there was a turnover in the administration. Ex. 2, Scacco Aff. ¶ 43.     Shortly after the

election, Fasoli stated on numerous occasions that the department was going to be shut down,

and that Scacco and Frycz were going to lose their jobs.  Ex. 2, Scacco Aff. ¶ 45; Ex. 4, Frycz

Aff. ¶ 19.

On November 11, 2009, Jim Fasoli complained to Steve Frycz that a co-worker, Art

Zanvettor, was harassing him.  Frycz told Zanvettor that the office had a zero tolerance policy for

workplace harassment.  Fasoli became upset and left work at noon, taking the remainder of the

day as a vacation day. Ex. 4, Frycz Aff. ¶ 29.

On December 3, 2009, Frycz observed Fasoli speaking with another co-worker, John

Perkins.  Perkins was assigned to do a road call on a vehicle.  Frycz was assigned to a job in the

shop.   Frycz told them to start working.  Fasoli picked up a tool and stated that he needed to

borrow the tool from Perkins for the job assignment.  Frycz knew from experience that the tool

that Fasoli picked up was not necessary for the job assignment.  Later that morning, Fasoli went

---

[3]     Scacco also subsequently received a call from Board of Finance representative Joseph
Tarzia about the accident and use of the pick up truck.  Scacco Aff. ¶ 43   .

into Michael Scacco's office.  Frycz was present.  Fasoli stated that he wanted to go on the road with Perkins instead of doing his assigned job in the shop.  He was told to go back to work.  Instead of going back to work, he left early for "union business."  As he left, he stated, if you want to see grievances, you're going to see plenty of them. Ex. 4, Frycz Aff., ¶ 31.  Scacco Memorandum to James Fasoli, dated, December 22, 2009, attached as *Exhibit* 25.  Ex. 2, Scacco Aff.  ¶ 47.

On December 8, 2009, Fasoli stated "Bob Murray (Director of Labor Relations) could just end this whole thing if he made me an offer.  That's all he has to do is make me an offer and I would be out of your life."   Scacco Memorandum to Alexander Tergis, dated December 10, 2009 ("Scacco Memo, 12/10/09"), attached as *Exhibit* 26.  Ex. 2, Scacco Aff.  ¶ 48.

On December 9, 2009, an individual came to Fleet Maintenance to pick up a piece of equipment that he had bought through one of the city's auctions.  The person walked through in the appropriate marked areas and never went near any of the fleet vehicles that were undergoing repair.  Fasoli came into Scacco's office and complained that it was unsafe to work because there were people walking around. Ex. 26, Scacco Memo, 12/10/09; Ex. 2, Scacco Aff.  ¶ 49.

On December 10, 2009, Jim Fasoli was working on a transmission.  He complained that it was unsafe to pull a transmission that was on the ground with the transmission jack that was in the shop.  Another time consuming conversation ensued, in which Fasoli stated, that "it's just a question of time who gets fired first, you or me... If I get fired first I will be getting 4 million dollars, I have an airtight case against the city and you keep giving me more documentation every time we have those meetings and hearings.  I have such a good case and you don't realize that you're helping me.  My lawyer said no way can we lose.  But I said enough for now."  Ex. 26. Fasoli then announced that he was leaving to go to the City's Toys for Tots Program, and

14

stated that he had permission from the Mayor to leave whenever he wanted to work on the program.  He did not clear this in advance with Scacco.  He did not finish the transmission job that day.     Ex. 26, Scacco Memo, 12/10/09; Ex. 2, Scacco Aff.  ¶ 50;Ex. 4, Frycz Aff. ¶ 34. Mr. Scacco subsequently contacted the jack manufacturer, and brought in an outside company to confirm that the jack was safe to use.  The transmission jack that Fasoli complained about is still in use today. Ex. 2, Scacco Aff.  ¶ 51; Ex. 4, Frycz Aff.  ¶ 35.

Scacco initiated discipline against Fasoli in December.  Scacco had spent the previous year documenting the repeated acts of insubordination, poor performance, and difficult behavior of Mr. Fasoli, as directed by his immediate Supervisor Alex Tergis.  In his previous experience in the private sector, such behavior would have led to Fasoli's dismissal.  Yet in almost every instance, Human Resources failed to take strong measures against Fasoli.  Although Scacco wanted to have Fasoli discharged, Fasoli was only issued a five day suspension.  *See* Ex. 25, Memorandum of Michael Scacco to James Fasoli Re: Suspension, dated December 22, 2009; Ex. 2, Scacco Aff.  ¶ 52.

Scacco had reason to believe that Fasoli was being protected from discipline by the politically powerful friends that Fasoli claimed to have. Ex. 2, Scacco Aff. ¶55. Nearly every criticism directed towards Scacco or Steve Frycz in 2008-2009 by Fasoli was followed by an inquiry or attack by Board of Finance Member Joseph Tarzia, Board of Representative member Sal Gabriele, or others.  Examples include:

1.   Scacco's qualifications as Fleet Manager

2.  The fact that Scacco was not present during a snow storm

3.  Questions about the delay in Steve Frycz' ASE certifications

4.  Removal of Steve Frycz' salary from the Fleet Maintenance Budget

15

5.   The purchase of the six used vehicles

6.   Scacco's use of a City of Stamford fleet vehicle

7.   Scacco's automobile accident

8.   Fasoli's claim that Fleet Maintenance was going to be shut down

Scacco Aff.  ¶ 46.

Ernie Orgera, a co-defendant in this case, was appointed Director of Operations by Mayor Pavia on December 1, 2009.  Orgera had previously been the Supervisor of the Traffic Department, in the City of Stamford.  *See* Deposition of Ernest Orgera, dated January 21, 2013 ("Orgera Depo."), p. 11, attached as *Exhibit* 27.  As Director of Operations, Orgera oversaw the Operations Department in the City of Stamford, which included the engineering bureau, land use bureau, parks and recreation, fleet maintenance, highway, solid waste, and traffic.  Ex. 27, Orgera Depo., p. 14. Prior to December 1, 2009, Orgera had never been Scacco's supervisor.  Ex. 2, Scacco Aff.  ¶¶ 56-57. Pavia, Orgera, and Tarzia were all in the same political party.  Ex. 2, Scacco Aff.  ¶ 58.  Both Tarzia and Orgera had been promoted by Pavia after the election.  Ex. 2, Scacco Aff.  ¶ 59. [4]  Orgera had played no role in any of the prior employment or disciplinary issues involving Fasoli.  Ex. 2, Scacco Aff.  ¶ 57.

**D.  Joseph Tarzia Intervenes to Get Fasoli Transferred**

After Fasoli was issued the five day suspension in December, Joseph Tarzia met with Ernie Orgera in Orgera's Office.   Tarzia asked Orgera to intervene on behalf of Fasoli, so that Fasoli would not be terminated or disciplined.  Orgera told Tarzia that he would look into it. Orgera stated that the reason he agreed to help was that he thought it was a good idea to help Mr. Tarzia, who was the incoming Chairman of the Board of Finance. Ex. 27, Orgera Depo., pp.  32-

---

[4]     Pavia appointed Joseph Tarzia to be the Chairman of the Board of Finance for the City of Stamford.  Scacco Aff. ¶ 59.

34. Orgera consulted with Human Resources and decided to transfer Fasoli to the Scofieldtown Yard on Rockrimmon Road.  Fasoli was to report to Dan Colleluori, the supervisor of the Solid Waste Department, or his designee.  Ex. 27, Orgera Depo., p. 48.   The Scofieldtown Yard is used as a recycling center, and also a location to dump leaves to make mulch.  The Yard had need of a mechanic for some minor mechanic work.  Ex. 27, Orgera Depo., pp. 37, 47.    The funding for Fasoli's position, however, would continue to come out of the budget from Fleet Maintenance.  Ex. 27, Orgera Depo., p. 49.    Orgera made the decision in consultation with Human Resources, but never consulted Scacco.  Scacco had no role in the transfer decision.  Ex. 27, Orgera Depo., pp. 37-38; Ex. 2, Scacco Aff. ¶ 60.   Scacco had no knowledge of Tarzia's intervention in the Fasoli transfer at the time it took place.  Orgera never personally told him about it until many months later.  Ex. 2, Scacco Aff. ¶ 61.    Ordinarily, Orgera does not get involved in disciplinary issues, but on two occasions (Fasoli and another employee Tony Vaccaro) did so at Tarzia's request.  He did so because Tarzia was an elected official. Ex. 27, Orgera Depo., p. 74.

Orgera met with Fasoli in person and told him that he would be intervening with the human resources department to stop the disciplinary action.   If he behaved himself without any trouble, Orgera would make the disciplinary action disappear.  Fasoli thanked him and accepted the transfer.  Ex. 27, Orgera Depo.  pp.  45-46.

On January 4, 2010, Fasoli was transferred to the Scofieldtown Yard, and was no longer under the supervision of Michael Scacco.  *See* Memorandum of Ernie Orgera to James Fasoli, re transfer, dated January 4, 2010, attached as *Exhibit* 28.

### E.  Difficulties With Fasoli After He Returns to Fleet Maintenance: October 14, 2010 – July 2011[5]

---

[5]      Plaintiff's Amended Complaint was filed in July 2011.

Scacco had little day-today contact with Fasoli from the time he was transferred to the Scofieldtown Yard until he returned to Fleet Maintenance in October 2010.  Ex. 2, Scacco Aff. ¶ 62.[6]  In October 2010, Ernie Orgera made the decision to reassign Fasoli to the Fleet Maintenance Department under Scacco's supervision.  *See* Ernie Orgera Memorandum to James Fasoli, re reassignment, dated October 14, 2010, attached as *Exhibit* 29.  Orgera sent Fasoli back to Fleet Maintenance due to lack of manpower.  Although after Fasoli's transfer, Fleet Maintenance was down two mechanics, Scacco had never requested that Fasoli return. Ex. 2, Scacco Aff. ¶ 63.  The decision to have Fasoli return to Fleet Maintenance was made by Ernie Orgera. Ex. 27, Orgera Depo. p. 51.  Scacco was told about it after Orgera made the decision. Ex. 2, Scacco Aff.  ¶ 63.

---

[6]     Although things were quiet at Fleet Maintenance while Fasoli was working at the Scofieldtown yard, the political infighting and litigation escalated outside the shop.  Shortly after Fasoli's suspension and transfer, Representative Gabriele began to ask questions about the six trucks that Scacco, Barnes and Tergis had purchased in November 2008.  The issues being raised were identical to the issues raised earlier by Fasoli.    An FBI agent also came to Fleet Maintenance asking questions about the Title for the six trucks.

In May, 2010, Tania Barnes, a human resources employee, filed an Ethics Complaint with the Board of Ethics for the City of Stamford against Finance Board Chairman Joseph Tarzia for interfering in a disciplinary matter.  Several weeks later, Michael Scacco filed an Ethics Complaint against Joseph Tarzia, Sal Gabriele, and another member of the Board of Finance based upon their interference with his efforts to discipline Fasoli, and their support of Fasoli's efforts to undermine him.  *See* Scacco Ethics Complaint, attached as *Exhibit* 30.   In June, the investigating panel of the Stamford Board of Ethics found probable cause to proceed on both Scacco and Barnes' Ethics complaints.  The hearings on the two Ethics Complaints were scheduled for the fall.  Ex. 2, Scacco Aff. ¶¶ 90-91.

In April, several employees from the Highway Department had been observed loading a truck with discarded snow plows from the City of Stamford transfer station.  When questions were raised, the employees handed in a bag of cash the following day.  This incident set off a yearlong series of investigations pertaining to the disposal of scrap metal and other allegations that arose.  *See* Email exchanges between Sal Gabriele, Michael Scacco, and Peter Privitera, the Director of the Office of Policy and Management/Purchasing Agent, attached as *Exhibit* 31.  Neither Scacco nor any employee in Fleet Maintenance had any involvement in the disposal of scrap metal. Ex. 2, Scacco Aff.  ¶ 96.

Shortly after Fasoli returned to Fleet Maintenance from Scofieldtown Road, five of the seven remaining mechanics at Fleet Maintenance put in for transfers due to the fact that Fasoli was returning to Fleet Maintenance.    They were Orazio Cierello, Ken Gode, Paul Kopeck, Bobby Koczenick, and Arthur Zanvettor.[7]  Scacco referred them to Mr. Orgera.  The transfers never took place.  Ex. 2, Scacco Aff. ¶ 64.

Fasoli continued to take an excessive amount of time on his jobs, spent lots of work time on the phone and displayed a negative attitude towards Fasoli and Frycz after he returned from the Scofieldtown Yard.  He continued to take excessive amounts of time on certain tasks in comparison to other mechanics who performed the same task.  In two instances, he failed to complete assignments that had to be reassigned to other mechanics to finish.  On one occasion, Fasoli completed a clutch adjustment on a vehicle, and the truck continued to have problems and had to be taken out of service and sent to an outside shop.  *See* Memorandum of Michael Scacco to James Fasoli, dated April 11, 2011, attached as *Exhibit* 32;  Ex. 2, Scacco Aff.  ¶  66.

Prior to Fasoli's transfer to Scofieldtown, Scacco had taken great pains to document Fasoli's conduct in order to justify his termination.  He had found little support from human resources.  After Fasoli returned to Fleet Maintenance, Scacco stopped documenting Fasoli's insubordination and performance issues, and tried to defuse any potential confrontations.  Ex. 2, Scacco Aff. ¶ 67.  This did not work.

At this point Fasoli now claimed to be a whistleblower.  *See* Letter of Attorney Richard Freeth, dated October 27, 2010, attached as *Exhibit* 33.  Scacco was unaware of this.  Ex. 2, Scacco Aff. ¶ 92.  In February 2011, Fasoli made a complaint to Scacco that someone had

---

[7]    The two remaining mechanics, Mike Romaniello and John Perkins, did not request transfers. Perkins has been represented by Attorney Richard Freeth in various employment matters. Attorney Freeth is currently representing Mr. Fasoli in the instant case. Ex. 2, Scacco Aff.  ¶ 65.

written something about him on the cafeteria blackboard that suggested that he was a whistleblower.  Scacco never saw the blackboard or the comment.  He asked the other Fleet Maintenance employees about it, but nobody knew anything about it.  Nobody else saw it.  Ex. 2, Scacco Aff. ¶ 68.

On February 18, 2011, Fasoli punched in at 6:53 am.  At 8:30 am, he went to Scacco's Office and told Scacco that someone had called him a rat.  Fasoli said that he was stressed out and went home sick.   *See* Scacco Memo to Emmet Hibson and Ernie Orgera, dated 2/18/11 – 3/2/11, attached as *Exhibit* 34; Ex. 2, Scacco Aff. ¶ 69.

On February 23, 2011, at 11:30 am, Fasoli went into Scacco's office and implied that someone had called him a name.  He left early and claimed to go to see his physician.  Fasoli said Ken Gode overheard it.  Scacco questioned Gode, and neither he nor any of the other workers overheard the conversation.  Ex. 34, Scacco 2/18/11 – 3/2/11 Memo; Ex. 2, Scacco Aff. ¶ 70.

On February 28, 2011, Fasoli told Scacco to look at his tool box.  On the tool box was a plastic mouse.  Fasoli said that someone put it there.  Fasoli said that he was stressed out and had to leave work early.   Ex. 34, Scacco 2/18/11 – 3/2/11 Memo.; Ex. 2, Scacco Aff. ¶ 71.

On March 1, 2011, Fasoli called in sick.  Ex. 34, Scacco 2/18/11 – 3/2/11 Memo.; Ex. 2, Scacco Aff. ¶ 73.

Scacco spoke to all of the drivers and found no evidence supporting Fasoli's claims.  In his Memorandum to Hibson, the Head of Human Resources, and Orgera, the Director of Operations, Scacco indicated that Fasoli had made numerous remarks about the "heavy duty" lawsuit that he was going to bring against the City of Stamford, and wanted to create a false

accusation against the City for monetary gain.  Ex. 34, Scacco 2/18/11 – 3/2/11 Memo.;  Ex. 2, Scacco Aff. ¶ 72.

On March 17, 2011, Fasoli came over to Scacco and told him that somebody had put another toy "rat" on his toolbox.  The toy "rat" was a mouse the size of a paperclip.  Scacco put the item on top of his computer monitor with other trinkets.  *See* Scacco Memo to Orgera re Mouse, dated March 17, 2011, attached as *Exhibit* 35.  Ex. 2, Scacco Aff. ¶ 75.[8]  Fasoli punched out and left work for the day, five minutes after he had punched in.  Ex. 2, Scacco Aff. ¶ 75.  Fasoli called out sick the following day, March 18, 2011.  Ex. 2, Scacco Aff. ¶ 76.

Scacco believed that in light of Fasoli's work history, this was just another ploy by Fasoli to get out of work.  Ex. 2, Scacco Aff.  ¶ 78.  Scacco questioned the employees about the toy.  None of them knew anything about it.   Scacco told them to stay away from each other's tool boxes.  Ex. 2, Scacco Aff.  ¶ 72 .

On the following Monday, March 21, 2011, Scacco assigned Fasoli to do a safety check on a vehicle.  Instead of working on the vehicle, Fasoli spent about an hour on the computer.  After his break, instead of working on the vehicle, Fasoli spent another thirty minutes talking to another employee.  *See* Ex. 32 Scacco Memo, 4/11/11.  Ex. 2, Scacco Aff. ¶ 79.

Scacco felt that it was necessary to initiate discipline against Fasoli due to the deteriorating work environment, his numerous absences, and recent events.  Scacco wanted a Human Resources Representative to be present when he gave Fasoli notice of his pre-disciplinary hearing.  Tania Barnes, a human resources assistant, came down to Fleet Maintenance.   Also present were Orazio Cierello, Fasoli's union representative, and Steve

---

[8]     One of Fasoli's co-workers subsequently told Scacco that he had observed Fasoli taking photographs of the toy on his computer monitor as evidence for his (Fasoli's) lawsuit.  Scacco took the mouse and put it away. Scacco Aff.  ¶ 77.

Frycz.  Fasoli immediately started screaming at Barnes, accusing her and Ernie Orgera of being corrupt.  Fasoli said he felt sick, and was having chest pains, and wanted to go home.  Barnes insisted that if he was having chest pains, he should go to the hospital.  An ambulance arrived, and took Fasoli to Stamford hospital.  Ex. 2, Scacco Aff. ¶ 80.

The next day, March 22, Fasoli did not come to work and never called in to say he was not coming to work.  Scacco later learned from Fasoli's union that Fasoli had been admitted to the hospital overnight.  Ex. 2, Scacco Aff. ¶ 81.

The following day, March 23, Fasoli called into work ten minutes before the start of his shift to indicate that he would be taking a vacation day.  Ex. 2, Scacco Aff. ¶ 82.

On March 25, 2011, Scacco gave Fasoli notice that the earlier pre-disciplinary hearing had been scheduled for that day at 10:00 am.  *See* Notice of pre-disciplinary hearing from Scacco to Fasoli, dated March 25, 2011, attached as *Exhibit* 36.    At 9:30 am, Fasoli notified Steve Frycz that he had injured his right shoulder and left for the day.   *See* Injury Report of James Fasoli, dated 3/25/11, attached as *Exhibit* 37.  The pre-disciplinary hearing was rescheduled to March 30, 2011 at 10:00 am.  *See* Notice of pre-disciplinary hearing, dated March 30, 2011, attached as *Exhibit* 38.

On March 30, 2011, the pre-disciplinary hearing for Fasoli was held.  Fasoli did not appear at the hearing.  He told his union representatives at 9:00 am that he would not be attending and that he had a doctor's appointment.  Fasoli never told anyone about the appointment in advance and never requested that it be rescheduled.   The hearing went forward

22

in his absence.  His union representative was present.  *See* Ex. 32, Memo from Scacco to Fasoli, dated 4/11/11.[9]

On May 25, 2011, a city sanitation vehicle was brought in for repairs of the strobe lights. If the strobe light on the vehicle is not working, the vehicle is considered unsafe and cannot be used.  Fasoli worked on the vehicle for several days.  He took seven hours to diagnose the electrical problem.  On June 9, the vehicle was returned into service.  On June 10, the Supervisor in sanitation reported that the strobe lights were still not working and the vehicle was taken out of service.  Another mechanic was reassigned to the vehicle.  That mechanic diagnosed an issue that Fasoli had overlooked.  The relay wires were burnt and melted.   The proper electrical repair was done to the vehicle, and the vehicle was returned to service without another problem.  Ex. 2, Scacco Aff. ¶ 84.

On June 7, 2011, Mr. Fasoli was assigned to do a brake repair on a city truck.  He worked on the vehicle from June 7 – June 14.  As part of the repair, Fasoli replaced the two front brake drums, and cleaned the brake shoes.  Fasoli tried to clean out the brake shoes with a blow torch. This is an outdated inefficient method that is no longer used.    On June 16, 2011, Scacco inspected the vehicle before it went out on the road, and determined that the two brake shoes were saturated with oil and needed to be replaced.  If brake shoes are saturated with oil, the vehicle will not be able to stop as quickly, creating a safety hazard.   Under the Department of Transportation regulations and various truck maintenance service guidelines, they need to be replaced.  Fasoli failed to replace the brake shoes, and failed to identify the need to replace the

---

[9]    On May 10, 2011, James Fasoli filed the instant lawsuit against Mr. Scacco, Michael Larobina, Ernie Orgera, Tania Barnes, and the City of Stamford.  Mr. Scacco learned about it when he read about it in the Stamford Advocate the following day.  This was ten days before he was actually served with the complaint.  Scacco Aff.  ¶ 83.

brake shoes if they are saturated with oil or grease.  Scacco assigned another mechanic to do the replacement of the brake shoes.   Ex. 2, Scacco Aff.  ¶¶ 85-86.

In addition, Scacco observed that Fasoli was spending an excessive amount of time at the computer, and inputting very little text.  At times, Fasoli was spending in excess of thirty minutes on the computer and inputting a single line of text.  Ex. 2, Scacco Aff.  ¶  87 .

Scacco brought these matters, to the attention of human resources.  Fasoli was not disciplined.   Human Resources turned it in to a training opportunity.    Fasoli was given a copy of this job description, and the opportunity to train in any area that he felt that he was unable to perform.  *See* Letter From Emmett Hibson to James Fasoli, dated July 30, 2011, attached as *Exhibit* 39.

On July 25, 2011, Fasoli filed his "First Amended Complaint."

In September 2011, Fasoli was transferred to work as an equipment mechanic for the Department of Highways.  He no longer reported to Scacco after that.  Scacco had no role in the decision to transfer Fasoli away from Fleet Maintenance.  Ex. 2, Scacco Aff.  ¶ 88.

### F.   Fasoli Made Good On His Promise to Bury Scacco in Grievances

Fasoli told the truth when he told Scacco that he was going to bury him in grievances. One would be hard pressed to find a more litigious employee than James Fasoli. Between June 2008 and September 2011, Fasoli filed or had the union file at least **sixteen** grievances, **six** unfair labor practices complaints, a discrimination complaint with the Commission on Human Rights and Opportunities ("CHRO"), and the Equal Employment Opportunities Commission ("EEOC"), and the instant lawsuit.  *See* Grievances of James Fasoli, attached as *Exhibit* 40; Unfair Labor Practices Complaints, attached as *Exhibit* 41, CHRO/EEOC complaint, attached as *Exhibit* 42.  Fasoli's own therapist, Jamie Klintberg, conceded at her

deposition that her client, James Fasoli, was the most litigious patient that she had ever treated. *See* Excerpt of Deposition of Jamie Klintberg ("Klintberg Depo.,"), p. 119, attached as *Exhibit* 43. Fasoli's grievances covered pretty much every possible aspect of work place conditions. In addition to the run of the mill grievance challenging discipline or suspension, Fasoli made wild allegations, such as, "discriminatory harassment, intimidation, bullying and fraudulent accusations" and requesting that he be made whole and "prohibit further stalking and witch hunts" (July 15, 2009); "brazen infliction of malicious physiological trauma" (Dec. 9, 2009), "unsafe assignment compromises and jeopardizes my safety by the continueing [sic] practice of inflicting stress, intimation and physiological trauma through another arbitrary re-assignment to an environment that is hostile to me." (October 22, 2010); "libelous disparaging actions and treatment to create frame-up, harassment retaliation" (June 17, 2011). *See* Ex. 40, Compilation of Fasoli Grievances.

One of the unfair labor practices complaint mentions Mr. Fasoli's litigiousness noting that he has "filed grievance after grievance. Mr. Fasoli has also filed complaints for harassment against the City of Stamford with the Connecticut Human Rights Organizations". *See* Ex. 41, Case No. MPP-28334 January 14, 2010.

**G.     Fasoli's Contentions About Protected Activities**

**1.   Plaintiff's Allegations Regarding Sexual Harassment of a Female Co-Worker**

Plaintiff alleges that in April 2008 he became aware of sexually harassing conduct directed toward a female co-worker, Charlene McArthur. Plaintiff alleges that on or about April 3, 2008, within a month of Scacco's arrival, he and a co-worker John Perkins, sent a letter to Dennis Murphy, the Director of Human Resources on behalf of a colleague Charlene McArthur, notifying the city of sexual harassment of McArthur. Amended Complaint, ¶¶ 21-24.

At the time that Fasoli made the complaint, he was the Secretary of his union, and Perkins was President of the Union. *See* letter of James Fasoli and John Perkins to Dennis Donohue ("Fasoli letter re: Charlene McArthur"), dated April 3, 2008, attached as *Exhibit* 44. Fasoli was in his capacity as a union representative when he acted on Charlene MacArthur's behalf.  *See* Ex. 42, CHRO/EEOC Affidavit of James Fasoli, ¶ 11 -14. This is further supported by the fact that plaintiff listed his actions on behalf of Charlene McArthur in the City's Union Business Activities Log Sheet.  *See* Fasoli Union Business Activities Log Sheet, 5/9/08 and 5/15/08, attached as *Exhibit* 45.

The individuals who Charlene McArthur accused of sexual harassment, were not in Fleet Maintenance.  They were in the solid waste division.  Scacco was not involved in any way in the complaint, the investigation of the complaint, or the discipline of those employees.  Scacco had no knowledge of the complaint or any of the allegations, or the City's response.  Ex. 2, Scacco Aff.  ¶ 95.    Fasoli has admitted that he has no evidence that Mr. Scacco knew anything about him raising the issue about Charlene McArthur.  Excerpts of Deposition of James Fasoli, dated November 21, 2011, ("Fasoli Depo. I") attached as *Exhibit* 46, pp. 38-39; 57-58; Excerpts of Deposition of James Fasoli, dated January 15, 2013, ("Fasoli Depo. V") attached as *Exhibit* 47, p. 778.  The investigation of McArthur's sexual harassment complaint was concluded on October 16, 2008.  *See* Letter of Robert Murray to Mike Kyek, dated October 16, 2008, attached as *Exhibit* 48.

In his CHRO affidavit, Fasoli alleges that the retaliation for helping Charlene MacArthur was a warning given for insubordination given in June 2008.  *See* Ex. 42, Fasoli CHRO Aff., ¶ 16 -18.  This warning was given by another supervisor, Doug Arndt, not Michael Scacco.  *See* Ex. 13, Arndt Interoffice Memo, dated 6/23/08.

In Fasoli's CHRO affidavit, he alleges that he was given a warning for work performance a few months later, and a one day suspension.  *See* Ex 42, Fasoli CHRO Aff., ¶ 18.  This occurred on February 4, 2009, **ten** months after Fasoli wrote the letter on McArthur's behalf, and **four** months after the investigation was completed.  *See* Ex. 15, Scacco Memorandum, dated 2/18/09 re suspension.

## 2.  Plaintiff's Allegations Regarding Scrap Metal Issues

Plaintiff contends that he was the individual who observed suspicious activities that led to a year-long investigation into allegations of theft of scrap metal by city employees when he notified Representative Gabriele and Finance Board Chairman Tarzia about it in April 2010. Excerpts of Deposition of James Fasoli, dated June 6, 2012, ("Fasoli Depo. IV"), attached as *Exhibit* 49, pp. 602-03.[10]  On April 8, 2010, Representative Gabriele sent an e-mail raising a concern about the disposal of old city snow plows to Scacco.  Scacco referred Gabriele to the Highway Department, since his department had nothing to do with the disposal of equipment.  It turned out that Doug Hoyt, the Superintendent of Highways, had directed his men to gather old broken plows and take them to the City's transfer station.  *See* Ex. 31, Email trail, Gabriele – Scacco – Privitera, dated 4/8/10 – 5/3/10.     This was the extent of Scacco's involvement in the scrap metal controversy.   Neither he, nor the Fleet Maintenance Department had any role in the disposal of scrap metal.  He was never the subject of any investigation or allegation.  He was never interviewed by the Stamford police, the Stamford State's Attorney's Office, or Kroll, the

---

[10]     Fasoli's testimony that he was the one who initially made the observations that triggered the events that led to the scrap metal investigation is demonstrably false.  On April 27, 2010, one month before he filed this lawsuit, Fasoli gave a sworn statement to the Stamford Police department about the scrap metal issues, stating that "he had never witnessed any such action." *See* Fasoli sworn statement, dated April 27, 2010, attached as *Exhibit* 50.   If this case proceeds to trial, the defendants will demonstrate that Fasoli's claim to have been the whistleblower who initiated the scrap metal controversy is a lie.

outside firm hired to investigate all of the allegations relating to scrap metal.  He was never implicated in any of the questionable activities that were the subject of any of these investigations.  Ex. 2, Scacco Aff. ¶ 96 .

Scacco was never directed by Ernie Orgera, or anyone else, to take any adverse action against Fasoli or anyone else in connection with the scrap metal allegations.  Ex. 2, Scacco Aff. ¶ 97.   Scacco never knew that Fasoli even claimed to be the source of the scrap metal investigation until Fasoli complained in a meeting about retaliation on March 2, 2011.  *See* Ex. 34, Scacco Memo to Hibson and Orgera re 2/18/11 – 3/2/11; Ex. 2, Scacco Aff. ¶¶ 92, 99.  Even then, Scacco never believed that Fasoli had been the source of that information, since he was working at the Scofieldtown Yard at the time, which was many miles away from Fleet Maintenance, the transfer station, and highway maintenance.  Ex. 2, Scacco Aff. ¶ 100.   Thus, even assuming Scacco had any reason to retaliate against Fasoli for his knowledge of scrap metal, there was only a two month window between the time that Fasoli raised the scrap metal issue with Scacco (3/2/11), and his filing of the instant complaint (5/10/11).  Nearly all of the alleged retaliatory adverse employment acts in plaintiff's complaint took place months or years before that.

### 3.   The Purchase of the Six Used Trucks in November 2008

Fasoli contends that Scacco retaliated against him for providing information to Joseph Tarzia, Salvatore Gabriele, and the FBI pertaining to the purchase of the six used trucks in November 2008.  Ex. 1, Amended Complaint ¶ 33(g), 34 – 39.

### a.   Fasoli's Contentions About the Purchase of the Six Vehicles

Fasoli had no role in the acquisition of the six trucks in November 2008. He had no knowledge of who was involved in the acquisition of the six trucks. He had no knowledge of the process undertaken to select those six vehicles. He had no knowledge of what alternatives were available in lieu of purchasing the six used trucks. He had no knowledge of the City's needs for vehicles for the upcoming winter. Ex. 46, Fasoli Depo. I, p. 116.

Fasoli contends that the vehicles were unsafe, because they were highway type tires. They were also not equipped with plows. He does not know if Scacco and the other persons involved in the purchase knew if the vehicles did not have plows. He did not know if the city-owned plows worked with the trucks. Ex. 46, Fasoli Depo. I, p. 117.

Fasoli further contended that the sanders did not work. He does not know if all of the sand trucks were equipped with plows and used for snow plowing and sanding that year. Fasoli Ex. 46, Depo. I, p. 118. Fasoli did not know if the company that sold the trucks to the city did some of the repairs or reimbursed the city for necessary repairs or modifications for the trucks. Ex. 46, Fasoli Depo. I, p. 118. Fasoli also claimed that the city sold some trucks that were in better condition. He did not know that some of the trucks that the city discontinued or put up for auction were too lightweight for the purpose that they were used by the city. Ex. 46, Fasoli Depo. I, p. 119. Fasoli based his opinions that the trucks were unsafe on some of the work that he did on the trucks. Ex. 46, Fasoli Depo. I, p. 120. Fasoli never drove the trucks while they were in service. Ex. 2, Scacco Aff. ¶ 101.

Fasoli allegedly discovered his alleged evidence of fraud in the purchase of the trucks when the titles to the vehicles were mysteriously left on his tool box by an unidentified source. Ex. 46, Fasoli Depo. I, p. 120. Fasoli did not have access to the Title documents for the vehicles. Ex. 2, Scacco Aff., ¶ 102. Fasoli testified that he left the title to the vehicles sitting on his tool

box for a couple of days, and then put them in his tool box. He did not tell anyone that he had the papers. Nobody asked for the papers, so Fasoli never gave them back. Ex. 46, Fasoli Depo. I, pp. 120-126.

Fasoli believed that the purchase price for the vehicles had been changed. He did not know if the alleged alteration was for the City of Stamford purchase price, or the purchase price from the previous buyer. Ex. 46, Fasoli Depo. I, pp. 125-126. He also believed that there did not seem to be a succession of title. "It seemed like there should be some more signatures or some more transfers on the back of the Title." He did not know who changed the numbers. Ex. 46, Fasoli Depo. I, pp. 125-126. Fasoli did not know if anything was illegal about the transaction. Ex. 46, Fasoli Depo. I, pp. 129-130. Fasoli's concern was that "he cared that we bought junk trucks and the numbers were changed." Ex. 46, Fasoli Depo. I, p. 126. Fasoli does not know if he ever told Scacco about his concerns. Ex. 46, Fasoli Depo. I, pp. 127-128. He did tell Sal Gabriele. Ex. 46, Fasoli Depo. I, p. 128.

### b.   Fasoli as an FBI Informant

In 2010, a special agent for the FBI visited Fleet Maintenance on a day that Scacco was not present to ask questions about the purchase of the six used trucks in November 2008. Nothing further was heard from the FBI. Ex. 2, Scacco Aff. ¶ 103. Scacco always suspected that Joseph Tarzia was the one who tried to get the FBI involved in that issue. Ex. 2, Scacco Aff. ¶ 104. Fasoli stated in his deposition that he was, in fact, the "FBI informant" who provided information on a great many issues to the FBI, including the six trucks purchased in November 2008. Ex. 22, Fasoli Depo. III, pp 396-399.[11] Scacco had no knowledge that Fasoli claimed to

---

[11]   Fasoli's self-portrayal as an FBI informant defies credibility. If this case proceeds to trial, his status as an "FBI Informant" is unlikely to survive scrutiny.

be an FBI informant until Fasoli testified at his deposition during this litigation.  Ex. 2, Scacco Aff. ¶ 105.

### c.    Fasoli's Disclosures About the Six Trucks to Gabriele and Tarzia

Fasoli frequently told Scacco, Steve Frycz, and others that he had connections in high places. Ex. 2, Scacco Aff.  ¶ 106.  He did this not in the context of being a potential whistleblower, but in the context that he was untouchable as an employee.  As previously noted, anytime tension escalated between Fasoli and either Scacco or Frycz in the shop, Representative Gabriele or Finance Board Chairman Tarzia would begin to question Scacco's activities directly or to his supervisors.  Ex. 2, Scacco Aff. ¶ 106.  In 2010, Scacco learned that Tarzia had interfered with the disciplinary process by avoiding Fasoli's suspension and having him transferred to Scofieldtown Road.  Ex. 2, Scacco Aff. ¶ 116.  The relationship between Fasoli, Gabriele, and Tarzia was an orchestrated campaign of harassment against Scacco, designed to protect Fasoli's job.  It was not whistleblowing.  *See* Ex. 30, Scacco Ethics Complaint.

Fasoli received notice of his suspension on December 22, 2009.  *See* Ex. 25, Notice of Suspension. On December 24, 2009, two days after notification of suspension, Representative Gabriele sent an Email to Robert Murray, the assistant Director of Human Resources, requesting a copy of Scacco's resume, the job posting at the time of his hire, and all of his time records from Kronos T & A system for the past year.  *See* Gabriele email to Robert Murray, dated 12/24/09, attached as *Exhibit* 51. On January 4, 2010, Joseph Tarzia requested documentation on the six trucks that had been purchased in November 2008.  *See* Tarzia E-mail to Tergis, dated January 4, 2010, attached as *Exhibit* 52.  This was literally on **the same day** that the transfer that he orchestrated on Fasoli's behalf was announced.  *See* Ex. 28, Notice of Transfer, dated January 4, 2010.    Shortly after Fasoli's transfer, in January 2010, Representative Gabriele began to persist

31

in seeking documentation about the November 2008 truck purchases from Scacco, and his supervisors, Ernie Orgera and Alex Tergis.  *See* emails from Representative Gabriele, attached as *Exhibit* 53.   Although the requests were repetitive and sought information that had already been provided, Gabriele persisted.[12]

Finally, Scacco, Orgera, and Tergis decided to present the materials directly to the Board of Representatives Operations Committee, which had oversight of Fleet Maintenance, on May 19, 2010.  Gabriele was present at the meeting, and Fasoli attended the meeting, claiming to be there as a "private citizen" and an "observer".  Scacco, Orgera, and Tergis presented to the Committee about the necessity for the truck purchase, and documentation relating to the sale. *See* Operations Committee Report of the Board of Representatives, dated 5/19/10, attached as *Exhibit* 55.

Fasoli's behavior at the meeting is illuminating:

Mr. Fasoli, who previously identified as a member of the public who came as an observer, asked the Chair for permission to make a statement.  Mr. Fasoli stated that he is a former vehicle maintenance mechanic as well as Secretary of Local 82.  He stated that the invoices that he printed out were different than those presented this evening, and added that the City does not have clear title to the trucks.  He further stated that he had been re-assigned to Scofieldtown Yard pending the resolution of a complaint he filed with the Connecticut Human Rights Commission.  Co-Chair Zelinsky asked if Mr. Fasoli had problems with Messrs. Scacco, Tergis or Orgera and whether that was the impetus for attending tonight's meeting.  Mr. Fasoli stated that he did, in fact have problems with his supervisors, they had charged him with certain "things," and this is what prompted his human rights complaint.

*See* Ex. 55, Operations Committee Report, pp. 4-5.   Co-Chairs Zelinsky, Coppola, and Representative Raduazzo all went on record stating that it was inappropriate for the matter to

---

[12]   This is a pattern of harassment that persists to the present day.   Joseph Sargent has been Tarzia and Gabriele's attorney in Scacco's Ethics Complaint, and Fasoli's attorney in this matter. He continues to send FOIA requests to the City of Stamford pertaining to these matters.  *See* FOIA request of Joseph Sargent, attached as *Exhibit* 54.

have been taken up by the Operations Committee, since it was a legal matter that should have been addressed by the Corporation counsel.   Co-Chair Coppola noted that Fasoli was "disingenuous, at best" when he misrepresented himself as being a mere observer to the meeting. Ex. 55, Committee Report, p. 5.  It is obvious that Fasoli and Gabriele were present at the hearing in order to continue their attack on Scacco, Tergis, and Orgera about the sale of the trucks.[13]   Astonishingly, Fasoli claims in this lawsuit that Scacco's behavior at the Committee Meeting was retaliation for his disclosure.  Specifically, plaintiff claims that Scacco fraudulently inflated Fasoli's hourly rate for the time that he spent working on vehicles in order to discredit his complaints about the vehicle purchase. Ex. 1, First Amended Complaint, ¶¶ 38-43.  To describe this allegation as narcissistic does not do it justice.

At the time of the hearing, Fasoli was assigned to the Scofieldtown Yard and not working at Fleet Maintenance. Ex. 2, Scacco Aff. ¶ 108.  He came voluntarily to the Committee Hearing and introduced himself as a mere observer.  *See* Ex. 55, Operations Committee Report, p. 5. Scacco had no idea that Fasoli was going to speak at the hearing so he had no reason to believe that there was any reason to discredit him. Ex. 2, Scacco Aff. ¶ 108.

Fasoli claims that at the Committee meeting, there was a chart or some invoices that showed various truck repairs.  He claims that the chart and an invoice showed Fasoli billing at a much higher labor rate than all of the other workers on the chart.  Later on, when he got back to the shop, he asked for documentation of the repairs made, and it showed him billing at the normal rate. Ex. 46,  Fasoli Depo. I, p. 155.  Fasoli does not know who prepared the chart or invoices. Ex. 46, Fasoli Depo. I, p. 158.  Fasoli's efficiency was not an issue that was addressed

---

[13]   As previously noted, Orgera was not the Director of Operations at the time that the trucks were purchased and had nothing to do with it.

at the Operations Committee Meeting.  Ex. 46, Fasoli Depo. I, p. 156.  The chart and invoices were never presented or addressed at the Operations Committee meeting.  Ex. 46, Fasoli Depo. I, pp. 157-158.   Fasoli has no knowledge that the chart was used or presented in any other context.  Ex. 46, Fasoli Depo., p. 158.  Fasoli does not know if the chart or invoices were ever published in a newspaper or used in a disciplinary hearing. Ex. 46, Fasoli Depo. I, p. 159.  Fasoli does not know if the information in the chart or invoices were ever seen by anyone else, ever.   Ex. 46, Fasoli Depo. I, p. 160.

Despite the fact that there is no evidence that the chart or the invoice was used in any other context, he claims that he was denied overtime at the Scofieldtown Yard as a result of this alleged chart.  Ex. 46, Fasoli Depo. I, p. 162.  Plaintiff alleges that Scacco vetoed Fasoli's overtime while at Scofieldtown Yard due to his speaking out on matters of public concern.  Ex. 1, Amended Complaint, ¶ 47.  Fasoli claims that he did work overtime several times while he was working at Scofieldtown and was paid out of the Solid Waste Department's Budget.  Ex. 22, Fasoli Depo. III, pp. 358-359.  But, Solid Waste refused to continue permitting Fasoli to work overtime if it came out of their budget.  Ex. 22, Fasoli Depo. III, pp. 358-359.  Nobody from solid waste ever called Scacco about whether or not Fasoli could work overtime.  Ex. 2, Scacco Aff.  ¶ 109.  Fasoli has no knowledge about what transpired between Scacco and the Solid Waste department.  Ex. 22, Fasoli Depo. III, pp. 358-359.  Scacco has no authority or discretion to determine who works overtime.  The union shop steward establishes an overtime list, and the overtime work is offered to the individuals on the overtime list in chronological order.  Ex. 2, Scacco Aff.  ¶ 110.

### 4.  Plaintiff's Allegations Regarding Nepotism In The Personnel Division

Plaintiff also alleges that he suffered retaliation based upon observation of nepotism and special treatment given to Tania Barnes's brother, George Rodriguez.   Barnes was a human resources generalist in the City's Personnel Division.[14]  Ex. 1, Amended Complaint ¶¶ 82 – 111. Plaintiff admits that he has no evidence that Scacco knew that plaintiff reported these concerns to Messrs. Gabriele and/or Tarzia.[15]  Ex. 49, Fasoli Depo. IV, p. 601.  Plaintiff also admitted he does not know if there is any causal connection between any discipline he received and the allegations Plaintiff asserted about alleged nepotism.  Ex. 47, Fasoli Depo., V, pp. 760-61. Scacco had no knowledge or any involvement in this matter whatsoever.  He did not know that a reporter contacted Tania Barnes about the issues with her brother on March 16, 2011, as plaintiff alleges.  Ex. 1, Amended Complaint, ¶ 107.  Scacco never knew that Fasoli was the source of the nepotism accusation against Tania Barnes until Fasoli made the allegation in the complaint.  Ex. 2, Scacco Aff.  ¶ 111.     As previously noted, Scacco asked for a human resources representative to come to Fleet Maintenance on March 21, 2011 due to escalating difficulties with Fasoli and his desire to have a witness while providing pre-disciplinary hearing notice to him. Ex. 2, Scacco Aff.  ¶ 80.

### 5.  Mr. Scacco's Ethics Complaint

The City of Stamford has an Ethics Code and procedure that permits any citizen to file a complaint for the violation of the City's Code of Ethics against any employee or elected or appointed officer of the City of Stamford.  *See* City of Stamford Code of Ethics, attached as *Exhibit* 56.  Under the Code of Ethics Procedures, a complaint is then referred to an investigatory

---

[14]   Barnes was initially a co-defendant in this case.  But, plaintiff dismissed the claims shortly after they were filed.
[15]   Plaintiff's self-portrayal of himself as a whistleblower in the matter of George Rodriguez and Tania Barnes, is self-serving and highly suspect.  If the case proceeds to trial, there will be substantial evidence contesting his claim that he was the one who reported this issue.

panel of the Board of Ethics, which then determines whether or not there is probable cause to proceed on the complaint.  If probable cause is found, the case is heard before an adjudicatory panel of the Board of Ethics.

Ever since his difficulties with Fasoli began, Fasoli bragged about his friends in high places.  Nearly every time that Scacco attempted to impose discipline on Fasoli, or Fasoli leveled an accusation against him or Steve Frycz, it was inevitably followed up by inquiries and veiled accusations by Representative Gabriele or Finance Board member Tarzia. In December, 2009, after Scacco finally persuaded human resources to impose discipline on Fasoli, Joseph Tarzia intervened on Fasoli's behalf and persuaded Ernie Orgera to transfer him.  Shortly thereafter, he was continually pressed by Tarzia and Gabriele.  In addition, a third elected official, Board of finance Member Robert Kolenberg, was pressing for the elimination of his department.  *See* Ex. 30, Scacco Ethics complaint. On May 20, 2010, Michael Scacco filed an Ethics Complaint against Gabriele, Tarzia, and Kolenberg. Ex. 30.

Plaintiff's sense of self-importance even drives him so far as to claim that Michael Scacco's Ethics Complaint, which was directed at those three elected individuals, was a retaliatory act directed against him.  Paragraphs 74-76 of plaintiff's complaint are as melodramatic as any "Dark Knight" comic book:

> 74.  Mr. Scacco's ethics complaint was filed in retaliation against Mr. Tarzia, Mr. Gabriele, ***and the Plaintiff,*** in response to their exposing waste and mismanagement in Mr. Scacco's department and the theft of City metals, and to intimidate them, and other employees and elected officials from future inquiries into his department and the Office of Operations.

> 75.  Mr. Scacco's ethics complaint also intentionally cast the ***plaintiff in a false light in retaliation for the Plaintiff's activities as a whistleblower***, and Scacco intentionally published and/or disclosed to the public portions of the Plaintiff's personnel files to the Ethics Board without the plaintiffs knowledge or permission.  Such act was an invasion of privacy.

36

76.  As a result of the publicity of the mismanagement in their department and the theft of City surplus/scrap metals, Mr.  Scacco and Orgera conducted a pattern of intimidation and retaliation in order to discourage and/or discredit the Plaintiff.  ***The short term goal of this intimidation and retaliation was to dissuade the plaintiff from providing testimony should he be called to testify as a witness in the ethics complaint against Mr. Tarzia and Mr. Gabriele.***

James Fasoli was not subject to any potential sanction as a result of the Scacco's ethics complaint.   As noted, the Investigating Panel of the Ethics Board found probable cause as to Scacco's Ethics complaint as to all three officials.  *See* Finding of Probable Cause, dated September 17, 2010, attached as *Exhibit* 57.   The claims against Kolenberg were dismissed by the adjudicatory panel of the Board of Ethics. Scacco's claim against Joseph Tarzia was voluntarily withdrawn after Tarzia resigned from the Board of Ethics in February 2011.  *See* Scacco Letter of Withdrawal, dated February 18, 2011, attached as *Exhibit* 58.   Scacco's claims against Gabriele's complaint were voluntarily withdrawn in May, 2011, after a voluntary mediation took place between Scacco and Gabriele.  *See* Scacco Letter of Withdrawal, dated May 24, 2011, attached as *Exhibit* 59.  There was never any evidentiary hearing before the Ethics Board.

It is ironic that Fasoli claims that Scacco's Ethics Complaint was filed in order to retaliate against him and intimidate him from providing testimony.  Within one year after Scacco filed his Ethics complaint, the following took place:

1.  Joseph Tarzia filed a federal civil rights lawsuit against Scacco and others; the case was withdrawn without ever having been served.

2.  Robert Kolenberg filed an Ethics Complaint counterclaim against Scacco; it was dismissed.

3.  Fasoli filed this lawsuit against Scacco and others.

Ex. 2, Scacco Aff.  ¶ 112 .  Scacco's "intimidation" efforts appear to have been unsuccessful.

Fasoli's claim is a case of the pot calling the kettle black.

## II.  DISCUSSION

### A.   Standard of Review on a  Motion for Summary Judgment

The standard of review on a Motion for Summary Judgment is well settled. As this Court

recently stated in *Vinci v. Quagliani*, 889 F. Supp. 2d 348, 353-354 (D. Conn. 2012):

> Summary judgment is appropriate when "there is no genuine issue as to any material fact
> and ... the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P.
> 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L.
> Ed. 2d 202 (1986). When ruling on a summary judgment motion, the court must construe
> the facts in evidence in the light most favorable to the nonmoving party. It must also
> resolve all ambiguities and draw all reasonable inferences against the moving party.
> *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct.
> 1348, 89 L. Ed. 2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.
> "Only when reasonable minds could not differ as to the import of the evidence is
> summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). A
> nonmoving party, such as the Plaintiff in this case, must therefore present affirmative
> evidence in order to defeat a properly supported motion for summary judgment. When "a
> motion for summary judgment is properly supported by documentary and testimonial
> evidence ... the nonmoving party may not rest upon the mere allegations or denials  of his
> pleadings, but rather must present significant probative evidence to establish a genuine
> issue of material fact." *Marczeski v. Gavitt*, 354 F. Supp. 2d 190, 193 (D. Conn. 2005)
> (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265
> (1986)). To present a "genuine" issue of material fact, there must be contradictory
> evidence "such that a reasonable jury could return a verdict for the non-moving party."
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.
>
> Should the nonmoving party fail to make a sufficient showing on an essential element  of
> his case with respect to which he has the burden of proof, summary judgment against him
> is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 322. A "complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily renders all
> other facts immaterial." *Id.* at 322-23. If the nonmoving party submits evidence that is
> "merely colorable," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. at 249-50. The "mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary judgment."
> *Id.* at 247-48.

**B.  First Amendment Retaliation for Exercise of Free Speech (Count One)**

42 U.S.C. § 1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiff claims that Scacco and the other defendants violated his right to free speech under the First Amendment of the U.S. Constitution.  He alleges an assortment of allegations of protected speech and frequently mentions retaliation, and invites the Court to figure his claims out.

In a First Amendment retaliation claim, a defendant is entitled to summary judgment where the plaintiff does not present sufficient evidence   (1) that the speech at issue was protected; (2) that the plaintiff suffered an adverse employment action; and (3) that there was a causal connection between the allegedly protected speech and the adverse employment action. *Vinci v. Quagliani*, 889 F. Supp. 2d 348, 354 (D. Conn. 2012).

**1.  Plaintiff's Alleged Speech is Not Subject to First Amendment Protection**

The "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  This right is not absolute.  As the United States Supreme Court has repeatedly observed, a balance must be struck "between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services through its employees." *Pickering v. Board of Ed. of Township H.S. Dist. 205, Will County*, 391 U.S. 563, 568-69 (1968).  The determination of

whether an employee's speech is entitled to First Amendment protection is a question of law.

*Connick v. Myers*, 461 U.S. 138, n 7 (1983).

> a.  **A Public Employee's Speech is not Protected by the First Amendment When he Speaks Pursuant to his Job Duties**

When an employee's speech is made pursuant to his official duties, his speech is not

protected by the First Amendment.  In order for a public employee's speech to enjoy First

Amendment protection, the speech must be made as a private citizen. *Garcetti,* 547 U.S. at 421.

In *Weintraub v. Board of Educ.*, 593 F. 3d 196, 205 (2d Cir. 2010), a teacher who complained

about various matters by filing a union grievance was not entitled to First Amendment

protection.  The Second Circuit emphasized that even though the matters that the teacher

complained about were not specifically related to her duties, her access to the grievance process

as a means of raising the issue was an avenue unique to public employees, and not the public at

large. *Weintraub,* 593 F. 3d at 204-5.

> i.  **Fasoli's Assistance to Charlene McArthur was not Protected Speech**

Applying *Garcetti* and *Weintraub* to the instant case, it is clear that Fasoli's activities and

conduct on behalf of Charlene McArthur were not protected speech.  As detailed above, Fasoli's

intervention on behalf of McArthur was through the Union as evidenced by the April 3, 2008

letter (ex. 44), and Union Business Activities Log Sheet (ex. 45). Fasoli's position as Union

secretary was an inherent part of his job in Fleet Maintenance.  As Union Secretary, he had an

access unique to his status as a public employee to assist Ms. McArthur in her sexual harassment

claim, as well as a duty to do so.

> 2.  **A Public Employee's Speech is not Protected by the First Amendment when his Speech is not a Matter of Public Concern**

In addition to the requirement that the employee must be speaking as a private citizen, the public employee must be speaking out on a matter of public concern.  Speech is considered to deal "with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011).  In deciding whether an individual's speech is of public or private concern, the court must examine the "content, form, and context of that speech, as revealed by the whole record." *Id.* at 1211.

Speech on matters of personal interest, which is not protected, includes speech about private employee grievances, personnel decisions, and disciplinary policies. *See Tiltti v. Weise*, 155 F.3d 596, 602-03 (2d Cir. 1998) (rejecting First Amendment claim with respect to statements complaining about nature of work assignments and rate of pay because "expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern"). *See also Serrato v. Bowling Green State Univ.*, 252 F. Supp. 2d 550, 555 (N.D. Oh. 2003) (stating that an "internal employee grievance is the quintessential example of a matter of private concern").  The fact that an employee raises his concerns outside of the chain of command does not transform the speech into a matter of public policy.  *Ross v. Breslin*, 693 F.3d 300, 304 (2d Cir. 2012).  The fact that the speech is critical of the conduct of the employee's unit does not raise it to the level of protected speech made on matters of public policy.  *Singh v. City of New York*, 524 F.3d 361 (2d Cir. 2008); *Roman v. Velleca*, 2012 U.S. Dist. LEXIS 136946, 25-26 (D. Conn. 2012).

### i. Fasoli's Concerns About the Purchase of the Six Vehicles in November 2008 Did Not Raise Issues of Public Policy

The mere fact that Fasoli went outside of the chain of command and told his concerns about the purchase of the six trucks to his "friends in high places" does not elevate his

communications to matters of public policy. By his own admission, Fasoli had no knowledge about any illegalities involving the trucks.  He simply thought that the purchase was a mistake.

Moreover, Fasoli's speech was clearly part of a personnel dispute that he was having with Scacco and other members of City management.  The first request that Fasoli made for information pertaining to the trucks was through the union as part of the defense of his February 2009 suspension.  *See* Email trail, 8/19/09-8/20/09, Peter Knowlton to Robert Murray, attached as *Exhibit* 62.  When the City refused to produce the information on the basis of its irrelevance to Fasoli's suspension, the union filed a Municipal Prohibited Practices complaint on Fasoli's behalf to obtain the information about the trucks. *See* Municipal Prohibited Practices Complaint, dated 9/8/09, attached as *Exhibit 63*.   The fact that this was all a part of a personnel dispute is reinforced by the timing of Representative Gabriele's requests for information about the trucks. As previously noted, Gabriele began his repeated requests for information about the trucks immediately after Fasoli's five day suspension and transfer in December 2009- January 2010. *See* Ex. 53.  It is obvious that Gabriele commenced his request in response to the discipline imposed upon Fasoli.    Finally, at the May 20, 2010 Operations Committee meeting, Fasoli admits that he was there to discuss the truck issue because he was upset with Scacco and his supervisors and had a pending CHRO complaint.  *See* Ex. 55, Committee Report.  Fasoli's communications about the November 2008 purchase of the trucks is not protected speech.

### 3.   The City of Stamford's Interest in the Efficient Fulfillment of its Responsibilities to the Public Outweigh Plaintiff's Interest in Freely Speaking his Mind on a Matter of Public Concern

Even assuming, *arguendo*, that any of the plaintiff's speech was constitutionally protected, it would still not give rise to a claim.  Under *Pickering v. Board of Education*, 391 U.S. 563, 568, (1968), an employee's interest in freely speaking his mind on a matter of public

concern must be balanced against the government's interest in the effective and efficient performance of its responsibilities to the public.  The Supreme Court has identified several pertinent considerations in assessing the government's interest in disciplining an employee in a matter involving protected speech:  (1) whether the employee speech has a detrimental impact on the close working relationships for which personal loyalty and confidence are necessary; and (2) whether the protected speech impedes or interferes with the speakers duties or interferes with the regular operation of the enterprise.  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

There can be no doubt that the City of Stamford's interest in the effective functioning of its Fleet Maintenance Department outweighed Fasoli's interest in speaking out.    He was an indisputably difficult employee whose difficulties with management pre-dated Scacco's hiring. There were numerous complaints about him, his work performance, and his propensity to create turmoil before Scacco even applied for the job.  He questioned every management decision and any change in procedures.

Whenever there was any disagreement, he attempted to escalate it by turning everything into a safety issue, an unfair labor practice, "torture," "psychological abuse," or "corruption." His disagreement with management's decision to purchase the six vehicles becomes "gross mismanagement," even though he admits he knows little about the circumstances of the purchase.    Fasoli eventually cloaked himself in the mantle of a whistleblower, but in fact, he was the epitome of the boy who cried wolf.  Everything needed to be investigated or audited. Nothing could be done without the union's consent.

Any discussion between management and human resources relating to him was a "conspiracy."    Any behavior that he disliked was labeled "retaliation."  Any effort to counsel him or discipline him was met with a flurry of grievances, discrimination complaints, unfair

labor practices, and eventually this whopper of a lawsuit. *See e.g.* Exs. 40, 41, 42. Fasoli bragged about his powerful friends, and did not hesitate to take advantage of his relationships with them for his own purposes. Ironically, Joseph Tarzia's intervention into personnel matters on behalf of Fasoli and another co-worker unleashed a chain of events that ultimately led to Tarzia's resignation from the Board of Finance. *See* Ex. 58. His alleged workplace speech was disruptive in the workplace even for his political allies.

At one point, five of seven mechanics at Fleet Maintenance requested transfers when Fasoli was being brought back to Fleet Maintenance from Scofieldtown Yard. Ex. 2, Scacco Aff. ¶ 64.There can be little argument that his speech and his effort to portray himself as a whistleblower was completely intertwined with his efforts to defend himself from discipline for poor performance, and undermine Scacco's efforts to modernize Fleet Maintenance. The City of Stamford's interest in efficient government outweighed any interest Fasoli may have had in speaking out. None of his speech was entitled to any constitutional protection.

### 4. Plaintiff Can Demonstrate No Causal Connection Between Any of His Speech and Any of the Alleged Retaliatory Conduct

In a First Amendment retaliation claim, a plaintiff must establish "a causal connection between defendants' allegedly retaliatory conduct and [the plaintiff's] protected speech." *Washington v. County of Rockland*, 373 F.3d 310, 320-321 (2d Cir. 2004). To satisfy the causal connection requirement, plaintiff must show that the protected speech was "a substantial motivating factor" in the employer's decision to engage in retaliatory conduct. *Id.* at 320-321. Speculation about what may have motivated a defendant employer to act is insufficient to sustain a First Amendment retaliation claim. *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004).

Where adverse job actions began **before** the plaintiff had ever allegedly engaged in any protected activity, an inference of retaliation does not arise. *Slattery v. Swiss Reinsurance Am.*

*Corp.*, 248 F.3d 87 (2d Cir. N.Y. 2001).  In addition, District Courts in the Second Circuit have

generally held that lapses of 2-3 months between the protected activity and alleged retaliatory

actions do not support an inference of causation.  *Smith v. Branford,* 777 F. Supp. 2d 340 (D.

Conn. 2011).  In addition, no inference of a nexus between alleged protected speech and multiple

adverse actions can be drawn when a plaintiff alleges multiple instances of protected speech and

adverse employment actions, but cannot provide specific factual allegations between any specific

speech and any specific adverse employment activity.  *Edwards v. Horn*, 2012 U.S. Dist. LEXIS

30968 (S.D.N.Y. 2012); *Andino v. Fischer*, 698 F. Supp. 2d 362 (S.D.N.Y. 2010).

In the instant case, Plaintiff alleges numerous instances of alleged "protected conduct," as

well as claims of adverse employment actions spanning over a period of three years.  In addition,

he claims that the City was motivated by his age in these same adverse actions.  Finally, he

mixes these accusations with the many grievances and unfair labor practices that he filed in

response.    Yet, at no point does Fasoli provide any evidence that a specific adverse employment

action was motivated by a specific instance of protected conduct.

Fasoli concedes that he has no idea whether any specific action by Scacco or anybody

else is related to any specific speech that he made:

> Q:   Why was the information –why would that information have been relevant to
> either your grievance or your disciplinary hearing where you were suspended for one
> day?
> A:  Because I stated that the trucks were unsafe.
> Q:  Yeah, but that is not why you were disciplined.
> A:  **I was disciplined for many reasons. I have no idea what the motive was or
> why.  They are all still pending as far as I know.**

Ex. 16, Fasoli Depo., II, p. 175.

> Q:  Can you answer my question whether or not there's a specific criticism that was made
> because of the fact that you complained about work being assigned to outside vendors?
> Yes or no.

45

A:  Again you want me to answer yes or no.  I don't know what the specific criticism would have been.  I make a complaint, I get criticized.  I don't know if that criticism or if my complaint about work performance, what it was related to because I did make complaints about numerous things.  So I can't say "I said this and he criticized me for it."

Q:  Why can't you do that?

A:  Because I don't know what went in his mind, how long it took him to retaliate against me –

Q:  setting aside –

A:  --**so it wasn't a specific retaliation, I did this and he did that, I did this, that and later on he did this, this, this, and I believe it was a pattern of retaliation for me complaining.  I can't answer it no other way.**

Q:  So your testimony is simply that you believe there was a pattern of performance criticism against you, but you are not able to connect the specific performance criticism to any individual or specific complaints, is that what you're saying?

A**:  I'm saying I don't know why my performance was constantly criticized and no one else was.  I don't know why.**  I believe that it was me complaining about the issues such as safety, such as outside work vendors working on the trucks, such as the type of work I was assigned.  So that's what I believe.

Ex. 49, Fasoli Depo., IV, pp. 571-573.

Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim.  *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2000) (citing *Blue v. Koren*, 72 F.3d 1075, 1082-83 (2d Cir. 1995)).  *Brink v. Muscente*, 2013 U.S. Dist. LEXIS 137880 (S.D.N.Y. Sept. 25, 2013).  In the instant case, Fasoli is unable to tie the motivation behind alleged adverse employment action to any specific speech.  The fact that he was a constant complainer, or that he was disliked because he was a constant complainer, is insufficient.

### a.  Transfers to and From Fleet Maintenance

Fasoli makes retaliation claims against Scacco for Fasoli's transfers to and from Fleet Maintenance, even though Fasoli has no evidence that contradicts the testimony of Scacco and Ernie Orgera that Scacco played no role in any of the transfers. Ex. 22, Fasoli Depo. III., 355-

356.  Indeed, Scacco wanted Fasoli discharged and not transferred to Scofieldtown, and he faced an open revolt when Fasoli came back to fleet Maintenance.  Scacco Aff. ¶ 52.

### b.  Charlene McArthur Sexual Harassment

Fasoli makes claims against Michael Scacco for retaliation for his efforts on behalf of Charlene McArthur for an incident involving sexual harassment, even though Scacco never had any knowledge of the complaint or Fasoli's role in processing her complaint, and Fasoli has no evidence that Scacco had any knowledge of the complaint.  Ex. 46, Fasoli Depo. I, pp. 38-39, 57-58; Ex. 47,  Fasoli Depo. V, p. 778.  Scacco Aff. ¶ 95.

### c.  Retaliation For the Scrap Metal Issue

Fasoli makes claims that Michael Scacco retaliated against him for the scrap metal issue. The scrap metal controversy arose following emails between Gabriele and Scacco on April 8, 2010.  At that time, Fasoli was not even working at Fleet Maintenance or reporting to Scacco. Prior to that, Scacco, Steve Frycz, and others had already disciplined or raised concerns about Fasoli on numerous occasions: June 18, 2008 (documenting excessive time on repair), June 23, 2009 (written warning for insubordination); February 18, 2009 (one day suspension); June 30, 2009 (written warning); July 18 (Expression of safety concerns due to Fasoli's emotional state); August 5, 2009 (written warning);  December 22, 2009 (five day suspension).

Fasoli has presented no evidence that Scacco knew that Fasoli claimed to be the source of the scrap metal investigation until a meeting where Fasoli made generalized complaints about being a whistleblower on March 2, 2011, just two months before he filed his lawsuit.  *See* Ex. 34, Scacco Memo to Orgera and Hibson, dated 3/2/2011.  Fasoli knows of no evidence that Scacco did anything wrong in connection with the disposal of the scrap metal.  Ex. 46, Fasoli Depo. I, p.

70. Fasoli has no evidence that anyone ever told or directed Scacco to take action against Fasoli as a result of his role in the scrap metal controversy.  Fasoli has no evidence to contradict Scacco's testimony that he never believed that Fasoli was the source that led to the scrap metal controversy.  Scacco Aff. ¶ 98-100.

### d.  Purchase of the Six Trucks in November 2008

As previously noted, the issue of the six vehicles arose in August 2009, as part of Fasoli's union's defense of his grievance. *See* Ex. 62.  Fasoli testified that he did not go to anyone else before raising the issue through the union.  Ex. 46, Fasoli Depo. I, p. 137.   Fasoli further testified that the first time that he spoke to any city official about the issues relating to the six trucks was "about 4-5 weeks before the operations committee meeting." Ex. 46, Fasoli Depo. I, pp. 143-44.  As previously noted, the Operations Committee Meeting took place on May 19, 2010, so Fasoli's initial complaint about the trucks to city officials would have taken place in April 2010.

As noted in the discussion regarding scrap metal *supra,* this would have been while Fasoli was stationed at Scofieldtown Yard, not at Fleet Maintenance.  He was not even reporting to Scacco at the time of his alleged disclosures to Tarzia and Gabriele.  As noted *supra,* most if not all of the disciplinary actions that Fasoli claims to be retaliatory took place well *before* his transfer to Scofieldtown Road.  There is insufficient evidence to believe that anything that happened after this can be related to this disclosure, given the longstanding pre-existing documented difficulties between Fasoli, Scacco, and Scacco's predecessors at Fleet Maintenance.

### e.  Ethics Complaint[16]

As outlined above, Scacco's Ethics Complaint, which was filed in May 2010, was filed at a time when Fasoli was not working at Fleet Maintenance or reporting to Scacco.  Once again, there is no inference of improper motivation that Scacco's acts were intended to "chill" or intimidate Fasoli from testifying as a witness because Fasoli had been subject to discipline and criticism well before Scacco ever filed his Ethics Complaint.

Scacco's Ethics Complaint could not possibly be directed at "chilling" Fasoli's testimony at a potential ethics hearing for a number of reasons:

1)   At the time that it was filed, Scacco had no control over whether there would even be an adjudicatory investigatory hearing.  Under the City of Stamford's Board of Ethics Rules, an Investigatory Panel, composed of citizens who were not elected officials or part of City Government, would make the determination of whether there was probable cause to go forward on the complaint.  *See* Ex. 56, Stamford Code of Ethics, Rule 19-47.D. As previously noted, probable cause on Scacco's complaint was not determined until September 2008, four months after Scacco had filed his complaint.

2)   Scacco's complaint was prosecuted by the Investigating Board of the Board of Ethics.  Once probable cause was determined, Scacco's complaint was prosecuted by the Investigating Panel, not Scacco.  *See id.*  They would determine the witnesses to be called.  Scacco had no control over who would be called as a witness.

---

[16]      Scacco's Ethics Complaint was not filed by Scacco in his capacity of as Director of Fleet Maintenance.  Any individual can file an Ethics Complaint against an employee or elected official.  An Ethics Complaint is separate from the employee discipline and grievance process and Scacco's Ethics Complaint was not filed as part of his duties as Director of Fleet Maintenance.  Thus, Scacco's Ethics Complaint cannot be considered an adverse employment action under 42 U.S.C. § 1983, because Scacco's complaint was not filed "under color of law."

49

3)   Given Fasoli's litigious nature, no reasonable jury would ever believe that Scacco could conceivably have believed that filing a claim would ever intimidate Fasoli.

4)   Scacco's Ethics Complaint was not directed against Fasoli.

Fasoli can point to no direct evidence of improper motive underlying any of his multiple allegations of protected speech.  Given the fact that Fasoli was having significant employment issues at Fleet Maintenance before Scacco was hired, and before most or all of the alleged speech occurred, no inference from temporal proximity can be drawn to connect the speech to the alleged adverse employment actions.    There is insufficient evidence of any causal connection between Fasoli's alleged protected speech and any of his alleged adverse employment actions.

## 5.  Scacco is Entitled to Qualified Immunity

An individual defendant is entitled to summary judgment on the issue of qualified immunity (1) if the court finds that the asserted rights that are at issue were not clearly established, or (2) if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in his favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.  *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)).

Even assuming *arguendo*, that Fasoli had made out a prima facie case for his § 1983 claim, Scacco would be entitled to qualified immunity in the instant case.  Under the circumstances of the instant case, no rational jury would fail to conclude that Scacco's behavior

was objectively reasonable.  In addition to the arguments already set forth, Scacco notes the following:

1.   Any discipline that Scacco imposed was reviewed by Human Resources.  See Ex. 15, 18, 21, 23, 25, 32, 33, 34, 35, 36, 38.

2.   Scacco documented the reasons for any discipline in writing.  *See e.g.*,  Exs. 15, 25, 32, 38.

3.   Any discipline that Scacco imposed was subject to appeal and review under the collective bargaining agreement.  *See generally*, Ex. 60, CBA.

4.   Several of the suspensions imposed by Scacco were reduced or reversed. Ex. 2, Scacco Aff. ¶ 54 .

5.   There were independent witnesses for nearly all of the events leading to Fasoli's discipline.

6.   There is no evidence that Scacco either placed the toy mouse on Fasoli's tool box, or wrote anything on the blackboard.

7.   Scacco investigated the allegations, and found no corroborating witnesses or evidence.

8.   Scacco properly took into account his experience with Fasoli's credibility and litigiousness.

9.   Scacco reported the incidents with the toy mouse to human resources, questioned the staff about it, and told everyone to stay away from each other's tool box. *See* Ex. 35.

Scacco had a legitimate reason to impose discipline on Fasoli.  Any reasonable juror could not fail to appreciate that Fasoli was an extremely difficult and insubordinate employee.

Any reasonable juror would appreciate that Fasoli's insubordination and litigiousness were directed at undermining Scacco and what he was trying to accomplish in Fleet Maintenance.

For these reasons, Defendant Scacco is entitled to judgment on Count 1.

## C.  Invasion of Privacy (Count Nine)

Plaintiff alleges that the "disclosure of portions of the Plaintiff's personnel file, without prior notice to the Plaintiff, and the information contained therein, was highly offensive to the Plaintiff, and would likewise be found offensive to a reasonable person." Ex. 1, First Amended Complaint, ¶ 219. Plaintiff further alleges that he has "a protected interest in keeping his personnel files private, and the Defendants Scacco and the City violated that interest when they published portions of the Plaintiff's personnel files without his knowledge or permission"  (ex. 1, Compl. ¶ 220), and that the "Defendants Scacco and the City had a duty not to disclose the Plaintiff's personnel file for dissemination to the public, and they violated that duty when they published portions of the Plaintiff's personnel files without his knowledge or permission". Ex. 1, Compl. ¶ 221.  With regard to Scacco, Plaintiff alleges that

> (i) In violation of City regulations, Defendant Scacco has maintained a separate file on the Plaintiff in part and parcel to his harassment and retaliation of the Plaintiff. A copy of the same eventually made its way into the official personnel file of the Plaintiff and as such casts the Plaintiff in a false light because Defendant Scacco's self-serving documents received absolutely no review by the City's Human Resources or Legal Department. Ex. 1, Complaint ¶ 132.

> (ii) Mr. Scacco's ethics complaint also intentionally cast the Plaintiff in a false light in retaliation for the Plaintiff's activities as a whistleblower, and Mr. Scacco intentionally published and/or disclosed to the public portions of the Plaintiff's private personnel files to the Ethics Board without the Plaintiff's knowledge or permission. Such action was an invasion of Plaintiff's privacy. Ex. 1, Complaint ¶ 75.

Based on his allegations and testimony at his deposition, Plaintiff's invasion of privacy claim against Scacco is limited to his allegations concerning disclosure of Plaintiff's personnel file and the disclosure of his name as part of the Ethics Complaint Scacco brought against Tarzia, Gabriele, and Kolenberg. With respect to both of these categories, Plaintiff's claim is insufficient as a matter of law.

### 1. The Connecticut Personnel Files Act, Conn. Gen. Stat. §31-128f Does Not Provide For a Private right of Action

Conn. Gen. Stat. § 31-128f  prohibits certain unauthorized disclosures of personnel files. It does not provide a private cause of action.  *Siena v. Aetna, Inc.*, 2006 Conn. Super LEXIS 2614, CV040832550S (Conn. Super. Ct. Aug, 29, 2006); *Day v. Seacorp*, 2002 Conn. Super LEXIS 2744, CV 550385 (Conn. Super. Ct. Aug. 13, 2002). As such, to the extent that the plaintiff's invasion of privacy claim is premised on the wrongful disclosure of his personnel file or portions of his personnel file, his claim should be dismissed on this basis alone.

### 2. Plaintiff's Claim for Invasion of Privacy

**a. Legal Standard**

The Connecticut Supreme Court has stated the "[t]he four categories of invasion of privacy are set forth in 3 Restatement (Second), Torts § 652A [1977]: (a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn.

107, 131 (1982).   Plaintiff's claim as to Defendant Scacco lies in the fourth category of invasion

of privacy, to wit, false light.[17]

To prevail on an invasion of privacy by false light, the plaintiff must show "(a) the false

light in which the other was placed would be highly offensive to a reasonable person and (b) the

actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter

and the false light in which the other would be placed.  This form of invasion of privacy protects

one's interest in not being placed before the public in an objectionable false light or false

position, or in other words, otherwise than as he is."   *Id.  Honon v. Dimyan*, 52 Conn. App. 123,

132-33, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999).

 Restatement (Second), Torts § 652D, comment a, states, in pertinent part:

> 'Publicity,' as it is used in this Section, differs from 'publication,' as that term is
> used . . . in connection with liability for defamation . . .'Publicity' . . . means that the
> matter is made public, by communication of it to the public at large, or to so many
> persons that the matter must be regarded as substantially certain to become one of public
> knowledge. The difference is not one of the means of communication . . . It is one of a
> communication that reaches, or is sure to reach, the public.

*Ackiefi v. Town of Bloomfield*, 2007 Conn. Super. LEXIS 395,  at*28-29 (Conn. Super. Ct. Feb.

9, 2007).

**b.   Plaintiff's Claim for Invasion of Privacy Fails because Scacco's Communications
Relating to his Ethics Complaint Are Absolutely Privileged**

Any statements made by Scacco as part of the ethics complaint and investigation are

protected by the absolute privilege which covers actions done in furtherance of judicial and

legislative proceedings and administrative proceedings which are "quasijudicial" in nature.

*Kelley v. Bonney*, 221 Conn. 549, 566  (1992) (finding that immunity "extends also to the

---

[17] To the extent Plaintiff seeks to stray from his allegations and claims that Scacco gave
unreasonable publicity into his private life, the Defendant Scacco adopts the arguments made on
this issue by co-Defendant City of Stamford.

proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as judicial or quasijudicial, in character). The Connecticut Supreme Court has reiterated that "allegations contained within a complaint in a quasijudicial proceeding are absolutely privileged." *Kelley v. Bonney*, 221 Conn. 549 (1992) (citing *DeLaurentis v. New Haven*, 220 Conn. 225, 263 (1991)).

The privilege also applies to claims for invasion of privacy. *Alexandru v. Dowd*, 79 Conn. App. 434 (2003); *Honan v. Dimyan*, 52 Conn. App. 123, 134-135 (1999).

The factors to be determined in determining whether a proceeding is quasijudicial in nature includes "whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties." *Kelley*, 221 Conn. at 567.

The Stamford Ethics Board has the authority to conduct investigations and hearings pursuant Code § 19-14 D which provides that any person may submit a written complaint and that the Investigation Board members shall investigate the complaint and may conduct hearings to determine if there is probable cause to believe there is a violation of the Code of Ethics. If there is a finding of probable cause, the board initiates public hearings whereby "the Investigating Board members shall have the responsibility of gathering and presenting evidence, together with the complainant, to the Hearing Board members". *See* Ex. 56, § 19-14 D(3)(c). The Board of Ethics then determines whether a violation of the Code has been proven by clear and convincing evidence, and issues a written final decision with the Board's findings specifying the code section violated and factual basis supporting the violation. *See* Ex. 56, § 19-14D(6)(a)-(b)).

55

Statements and documents submitted by an individual in connection with the City of Stamford

Ethics Board are quasi-judicial in nature and subject to absolute immunity. *See Carbone v. Diez*,

2011 Conn. Super. LEXIS 3129, at *28 (finding that Norwalk Board of Ethics has authority to

conduct proceeding of a quasi judicial nature).  As such, the contents of the ethics complaint

filed by Scacco in addition to any statements made by Scacco as part of the investigation and

attendant proceedings are protected by absolute immunity.

    **c.   Even Assuming, Arguendo, that Scacco's Communications With Respect to his Ethics Complaint Were Not Privileged, the Undisputed Materials Demonstrate That Defendant's Invasion of Privacy Claim Are Legally Insufficient**

    The claim also fails substantively because none of the elements of false light are met.

First, Plaintiff cannot prove publicity sufficient to state a claim. There is no evidence that Scacco

publicized any information from Fasoli's personnel file to the public.[18]   Fasoli has no

knowledge as to whether any portions of his personnel file were ever publicized.  Ex. 22, Fasoli

Depo. III, p. 613.  Defendant point to no evidence that Scacco ever publicized any item from his

personnel file.  *See Handler v. Arends*, 1995 Conn. Super. LEXIS 660, at *28 (Conn. Super. Ct.

1995) (granting summary judgment on invasion of privacy by false light where no evidence that

defendant "'gave publicity' to matters which placed the plaintiff in a false light 'before the

public'"); *Day  v. Seacorp, Inc.*, 2002 Conn. Super LEXIS 2744, CV 550385 (Conn. Super. Ct.

2002) (granting summary judgment on invasion of privacy by false light where former employee

cannot prove publicity).[19]

---

[18]    The only public statements about Fasoli ever made by Scacco, directly or through counsel, were after Fasoli asserted himself into the public spotlight by filing this complaint and providing a copy of it to the Stamford Advocate.

[19]    The disingenuous nature of Fasoli's invasion of privacy claim is amply demonstrated by the fact that in the same complaint where he claims that he was improperly mentioned in Scacco's Ethics complaint, he identifies four non-party employees and either reveals confidential

Second, nothing about Fasoli that was mentioned in Scacco's Ethics complaints was false.  *See* Ex. 30, Ethics Complaint.   Fasoli was friends with Joseph Tarzia and Sal Gabriele, and was providing them with information.  Scacco was trying to discipline Fasoli for poor performance. Fasoli did request information pertaining to the trucks.  Tarzia did intervene on Fasoli's behalf.  The truth and accuracy of these statements is not in dispute.   None of these statements place Mr. Fasoli in a false light.  The defendant has failed to identify a single statement or document publicized by Scacco that has cast him in a false light.  *See Handler v. Arends*, 1995 Conn. Super. LEXIS 660, at *28 (Conn. Super. 1995).

**D.  Intentional Infliction of Emotional Distress (Count Ten)**

In Count Ten, Plaintiff claims intentional infliction of emotional distress against all Defendants. As an initial matter, the court lacks subject matter jurisdiction over Plaintiff's IIED claim in that the tortious conduct complained of falls within the purview of the Collective Bargaining Agreement and that is his exclusive remedy.  Even assuming, arguendo that this court has jurisdiction, Plaintiff's claim for intentional infliction of emotional distress fails the undisputed material facts are insufficient as a matter of law to support the "extreme and outrageous" element of that claim.

**a.   Legal Standard**

To prevail on a claim of intentional infliction of emotional distress, Plaintiff must establish that: 1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct; 2) the defendant's conduct was extreme and outrageous; 3) the defendant's conduct was the cause of the plaintiff's distress; and 4) the

---

issues (Charlene McArthur), or levels accusations at them (Richard Valentine, George Rodriguez).

emotional distress sustained by the plaintiff was severe. *Peytan v. Ellis* 200 Conn. 243, 253 (1986).

"[I]n assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function. In this capacity, the role of the court is to determine whether the allegations ... set forth behaviors that a reasonable fact finder could find to be extreme or outrageous. In exercising this responsibility, the court is not fact finding, but rather is making an assessment whether, as a matter of law, the alleged behavior fits the criteria required to establish a claim premised on intentional infliction of emotional distress." *Tracy v. New Milford Public Schools*, 101 Conn. App. 560, (2007); *Gagnon v. Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 847 (2006).  "Individuals in the workplace should  reasonably should expect to be subject to the stress inherent in routine employment-related conduct, including performance evaluation, both formal and informal, decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance, and disciplinary or investigatory action arising from actual or alleged employee misconduct."  *See Perodeau v. City of Hartford*, 259 Conn. 729 (2002).   Unpleasant workplace gossip, rivalry, personality conflicts and office politics are part of the vicissitudes of the workplace." *Id.*

Liability for intentional infliction of emotional distress has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim,

Outrageous!" *Valentine v. Labow*, 95 Conn. App. 436, 448, *cert. denied,* 280 Conn. 933, 909 (2006).

In *Engle v. Bosco*, 2006 WL 2773603 (Conn. Super. Ct. 2006), the plaintiff alleged that throughout the course of his employment he and other employees were verbally belittled and abused by the defendant.  On more than one occasion the defendant Bosco referred to the plaintiff and the plaintiff's co-workers as "dumb mother fuckers" and accused them of being "brain dead" in the presence of other employees. On another occasion the defendant Bosco told the plaintiff and the plaintiff's co-workers that he wouldn't let them "lick [his] dead cat's balls," and that his "dead cat could do a better job" than the plaintiff and other employees.  He also threatened the plaintiff with termination and intimidated him with threats of surveillance.  He also threatened the plaintiff with termination and intimidated him "by spitting on him and foaming at the mouth."  On another occasion the defendant Bosco allegedly stated that he would not let the plaintiff "lick the sweat off [his] balls."  The court held that this conduct was insufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress. Courts in Connecticut are reluctant to allow a claim for intentional infliction of emotional distress for issues arising in the workplace. *See, e.g., Dollard v. Bd. of Educ.,* 63 Conn. App. 550, 554 (2001) (plaintiff's claim of concerted plan to force plaintiff to resign or become so distraught as to have reason to terminate her does not rise to an intentional infliction of emotional distress claim); *Appleton,* 254 Conn. at 21 (finding allegations that school officials made derogatory comments, in front of other employees, concerning plaintiff's work performance and his ability to read, contacted plaintiff's daughter to recommend that plaintiff take some time off because he was acting erratically, and arranged to have him escorted by police off of school property were insufficiently extreme or outrageous to state a cause of action); *Emanuele v.*

*Boccaccio & Susanin,* No. CV 90-0379367S, 1992 WL 79823 at *2 (Conn. Super. Ct. Apr. 10, 1992) (holding conduct not extreme and outrageous where at-will employee alleged her employer made false accusations regarding her work performance, and used coercion, threats and intimidation to force her to sign a document against her will, all for the purpose of depriving her of benefits and compensation); *Rock v. Mott Metallurgical Corp.,* No. CV990492215S, 2001 WL 100307 at *5-8 (Conn. Super. Ct. Jan. 10, 2001) (granting defendant's motion for summary judgment where plaintiff alleged that she was ordered to lift and carry heavy objects beyond her ability, was required to work without being supplied the necessary resources, was transferred to a work station without a chair or desk, was called names, and was falsely accused of not finishing her work, because in totality the acts were "less than 'extreme' and 'outrageous' in nature"). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Little v. Yale*, 92 Conn. App. 232, 239-40, 884 A. 2d 427 (2005), *cert. denied* 276 Conn. 936, 891 A. 2d 1(2006).

Connecticut courts have repeatedly found that allegations concerning condescending, humiliating comments and/or actions by co-workers or supervisors are insufficient as a matter of law to set forth such a claim. *See Roman v. Department of Corrections*, 2006 WL 2556376 (Conn. Super. Ct. 2006).  In *Diorio v. Waterbury Hosp., Inc.*, 2007 WL 2080305 (Conn. Super. Ct.  2007) summary judgment was granted in a case with similar facts to the allegations in this case:  The plaintiff contended that she was subject to emotional distress by: being ignored by co-workers and her supervisor; being yelled at by a supervisor in front of co-workers and patients; being talked to in a "degrading way"; being subjected to mistreatment on a regular basis; having co-workers spy on her; and by being told that her supervisor wanted to get rid of her.

In *Appleton v. Board of Education*, 254 Conn. 205 (2000)*,* the plaintiff teacher claimed in her affidavit that one of the defendants "'made condescending comments to [her] in front of [her] fellow colleagues questioning [her] vision and ability to read; telephoned the plaintiff's daughter, representing that the plaintiff 'had been acting differently' and should take a few days off from work; and telephoned the police, who came to the school and escorted the plaintiff out of the building to her car. The plaintiff also asserted in her affidavit that she was subjected to two psychiatric examinations at the request of the board, and that she was forced to take a suspension and a leave of absence and, ultimately, forced to resign." 254 Conn. at 211. The court determined that, while distressing to the plaintiff, these occurrences did not constitute extreme and outrageous conduct and, therefore, concluded that the defendants' conduct was insufficient to form the basis of an action for intentional infliction of emotional distress. *Id*. at 212.

Similarly, in *Dollard v. Board of Education of the Town of Orange*, 63 Conn. App 500 (2001), the plaintiff alleged facts which fell short of the necessary level to give rise to a cause of action for intentional inflictions of emotional distress.  In *Dollard*, the plaintiff alleged that the defendants "jointly engaged in a concerted plan and effort to force the plaintiff to resign from her position or to become so distraught that they would have a colorable basis for terminating her employment." *Id.* at 552.  The plaintiff alleged that the defendants,

> hypercritically examin[ed] every small detail of her professional and personal conduct.  Specifically, the defendants transferred the plaintiff to a school where she did not want to be assigned and then secretly hired someone to replace her at the school from which she had been transferred. . . publicly admonished the plaintiff for chewing gum, being habitually late, being disorganized and not using her time well.  Finally, the defendants unnecessarily placed the plaintiff under the intensive supervision of a friend [of the defendant].

*Id.* at 552-53.  The court compared these facts to those in *Appleton* and determined that they were not sufficient enough to be considered extreme and outrageous. *Id.* at 554-55.  In doing so,

the court stated that "while the conduct alleged here may have been distressful and hurtful to the plaintiff, it was no more extreme and outrageous than the conduct alleged in *Appleton*. *Id*. at 555.

An employee being yelled at by their boss is not considered extreme and outrageous conduct.  In *Colona v. Baron Institute of Technology, Inc.*, No. HHDCV094042637S, 2011 WL 590880, (Conn. Super. Ct. Jan. 26, 2011), the Connecticut Superior Court granted a motion to strike for a claim of intentional infliction of emotional distress by a former employee against her superiors and the school.  The plaintiff alleged that she was retaliated against for exposing that the school was improperly adjusting grades of students so the school could continue to receive government funding. *Id.*  When the plaintiff made a statement regarding the issue, her superior approached her, and "in a very agitated style and in a harsh voice stated . . . 'you just threw me under the bus and then backed up and ran me over again!'" *Id.* at 2.  She also claimed that after she voiced her opinion her work environment became extremely "hostile and uneasy" and that the schools managerial employees "engaged in a course of retaliatory conduct against the plaintiff in an effort to terminate her employment, and that they became 'hostile, degrading and threatening in their behavior' and made negative and offensive comments" to her. *Id*. at 2.  The court determined that this was not sufficient to allege a cause of action for intentional infliction of emotional distress.  In doing so, the court compared the facts to the earlier Connecticut cases of *Appleton* and *Dollard* and stated that "while the conduct alleged by the plaintiff herein was offensive and insulting to her, it was far less egregious that the conduct alleged in the foregoing cases wherein the Supreme and Appellate Courts determined that the allegations did not rise to the level of 'extreme and outrageous.' " *Id.* at 8.

The Court has also determined that actions done by an employer before the termination of an employee that were meant to harass, intimidate and defame him in the workplace were not

considered extreme and outrageous.  In *Tracy v. New Milford Public Schools*, 101 Conn. App.
560, 922 A.2d 280 (2007), the plaintiff alleged that his superiors conspired to "harass him by
carrying out a pattern of conduct, including the denial of a position, initiating disciplinary actions
without proper investigation, defamation of character and intimidation, and that their conduct
was willful, wanton and malicious." *Id.* at 562.  Part of the plaintiff's complaint alleged that he
was subjected to discipline for three acts of misconduct without a proper investigation. *Id.* at 567.
After the trial court granted the motion to strike, the plaintiff argued on appeal that all he was
required to do was allege facts to form the basis of the claim, and he would then be able to
develop the facts during trial. *Id.* at 569.  The Appellate Court, in comparing the facts to cases
like *Appleton*, concluded that the facts pled did not rise to a level considered extreme and
outrageous. *Id.* at 570.

A claim that an employee made false oral or written statements about a plaintiff does not
rise to the level of extreme and outrageous either.  In *Avitable v. 1 Burr Road Operating
Company II, LLC*, No. FSTCV095012806S, 2010 WL 2926242 (Conn. Super Ct. June 4, 2010),
the plaintiff's claim for intentional infliction of emotional distress was based on the allegations
that: 1) he was wrongfully discharged; 2) the defendants falsely accused him of  violating the
defendant's policies; and 3) the defendants falsely accused him of engaging in unprofessional
conduct and inappropriate conduct at work. *Id.* at 8.  To determine whether the allegations the
plaintiff made rose to the level of extreme and outrageous, the court compared the facts in the
case to *Tracy, Appleton,* and *Dollard.*  After reviewing the facts of the previous cases, the court
determined that the allegations made by the plaintiff were "far less egregious than the
allegations" in previous cases, and as a result granted the defendant's motion to strike. *Id.* at 9.

Similarly, the federal courts in this District, applying Connecticut law, interpret the qualification of extreme and outrageous conduct in the workplace strictly. *See, e.g., Armstead v. Stop & Shop Cos.,* No. 3:01 CV 1489(JBA), 2003 WL 1343245 at *4-5 (D. Conn. Mar. 17, 2003) (dismissing intentional infliction of emotional distress claim, holding that "claims of employer misconduct in the form of intentional discrimination or retaliation, including discharge, which challenge motive or intent, are dismissed unless the manifesting conduct is extreme and outrageous."); *Thomas v. St. Francis Hosp. & Med. Ctr.,* 990 F. Supp. 81, 92 (D. Conn. 1998) (verbal warnings, suspension, and termination may have resulted in hurt feelings, but were insufficient to support claim of intentional infliction of emotional distress); *Johnson v. Cheseborough-Pond's USA Co.,* 918 F. Supp. 543, 551 (D. Conn. 1996) (negative performance reviews, sudden termination, and being physically escorted from premises are not actionable as intentional infliction of emotional distress); *Carone v. Mascolo*, 3:06CV01094(DJS), 2007 WL 2318818 (D. Conn. Aug. 14, 2007).

### b.   The Undisputed Factual Allegations in the Instant Case Fall Short of the Legal Threshold to Bring a Claim of Intentional Infliction of Emotional Distress

The factual allegations which the Plaintiff claims are the basis of the IIED claim against Mr. Scacco fall into four different categories:

(1) allegations concerning Scacco's behavior at the Board of Representatives Operations Committee Meeting held on May 19, 2010;

(2) allegations pertaining to the Board of Ethics Complaint filed by Mr. Scacco against Mr. Tarzia and Mr. Gabriele;

(3) allegations pertaining to a meeting between Mr. Scacco, Tania Barnes, and the Plaintiff on March 21, 2011;

(4) allegations that Mr. Scacco sought to intimidate or retaliate against the Plaintiff, by among other things:  denying the Plaintiff overtime work sometime between January and April of 2010; threatening the Plaintiff with the possibility of being terminated of

suspended without pay for "vague accusations of 'poor work performance'" ; issuing a pre-disciplinary notice for failing to call in sick on March 22, 2011; maintaining a separate file on the Plaintiff which was "part and parcel to his harassment and retaliation" ; gathering false evidence and witnesses in order to bring disciplinary action against the Plaintiff; and keeping the toy mouse on his computer monitor.

As highlighted by these cases, the acts complained of in this case, drawing all reasonable inferences, fall far short of the extreme and outrageous conduct needed to sustain a claim of intentional infliction of emotional distress in the workplace.  The allegations against Scacco are the types of allegations of unpleasant and stressful workplace conduct that have previously been rejected by the Connecticut Supreme and Appellate courts, as well as numerous federal courts, as satisfying the "extreme and outrageous" element of a claim of Intentional Infliction of Emotional Distress in the workplace.

With regard to the allegations addressing the May 19, 2010 Board of Representatives Operations Committee Meeting, previously discussed, the accusation of falsified documents is insufficient.   There is no evidence that at the meeting Scacco made any statements concerning Fasoli. *See* Ex. 55, Committee Meeting Report.  Or, that any report with inflated labor rates was presented, reviewed, or discussed at the meeting. *Id.* By contrast, the evidence is undisputed that Fasoli attended the meeting and accused Scacco of providing inaccurate records relating to the purchase of the used trucks.  *Id.* Simply, there is no evidence to support Plaintiff's unfounded allegations of intentional conduct that is extreme and outrageous.

With regard to the actions surrounding Mr. Scacco's Ethics Complaint against Mr. Tarzia and Mr. Gabriele, as discussed *supra*, these action are absolutely privileged.  The judicial privilege also applies to claims of intentional infliction of emotional distress arising out of the litigation.  *Alexandru v. Dowd*, 79 Conn. App. 434 (2003).  Plaintiff has no evidence of any

65

public humiliation or unethical association beyond filing his complaint and supporting documents.

With regard to the actions surrounding the March 21, 2011 meeting with the Plaintiff, allegations that Scacco shouted at him and made false accusations, even if true, are legally insufficient.

Finally, with regard to the barrage of allegations concerning Fasoli's displeasure with discipline, transfers, overtime, suspensions, office pranks, and other allegations of violations of the terms and conditions of his employment there is no evidence that these actions rise to level of extreme and outrageous conduct.

Again, in addition to the dearth of evidence to support such allegations, the case law above shows that all of the acts alleged are not extreme and outrageous as a matter of law. For these reasons, the Plaintiff's allegations do not rise to the level of extreme and outrageous necessary to make out a claim for IIED and the judgment should enter in favor of Defendant.

### c.   Plaintiff's Intentional Infliction of Emotional Distress Claim is Precluded by His Collective Bargaining Agreement

At all times mentioned in his complaint, Plaintiff has been a member of the United Electric, Radio and Machine Workers of America, Local 222, CILU/PIPU # 82.[20]  Ex. 2, Scacco Aff. ¶ 93. Article 1 of the CBA broadly recognizes the union as the "exclusive bargaining agent with respect to wages, hours, and **working conditions."** (Emphasis added).  Ex. 60, CBA, Art I, p. 4. The CBA provides a Grievance and Arbitration Procedure.  Ex. 60, CBA Art. XXV, p. 24.  Any employee has the right to initiate the procedure.  If the procedure is not resolved through the

---

[20] From July 1, 2003 through June 30, 2009, United Electric Union operated under the terms of the Teamsters' Collective Bargaining Agreement. Ex. 2, Scacco Aff. ¶ 94. The Collective Bargaining Agreement is attached as Ex 60.

initial steps, the union may request arbitration before the state Connecticut Board of Mediation

and Arbitration.  CBA Art. XXV, p. 24.  *See also* Conn. Gen. Stat. §7-4659(e).   The CBA

provides in pertinent part that "The findings, decision, or award of the Board shall be final and

binding upon the City, the Union, and the employee(s) and may be enforced by proper action in

any Court of proper jurisdiction."  Ex. 60, CBA Art. XXV, p. 25.  Conn. Gen. Stat. §52-417*et*

*seq.* provides the exclusive means of either enforcing or vacating any award by the State Board

of Mediation and Arbitration.  The procedures set forth in the CBA for resolution of grievances

and/or review of disciplinary action shall be **the exclusive method** of settlement of grievances

and/or reviewing disciplinary action.  Ex. 60, Article XXV(e), p. 25

   "Parties to a collective bargaining agreement must attempt to exhaust the exclusive

grievance and arbitration procedures established in their [collective bargaining] agreement before

resorting to court." *School Administrators Association of New Haven v. Dow*, 200 Conn. 376,

382 (1986) (superseded by statute on other grounds).   "In determining whether a tort claim is

subject to the grievance procedures of a collective bargaining agreement, the critical inquiry,

therefore, is whether the tortious conduct is encompassed by the terms of the agreement."

*Sobczak v. Board of Education,* 88 Conn. App. 99, 109 (2005).

   In the instant case, Fasoli has filed numerous grievances relating to all of the factual issues

that are the predicate for his Intentional Infliction of Emotional Distress Claim.  The grievances

Plaintiff brought covered allegations of "retaliation", intimidation, "harassment", "unjust

discipline", "cruel and unusual suspension", illegal manipulation of pay and benefits" "libelous

disparaging actions and treatment to create frame-up," "insubordination" "discriminatory

harassment" "bullying and fraudulent accusations" "denying overtime" "unsafe assignment"

"brazen infliction of emotional trauma"  *See generally* Ex. 40, Fasoli grievances.   Fasoli's CBA

explicitly states that the union is the exclusive representative with respect to working conditions. In *Sobczak* this identical language was found to encompass claims relating to a hostile environment.  The court held that the plaintiff's claim for intentional infliction of emotional was precluded due to his failure to exhaust his administrative remedies.  88 Conn. App. 109.  *See Peluso v. Town of Greenwich*, No.FSTCV226011270S, 2012 Conn. Super. LEXIS 3058, 2012 WL 6846546, at *9 (Conn. Super. Ct. Dec. 14, 2012) (holding that emotional distress claim subject to exhaustion requirement as the tortious conduct fit the definition of a grievance as relating to conditions of employment and noting that the "fact that the plaintiff has couched his various complaints as common-law tort claims does not change this result."). It is undisputed that pursuant to the terms of the Collective Bargaining Agreement, the resolution of these grievances through the administrative process is the exclusive method for resolving grievances or for reviewing disciplinary action.  As such, Plaintiff is precluded from bringing the instant claim for intentional infliction of emotional distress.

**III.  CONCLUSION**

For the reasons outlined herein, as well as in the arguments of the co-defendants in this matter, the defendant Michael Scacco's Motion for Summary Judgment should be granted in its entirety, and judgment should enter herein.

**RESPECTFULLY SUBMITTED,**

**THE DEFENDANT, MICHAEL SCACCO**

**By:**   //s//*Lewis Chimes*_____
Lewis H. Chimes
Fed. ID # ct07023
Law Office of Lewis Chimes LLC
45 Franklin Street
Stamford, CT 06901
 203-324-7744
Fax:  203-969-1319
*chimeslaw@gmail.com*

## <u>CERTIFICATION</u>

I HEREBY CERTIFY that on the 20th day of November, 2013 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Richard Freeth, Esq.
500 Summer Street, Suite 203
Stamford, CT 06901

Alan Neigher
Sheryle Levine
Byelas & Neigher
1804 Post Road East
Westport, CT 06880

James M. Sconzo
Jonathan
Jorden Burt LLP
175 Powder Forest Drive, Suite 301
Simsbury, CT 06089-9658

<u>  /s/Lewis H. Chimes</u>
Lewis H. Chimes