# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JAMES FASOLI,

               Plaintiff,

  v.

CITY OF STAMFORD, EARNEST
ORGERA, and MICHAEL SCACCO,

           Defendants.[1]

No. 3:11 - CV - 767 (CSH)

NOVEMBER 24, 2014

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiff James Fasoli ("Fasoli"), a public employee of the City of Stamford ("City"), brings this action against the City, as well as Earnest Orgera ("Orgera") and Michael Scacco ("Scacco"), both of whom are employed by the City. Fasoli alleges employment retaliation for engaging in speech protected by the First Amendment of the United States Constitution and Article First of the Constitution of the State of Connecticut, in violation of 42 U.S.C. § 1983, Title VII, 42 U.S.C. § 2000e et seq., and Conn. Gen. Stat. §§ 31–51m, 31-51q, and 46a-60(a)(4) (Counts One through Five); retaliation and age discrimination, in violation respectively of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1) & (d), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stats. 46a–60(a)(1) (Counts Six through Eight); invasion of privacy (Count Nine); and intentional infliction of emotional distress (Count Ten). Plaintiff seeks indemnification by the City, pursuant to Conn. Gen. Stat. §§ 7-101a and 7-465, for

---

[1]   Stipulations of dismissal have been issued as to Plaintiff's actions against Tania Barnes and Michael Larobina.  [Docs. 38 & 195.]

damages he alleges Defendants have caused him (Count Eleven).  Pending before the Court are Defendants' motions for summary judgment [Docs. 146, 152 & 173], each seeking summary disposition of all claims Plaintiff alleges in his Amended Complaint [Doc. 31].  For the reasons given below, summary judgment in favor of each Defendant is GRANTED.

## I.  BACKGROUND

There is very little that is not disputed here.  Nevertheless, and as the Court explains below, no genuine and material factual dispute that precludes summary judgment exists because, in opposition to Defendants' properly supported motions for summary judgment, Fasoli has presented nothing more than mere speculation and conjecture on key elements of his claims.

This Ruling begins with a recitation of the allegations in Fasoli's Amended Complaint. Additional factual background is derived from the evidentiary record generated by the extensive discovery conducted before these motions for summary disposition were filed.

At the time he filed his Amended Complaint, Fasoli was 66 years old and had been an Equipment Mechanic in the Vehicle Maintenance Department ("Vehicle Maintenance"), which is part of the City's Office of Operations ("Operations"),[2] since November 2005.  Am. Compl. [Doc. 31] at ¶¶ 7, 18.  For some of the time relevant to this action, Fasoli also was Secretary of the local union, Stamford Employees Local # 82 of UE # 222-CILU.[3]  See Doc. 173-48.  Fasoli remains

---

[2]   In addition to Vehicle Maintenance, the departments comprising Operations are: Engineering Bureau, Land Use, Parks and Recreation, Highways, Solid Waste, and Traffic.  Orgera Aff. [Doc. 179-13] at 14:9-23.  Operations employs approximately 250 people.  Id. at 23:16-18.

[3]   Fasoli  was  relieved of his union duties in about March 2011, when someone else was elected in his place.  Fasoli Dep. [Doc. 198] at 32:1-4.  He does not claim Defendants are in any way responsible for that change.

employed in Operations, but he now works in the Solid Waste Department.[4]

Orgera is Director of Operations, a position to which he was appointed on or about December 1, 2009 by the then-newly elected Mayor of Stamford, Michael Pavia, who took office on the same date. Orgera Dep. [Doc. 179-13] at 11:3-8, 13:18-20. Before that appointment, Orgera had been a City employee for approximately twenty years and had positions with the City including Traffic Maintenance Supervisor and Supervisor of Traffic and Road Maintenance. Id. at 11:14-12:5. Orgera did not have supervisory authority over Fasoli until he became Director in December 2009.

Scacco is the Manager of Vehicle Maintenance,[5] a position he has held since March 2008. Scacco Aff. [Doc. 173-5] at ¶ 2. Scacco had supervisory authority over Fasoli from March 2008 to January 2010, and then again from November 2010 to September 2011. Id. at ¶ 88.

In his Amended Complaint [Doc. 31], Fasoli attributes the start of his workplace troubles to a letter he wrote to the City, in April 2008, reporting what he believed to be sexual harassment of a female co-worker, Charlene McArthur ("McArthur").[6] The letter, which was signed by Fasoli in

---

[4]   In September 2011, Fasoli was transferred by Human Resources from Vehicle Maintenance to a facility in the Highways Department. Orgera Dep. [179-13] at 83:5-85:5. But because Orgera felt that Fasoli was not doing any work as a mechanic there, he transferred Fasoli to a facility in the Solid Waste Department. Id. Although Fasoli's deposition testimony shows he was not pleased with either of these transfers, Fasoli Dep. [Doc. 198] at 731:10-733:18, he did not amend his complaint to include them as acts of retaliation and refers to them only in passing in his opposition briefing, [Doc. 179] at 15. In consequence, the Court disregards them in its analysis of the claims that are asserted.

[5]   Vehicle Maintenance is responsible for maintaining the fleet of vehicles and equipment belonging to Operations. See Scacco Aff. [Doc. 173-5] at ¶ 3. In addition to Scacco, Vehicle Maintenance employs a foreman, Steven Frycz ("Frycz"), who has held that position since 2008, Frycz Aff. [Doc. 173-7] at ¶ 3, several mechanics, which included Fasoli, and an inventory clerk.

[6]   The Court refers to McArthur as a co-worker of Fasoli because she was an employee in Operations. Fasoli Dep. [Doc. 198] at 38:8-23. But unlike Fasoli, McArthur worked in the Solid Waste Department, and she reported to a supervisor other than Scacco. Id. The Court notes, for

3

his official capacity as Secretary of the local union, as well as John Perkins, who was President of the same, is addressed to the City's then-Director of Human Resources, Dennis Murphy, and copied to Benjamin Barnes ("Barnes"), the City's then-Director of Operations, Alex Tergis ("Tergis"), the City's then-Public Services Bureau Chief, and Dan Colleluori ("Colleluori"), then-Supervisor of Solid Waste (where McArthur worked).   [Doc. 173-48.]   According to Fasoli, on numerous occasions when McArthur returned to her car after work she would find pornographic magazines anonymously placed on the windshield.   Fasoli was with McArthur on one such occasion.   He believed the City was responsible for addressing the situation because McArthur parked her car in a lot for City employees.   In addition to the letter, Fasoli also advised Barnes orally about McArthur's experience and "implored him to do something about it."   Am. Compl. [Doc. 31] at ¶ 25.   In addition, Fasoli attended two meetings between McArthur and the City, and "advocated on her behalf with respect to the sexual harassment that she was experiencing."   Id. at ¶ 26.   Fasoli maintains that "[w]ithin two months thereafter," and "[a]s a result of [his speaking out on behalf of McArthur]," he was "targeted," "retaliated against[,]" and "put on Defendants' 'hit list[,]'" and that he "started receiving warnings for insubordination[ ] [and] 'stealing time[,]'" and "was threatened with termination and [ ] subject[ed] to summary suspensions during 2008 and 2009."   Id. at ¶¶ 29-31.

Then, on or about January 4, 2010, Orgera, who had recently become Director of Operations, reassigned Fasoli from Vehicle Maintenance to Scofieldtown Yard, a facility operated by Operation's Solid Waste Department, which, as Fasoli maintains, "was generally understood to be built on a toxic waste site."   Id. at ¶ 45.   Fasoli avers that his transfer to Scofieldtown Yard "was done, inter alia, to

---

reasons that will become apparent, infra, that the record contains no evidence showing that McArthur had any dissatisfaction with Scacco, either in connection with her sexual harassment claim or otherwise.

retaliate, intimidate and silence him from speaking out about waste and mismanagement within the City's Office of Operations and to move him away from the situs [sic] of the questionable practices he had theretofore observed [at Vehicle Maintenance]." Id. at ¶ 46.  Fasoli nevertheless complains that, although he was offered overtime by his immediate supervisor at the facility, Randy Hunter, Scacco vetoed it.  Fasoli maintains Scacco did this in retaliation for "speaking out on matters of public concern." Id. at ¶ 47.

In February of 2010, Fasoli learned that a position had opened up for a Traffic Violations Officer (TVO) with special police powers, and that the position had been filled on a provisional basis by Tania Barnes's ("Barnes")[7] brother, George Rodriguez ("Rodriguez"). Id. at ¶ 85.  Fasoli believed that Rodriguez's hiring for that position was the product of "[n]epotism and favoritism[,]" because "the position was supposed to go to a member of his union under the collective bargaining agreement[,]" and "was never made public[.]" Id. at ¶¶ 85-89.  Fasoli "reported th[e] matter to [then-Stamford Board of Finance member] [Joseph] Tarzia [("Tarzia")] and [Board of Representative member Salvatore] Gabriel[e] [("Gabriele")] . . . ." Id. at ¶ 89.  As a result, Tarzia and Gabriele publicly called for an investigation of the Personnel Division and its hiring practices. Id. at ¶ 90; see also id. at ¶¶ 100, 102.

Shortly thereafter on April 8, 2010, Fasoli informed Gabriele "that City employees were throwing out City snowplows and selling City scrap metal . . . . to pay for private employee parties, and that this was done [in violation of City ordinances and] with the knowledge and consent of . . . [Orgera]." Id. at ¶¶ 49-50, 54.  Fasoli submits that he "had previously reported" the same activity

---

[7]   For most of the time relevant to this action, Barnes was a member of the City's Human Resources Department.  She is no longer employed by the City.

to Tarzia and Gabriele, but does not specify when he made those reports.  See id. at ¶ 50.  According to Fasoli, his "reporting of the mismanagement, misuse and theft of City assets within the Office of Operations was a political embarrassment to [ ] Orgera . . . and to [the Mayor of Stamford,] who appointed [Orgera to be Director of Operations]."  Id. at ¶ 66.  He states that, "[a]s a result of the inquiries generated by [his] whistle-blowing . . . the [Stamford] Board of Finance voted in May of 2010 to hire an outside auditor to conduct a forensic audit of the Operations Department with respect to the sale of City metals (the "Metals Audit")."  Id. at ¶ 67.  Fasoli also asserts that "[t]he Metals Audit generated significant public notoriety[,]" and states that "[i]t was rumored among City employees that [Fasoli had been the one to] provide[ ] the information to [Tarzia and Gabriele] that [led] to the Audit."  Id. at ¶ 68.  As a result of these rumors Fasoli claims that, starting in April 2010 and continuing through October 2010, he became the subject of disparaging remarks by City employees, including over the Department's two-way vehicle radio system, calling him a "whistleblower" and a "rat."  Id.

In mid-May 2010, Fasoli attended a Board of Representatives Operations Committee Meeting, which was also attended by Scacco.  Id. at ¶ 38.  At the meeting, Fasoli spoke out against the Department's purchase of certain 1996 used Mack trucks, claiming they were unsafe and in poor mechanical condition, questioning the vehicles' bills of sales, and the accuracy of documents submitted to the Operations Committee.  Id. at ¶ 39.  According to Fasoli, in retaliation for his speech, "Scacco presented figures [at the same meeting] that purported to show that [Fasoli]'s work as an equipment mechanic cost the Department more than any other employee."  Id. at ¶ 40.  In support of this accusation, Fasoli says that Scacco "fraudulently inflat[ed] . . . [Fasoli's] hourly rate from the standard rate used to calculate the cost of work for purposes of monitoring costs . . . in an

effort to discredit [Fasoli]'s complaints about the used vehicles that the Department had purchased." Id. at ¶ 41. Fasoli further submits that this was "not done to anyone else in the [D]epartment." Id. at ¶ 43.

The day after the board meeting, Scacco filed an ethics complaint against Tarzia, Gabriele, and Robert Kolenberg ("Kolenberg"), each of whom were elected Stamford officials. According to Fasoli, Scacco did this "in retaliation . . . for exposing waste and mismanagement in [ ] Scacco['s] department and the theft of City metals, and to intimidate them, other employees[,] and elected officials from [conducting] future inquir[i]es into his department and the Office of Operations." Id. at ¶¶ 72, 74. Fasoli further maintains that Scacco intentionally disclosed portions of his personnel files to the Ethics Board, and also, along with Orgera, conducted a pattern of intimidation and retaliation against him for the purpose of discouraging and/or discrediting him, and to dissuade him from providing testimony in Scacco's upcoming ethics hearing. Id. at ¶¶ 75-76.

A few months later, in September 2010, Fasoli claims that one of his co-workers, Richard Valentine ("Valentine"), stated at a union meeting that Fasoli should be thrown out of the union because he was a "rat." Id. at ¶ 80(d). Then, on October 14, 2010, Orgera issued an Official Notification of Reassignment transferring Fasoli from Scofieldtown Yard back to Vehicle Maintenance, where he would again report to Scacco. Fasoli contends that Orgera and Scacco did this in furtherance of their ongoing efforts to intimidate and retaliate against him. Id. at ¶ 77.

Fasoli began working at Vehicle Maintenance anew on November 1, 2010. Id. at ¶ 79. He maintains that shortly after returning there he was made the subject of intimidation and retaliation within the Department, including: (1) "[a]nonymous sexually explicit innuendos [ ] written on the lunchroom white board pertaining to 'whistleblowers' and 'rats'"; (2) the placing of "[r]eplica rats .

7

. . on [ ] [his] toolbox"; and (3) being "called a 'rat' by several of his co-workers, on numerous occasions, . . . [including] at meetings in which many of [his] co-workers were present." Id. at ¶ 80.

Fasoli also claims that as the date for Scacco's ethics hearing approached, Scacco, Barnes and Orgera intensified their harassment against him. Id. at ¶ 81. Specifically, Fasoli maintains that Scacco threatened to terminate him and/or suspend him without pay based on vague accusations of poor work performance and not working "while on the clock." Id. at ¶ 81. Fasoli believed these accusations were intended to dissuade him from testifying as a witness at the ethics hearing. Grievance Complaint Form [Doc. 173-44] at 27-28, dated March 28, 2011.

Then, in mid-March 2011, Fasoli says a Stamford Advocate reporter contacted Barnes with questions about her involvement in hiring her brother for the TVO position. Id. at ¶ 107. The next day, when Fasoli arrived at work, he found "a plastic replica of a rat . . . on [his] toolbox[.]" This act, as Fasoli characterizes it, was "a clear effort to harass and intimidate [him]" in connection with the reporter's inquiry. Id. at ¶ 108. The next day, Fasoli took a sick day because of "extreme emotional and physical stress" that he says resulted from "the continuing pattern of retaliation and harassment" he suffered at work. Id. at ¶ 112.

When he returned the next workday, Fasoli was summoned to Scacco's office and was confronted by Barnes and Scacco, who "wrongly accused [him] of failing to perform his job . . . . [and of] not working for an hour." Id. at ¶ 117. Fasoli says they both used "abusive language, [made] untrue allegations [against him,] and [had a] harassing demeanor[.]" Id. at ¶ 118. As a result, Fasoli says he "became ill, dizzy, had trouble breathing, and felt pain in his chest." Id. "[B]elieving [ ] he was having a heart attack," Fasoli was taken to Stamford Hospital where he underwent diagnostic testing[,]" which concluded that he was having an anxiety attack. Fasoli

maintains the anxiety attack "was directly caused by the belligerent actions of [ ] Barnes and Scacco." Id. at ¶ 119.  Fasoli was admitted and remained at the hospital until the next afternoon. Id. at ¶ 120.

Three days later, Scacco issued a pre-disciplinary notice to Fasoli, advising him of a hearing on March 30.  Id. at ¶ 122.  Fasoli alleges that the pre-disciplinary notice falsely accused him of violating the time and attendance policy and poor work performance, and was issued simply because he had not called in sick the day he was hospitalized, even though, as Fasoli maintains, Scacco and Human Resources were well aware that he had been admitted to the hospital for an "apparent heart attack."  Id. at ¶¶ 123, 124.  Following the disciplinary hearing, Scacco suspended Fasoli for five days.  Id. at 125.  Fasoli lost pay for the day he was hospitalized, and for follow-up doctor's appointments, despite the fact that he had accrued personal and sick days for such absences.  Id. at ¶ 126.

Fasoli contends that this pattern of harassment against him continues to the present and is part of a clear effort to, inter alia, prevent him from providing testimony at Scacco's ethics hearing. Id. at ¶¶ 127-128.  He also claims that the City improperly handled his personnel file by intentionally and purposefully leaving it in a common area of the Stamford municipal building for several weeks and then permitting the public to access his personal medical information, confidential communications about his well-being, and treatment.  Id. at ¶ 131.  As factual support for these accusations, Fasoli reports that his attorney was contacted by a reporter for the Stamford Advocate after viewing the contents of his personnel files, which the reporter had found in a publicly accessible area of the City's municipal building.  Id.

In addition, Fasoli claims that in connection with this pattern of harassment and retaliation

against him, Scacco maintained a separate file on him, which contained self-serving documents that "cast Fasoli in a false light" and which "eventually made their way into his official personnel file." Id. at ¶ 132.

Lastly, Fasoli avers that in mid-June 2011, Scacco concocted a scheme to discipline him, by first approving Fasoli's use of a brake pad that "had been cleaned [of] grease[,]" and then "gather[ing] false evidence and witnesses . . . to frame [Fasoli] for improperly using [that] defective part[.]" Id. at ¶ 134.  This incident resulted in a pre-disciplinary hearing, during which, according to Fasoli, "it was revealed that [ ] Scacco had lied about not knowing . . . of the cleaned brake pad[ ], and [that he] had concocted [the] scenario to [take] [ ] disciplinary action against [him]." Id. at ¶ 135.  Fasoli maintains that "[n]o discipline or other resolution [regarding the brake pad] ha[s] been made since the [ ] hearing."  Id. at ¶ 136.

## II. <u>STANDARD</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 258 (1986).  When ruling on a summary judgment motion, a court must construe the facts in evidence in the light most favorable to the nonmoving party.  It must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255.

However, when "a motion for summary judgment is properly supported by documentary and testimonial evidence . . . the nonmoving party may not rest upon the mere allegations or denials of

his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact." Marczeski v. Gavitt, 354 F. Supp. 2d 190, 193 (D. Conn. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).   In order to do so, the nonmoving party must produce contradictory evidence that is more than "merely colorable," "such that a reasonable jury could return a verdict [in his favor]." Anderson, 477 U.S. at 248. 249.   Accordingly, in the face of a properly supported motion, summary judgment is appropriate if the nonmoving party fails to present affirmative evidence on each essential element of his case with respect to which he has the burden of proof.  Celotex, 477 U.S. at 323.

### III. DISCUSSION

#### A.  Speech Retaliation Claims

In Counts One through Five of his Amended Complaint, Fasoli avers that the Defendants retaliated against him on the basis of his speech in violation of 42 U.S.C. § 1983 (Count One), Conn. Gen. Stat. §§ 31-51q (Count Two) and 31-51m (Count Three), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Count Four), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60-(a)(4) (Count Five).

To establish a retaliation claim under § 1983 in violation of a public employee's First Amendment right to freedom of speech, a plaintiff must show:  (1) his speech was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action.  Washington v. Cnty. of Rockland, 373 F.3d 310, 320 (2d Cir. 2004).

To demonstrate a free speech violation under Conn. Gen. Stat. § 31–51q, a plaintiff must

prove: (1) he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was disciplined or terminated on account of his exercise of such rights; and (3) his exercise of his First Amendment (or equivalent state constitutional rights) did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer. Lopez v. Burris Logistics Co., 952 F. Supp. 2d 396, 406-07 (D. Conn. 2013).

A violation of Conn. Gen. Stat. § 31–51m (Connecticut's Whistleblower's Protection Act), requires proof that: (1) a plaintiff engaged in protected speech; (2) the plaintiff was subsequently disciplined or discharged from his employment; and (3) a causal connection exists between the plaintiff's participation in the protected speech and his discipline or discharge.[8]  Ritz  v. Town of E. Hartford, 110 F. Supp. 2d 94, 98 (D. Conn. 2000).

A Title VII retaliation claim based on speech requires a plaintiff to show that: (1) he engaged in protected speech; (2) the employer was aware of this activity, (3) the employer took adverse action against him, and (4) a causal connection exists between the protected activity and the adverse action. DeMoss v. Norwalk Bd. of Educ., No. 3:05 CV 736 (DJS), 2014 WL 1875105, at *13 (D. Conn. May 9, 2014).  The elements for a claim of retaliation under the CFEPA are the same as for a retaliation claim under Title VII.  Id.[9]

---

[8]     The Court need not determine whether, as the City submits in its supporting memorandum, [Doc. 152-2] at 23-24, this claim is barred due to Fasoli's purported failure to exhaust any applicable administrative remedies since the Court must nevertheless consider the same instances of speech in connection with Fasoli's claims in Counts One and Two.

[9]    Fasoli's Title VII retaliation and CFEPA claims only implicate Fasoli's speech in April 2008 regarding McArthur's sexual harassment.  Am. Compl. [Doc. 31] at ¶¶ 165-170.  For this reason, the Court need not determine whether, as the City submits in its supporting memorandum, [Doc. 152-2] at 25-27, these claims are barred due to Fasoli's purported failure to exhaust any

Each of the foregoing causes of action is analyzed under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Arnone v. Town of Enfield, 79 Conn. App. 501, 507 (2003) (stating that retaliation claims for whistleblowing are analyzed under the McDonnell Douglas framework); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("Retaliation claims under Title VII . . . are [ ] analyzed under the McDonnell Douglas burden-shifting test[.]"); Bracey v. Northeast  Util. Serv. Co., No. CV126027883S, 2013 WL 6334262, at *13 (Conn. Super. Ct. Nov. 1, 2013) (stating that CFEPA "claims of retaliation . . . are evaluated under the McDonnell Douglas burden-shifting paradigm").  And although the evidentiary framework for analyzing First Amendment retaliation claims under § 1983 and Conn. Gen. Stat. § 31–51q is not expressly referred to in the case law as falling under the McDonnell Douglas rubric, it is still essentially the same.  See Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 47 (2d Cir. 2014).[10]

Under the McDonell Douglas burden-shifting analysis, for Fasoli to survive summary judgment on his speech retaliation claims, he must first establish a prima facie case of retaliation.

---

applicable administrative remedies since the Court must consider the same instance of speech in connection with Fasoli's claims in Counts One and Two.

[10]     The difference  with  First Amendment retaliation claims is that once the prima facie case has been established (and the burden shifts), a defendant has both the burden of proof as well as the burden of production to show, by a preponderance of the evidence, that it would have taken the same adverse employment action, on the basis of a legitimate, work-related reason, even in the absence of protected speech (as opposed to merely articulating such a reason).  Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 47 (2d Cir. 2014).  This caveat makes little difference in the Court's analysis of Counts One through Five of Fasoli's Amended Complaint since, as discussed infra, the Court finds that, in all but one instance, Fasoli has failed to establish a prima facie case of retaliation with respect to the adverse actions he alleges.  In the instance where Fasoli has made a prima facie case of speech retaliation (or where the Court makes that assumption for purposes of argument), the Court explicitly accounts for the just-mentioned caveat.

See <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 888-89 (9th Cir. 1994); <u>accord</u> <u>Gordon v. New York</u>

<u>City Bd. of Educ.</u>, 232 F.3d 111, 116 (2d Cir. 2000).  To do so, he must present evidence

demonstrating that: (1) he engaged in protected speech; (2) he suffered an adverse employment

action; and (3) a causal connection exists between his allegedly protected speech and the adverse

employment action, thereby "warrant[ing] the inference that the protected speech was a substantial

motivating factor in the adverse employment action,"[11] <u>Vinci v. Quagliani</u>, 889 F. Supp. 2d 348, 354

(D. Conn. 2012).

Proof of a causal connection, as required by the third element of the <u>prima facie</u> case, may

be demonstrated either: (1) indirectly, by circumstantial evidence, such as by showing that the

protected activity was followed closely in time by adverse treatment in employment, or (2) directly,

by evidence of retaliatory animus.  Id.  Either way, "a plaintiff may <u>not</u> <u>solely</u> 'rely on conclusory

assertions of retaliatory motive to satisfy the causal link[,]'" <u>id.</u> at 358 (citing cases); rather, "[he]

must [ ] provide the Court with '<u>some</u> <u>tangible</u> <u>proof</u> to demonstrate that [his] version of what

occurred was not imaginary[,]'" <u>id.</u>  Further, where, as here, the third element of causal connection

is premised on motive, <u>i.e.</u>, retaliation motivated by exercise of protected speech, it necessarily

follows that Fasoli must make some showing that Defendants knew of his protected activity.  <u>See</u>

_____

[11] Establishing causal connection by showing that speech (or some other protected activity or class) was simply a motivating factor for employer retaliation, but not necessarily the only factor, is the standard that applies to all of Fasoli's speech retaliation claims, save his Title VII retaliation claim (and ostensibly his CFEPA retaliation claim), which requires "but-for" causation, <u>i.e.</u>, a showing that the alleged retaliation would not otherwise have occurred were it not for his protected speech.  <u>Univ. of Texas Southwest Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2527-28 (2013).  But, as the Court explains <u>infra</u>, because Fasoli has failed to show that protected speech played any role at all in the adverse actions he alleges, the Court need and does not separately analyze the Title VII claim under the "but-for" standard.  <u>Accord id.</u> at 2526 (referring to mixed-motives standard as a "lessened causation standard" than the "but-for" standard).

id. at 359; accord Gordon, 232 F.3d at 116-17.

It is usually "the judge, not the jury, who must decide whether a plaintiff has satisfied the requirements of McDonnell Douglas's minimal version of a prima facie case[.]"  Gordon, 232 F.3d at 116.  If the court so finds, the burden then shifts to the defendant to offer evidence of a legitimate, nonretaliatory reason for its employment action.  McClain v. Pfizer, Inc., 692 F. Supp. 2d 229, 238 (D. Conn. 2010) (citing McPherson v. New York City Dept. of Educ., 457 F.3d 211, 215 (2d Cir.2006)).  If the defendant succeeds in doing so, the McDonnell Douglas presumption of unlawful retaliation falls away, and the burden shifts back to the plaintiff to produce evidence from which a reasonable jury could find that the employer's stated reason is merely pretext for illegal retaliation. Id.; see also Gordon, 232 F.3d at 116 ("when a retaliation case does go to the jury [after applying three-step burden-shifting framework from McDonnell Douglas], the jury's task is simply to determine the ultimate question of whether the plaintiff met her 'burden of proving that the defendant was motivated by prohibited retaliation'").

Fasoli identifies five instances of protected speech in support of the retaliation claims in his Amended Complaint:[12]  (1) his involvement on behalf of the purported sexual harassment of

---

[12]   Several times in his deposition testimony, Fasoli refers to grievances he filed with his union between June 27, 2008 and June 17, 2011.  The Court has reviewed some of the grievances, as Fasoli has offered copies of several of them as exhibits to his opposition briefs, [Docs. 176-15, 176-16], and Scacco has submitted a sampling of approximately fifteen grievances as an exhibit to his supporting brief, [Doc. 173-44].  In all but a few instances, these grievances do not contain enough detail to determine whether Fasoli is complaining of dissatisfaction with the conditions of his employment that might, at least in part, be viewed as implicating a matter of public concern.  See Mallett v. Town of Plainville, No. 3:01 CV 1137 (AHN), 2006 WL 931712, at *5 (D. Conn. Apr. 4, 2006).  Others contain lengthy statements by Fasoli regarding issues raised in his Amended Complaint.  These are addressed infra.  Significantly, Fasoli never asserts that the grievances themselves constitute instances of protected speech that are separate and apart from the instances of protected speech he identifies in his complaint.  The Court, thus, does not consider the grievances as separate acts of protected speech.

McArthur in April 2008; (2) his report to Tarzia and Gabriele in February 2010 about the hiring of Barnes's brother for the TVO position; (3) his report to Tarzia and Gabriele in April 2010 about the destruction of snow plows and sale of scrap metal; (4) his statements at a May 2010 board meeting regarding the City's purchase of six Mack trucks; and (5) the inquiry made by the Stamford Advocate reporter to Barnes in May 2011 regarding the hiring of her brother, which Fasoli maintains was prompted by his reporting of the same to Tarzia and Gabriele nearly a year earlier.

Each of the Defendants has denied Fasoli's allegations.  Each Defendant also maintains that Fasoli (1) has failed to establish a prima facie case of retaliation; and (2) even if he has met that initial burden, he has failed to produce sufficient evidence to create a genuine dispute that, as applicable, a Defendant's proffered legitimate, nonretaliatory reason is merely pretext for retaliation, or that a Defendant would not have taken the same action in the absence of any such protected speech.

As the Court explains, with one exception discussed below, in each instance of protected speech he has raised, Fasoli fails to also establish either the second element, i.e., an adverse employment action, or the third element, i.e., causal connection, of the prima facie case.

Even in the instances where the Court assumes or finds that Fasoli has established a prima facie case, Defendants have, as applicable, articulated a legitimate nonretaliatory reason, supported by record evidence, for taking the alleged adverse action, which Fasoli fails to rebut with any evidence suggesting otherwise.

Before analyzing each of Fasoli's claims, it bears repeating that the Court's function on summary judgment is confined to "issue-finding" not "issue-resolution[.]"  Burns v. Dep't of Pub. Safety, 973 F. Supp. 2d 141, 148 (D. Conn. 2013).  But, as just discussed, before it need "discern

16

[ ] whether there are any genuine issues of material fact to be tried[,] id., which, again, turns on whether Fasoli has produced sufficient evidence from which a reasonable jury could find that Defendants' stated reason for taking an adverse action is merely pretext for retaliation, the Court must first determine whether Fasoli has satisfied his prima facie burden.

Although "[t]he requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence[,]" Wallis, 26 F.3d at 889; accord Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000), Fasoli must still "offer evidence which 'gives rise to an inference of unlawful discrimination[,]'" Wallis, 26 F.3d at 889, i.e., evidence that warrants the inferences needed to establish each element of the prima facie case as a matter of law.   Thus, even at the preliminary prima facie stage, Fasoli cannot defeat summary judgment simply by resting on bald allegations and self-serving conclusions.   That principle is particularly significant in the case at bar, where Fasoli has had the benefit of full discovery.   When one examines Fasoli's contentions in the light of the evidentiary record, the effect is reminiscent of a Russian nesting doll:  each allegation gives way to another allegation, and still another; but each allegation is deficient, in one way or another, with respect to the evidence necessary to sustain it.

The Court will now address the twelve adverse employment actions Fasoli has raised in his Amended Complaint in chronological order.

1.) Adverse employment actions "during 2008 and 2009"

Fasoli submits that, "within two months" after speaking out against the sexual harassment directed at McArthur in April 2008, he was "targeted," "retaliated against[,]" and "put on Defendants'

hit list[,]"[13] and started receiving warnings for insubordination and "stealing time[,]" and was threatened with termination and subjected to summary suspensions in 2008 and 2009.

With regard to these allegation as to Orgera, Fasoli has proffered no evidence that he had a role in any of the above adverse actions. Moreover, it is undisputed that Orgera did not have supervisory authority over Fasoli until after he was appointed Director of Operations, on December 1, 2009. Orgera Dep. [179-13] at 31:3-14. There is also no genuine dispute that Orgera's first alleged adverse action against Fasoli is his transfer to Scofieldtown Yard on January 4, 2010, which is outside the time period in which the above alleged adverse actions occurred. Thus, there is no evidence of Orgera's involvement in this alleged retaliation.

This is so even though Fasoli claims "[he] got a total double cross from [Orgera] . . . [in that he] got a five-day suspension out of the blue for nothing." Fasoli Tr. [Doc. 198] at 716:22-23. However, the uncontradicted evidence shows that the suspension was issued by Scacco for poor work performance. Doc. 152-15. Even though Fasoli "believes" Orgera had a part in it because he had met with Orgera approximately two weeks earlier (just after Orgera's appointment as Director) regarding union matters and things in general, Fasoli Dep. [Doc. 198] at 717:9-11, the record evidence actually shows that the suspension was issued for poor work performance that occurred almost entirely before Fasoli's meeting with Orgera, i.e., from mid-August 2009 to mid-December 2009. Id. at 719:18-720:20; accord Doc. 152-15. Moreover, Fasoli does not even claim that he engaged in protected speech of any kind during the meeting with Orgera.[14] Fasoli Dep. [Doc. 198]

---

[13]    Fasoli concedes he used the term "hit list" figuratively, and that no actual list exists. Fasoli Dep. [Doc. 198] at 42:22-24.

[14]    Fasoli's testimony regarding his meeting with Orgera is telling for another reason. As noted, Fasoli testified that he believed Orgera had a hand in the five-day suspension, in part, because

at 717:4-720:20.

With regard to Scacco, it is undisputed that he had supervisory authority over Fasoli beginning in about March 2008 and throughout 2009.  Indeed, Scacco was Fasoli's supervisor (but not McArthur's) when Fasoli spoke out about the sexual harassment of McArthur in April 2008. Although the Amended Complaint does not allege any specific instances of discipline taken by Scacco against Fasoli during the referenced period, see Am. Compl. [Doc. 31] at ¶¶ 31-32, the Court has identified the following three such actions based on the parties' briefing and other submissions made in connection with the instant motions for summary judgment:  (1) a June 2008 incident report; (2) a one-day suspension in February 2009; and (3) a five-day suspension in December 2009.[15, 16]

The June 2008 incident report, which Scacco later placed in Fasoli's personnel file, states that the report was issued because Fasoli had acted in a manner that Scacco "felt . . . interfered with [his] responsibility to assign and manage work within the department."  Scacco Aff. [173-5] at ¶ 25. Specifically, as Scacco explained, he issued the report after he assigned, over Fasoli's objection on safety grounds, another employee as "lead man" to work with Fasoli on a repair.  Fasoli refused to

---

Barnes at some point said, "[Just] because [Fasoli] had a conversation with Ernie Orgera . . . if he thinks [the five-day suspension] is going away, he's sadly mistaken[.]"  Fasoli Dep. [Doc. 198] at 718:20-719:5.  Barnes's statement in fact supports Orgera's testimony that Tarzia requested he meet with Fasoli and intervene in Fasoli's pending disciplinary action.  See Orgera Dep. [Doc. 179-13] at 31:5-38:12, 46:1-47:6.

[15]    As a general matter, Scacco submits that "[a]ny time [he] initiated disciplinary action against an employee, [he would have it] reviewed by Human Resources prior to imposition.  The employee and his or her union representative was always given notice and an opportunity to be heard.  Any discipline imposed was subject to appeal and review under the collective bargaining agreement grievance procedure."  Scacco Aff. [Doc. 173-5] at ¶ 53.  Fasoli has not materially disputed any of this.

[16] Fasoli testified at deposition that he does not have any evidence of alleged retaliation by Defendants that predates the June 18 incident report.  Fasoli Dep. [Doc. 198] at 46:20-49:13.

take direction from the other man and then left the premises.  Id.; accord Fasoli Dep. [Doc. 198] at 50:19-55:19.  Fasoli does not materially contest the explanation by Scacco.  Fasoli Dep. [Doc. 198] at 49:14-58:15.

Because Scacco issued the incident report approximately two months after Fasoli complained on behalf of McArthur, the temporal proximity of the two events could arguably constitute circumstantial evidence of a causal connection between Fasoli's "protected speech" and that adverse employment action.  But temporal proximity is a thin reed.  "[E]ven very close temporal proximity is not always sufficient to support an inference that the plaintiff's protected activity was a motivating factor in the defendant's adverse employment action."  Smith v. Da Ros, 777 F. Supp. 2d 340, 357 (D.Conn. 2011) (citing cases).  "[T]he [ultimate] question of whether . . . a 'causal nexus' [exists] between a plaintiff's protected activity and the defendant's allegedly retaliatory action will depend on the facts and circumstances of each particular case."  Id.  "A district court must exercise its judgment about permissible inferences that can be drawn from temporal proximity in the context of a particular case."  See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009).

Here, absent any other evidence that might show Scacco issued the incident report in retaliation for Fasoli's speech involving McArthur, temporal proximity by itself is not sufficient to warrant an inference of a causal connection, especially in light of the fact that Fasoli has presented no evidence that Scacco had any reason to harbor ill will against Fasoli in connection with his defense of McArthur.  As Fasoli concedes, Scacco was not implicated in the McArthur incident in any way, Fasoli Dep. [Doc. 198] at 38:8-39:13.  Fasoli also does not materially contest Scacco's version of events regarding the June 18 incident, see id. at 49:14-58:15, and admits that he has no evidence to support his "perception" that Scacco issued the report in retaliation for his speech

regarding McArthur, id. at 57:7-23.

As to the other two incidents of adverse employment action, i.e., the one-day suspension in February 2009 and the five-day suspension in December 2009, both occurred at least ten months after Fasoli spoke out about McArthur's harassment.[17]  Neither the gap of approximately ten months between Fasoli's speech and the February 2009 suspension, nor the gap of nearly two years between his speech and the December 2009 suspension, permits an inference of causation between the asserted speech and either of these disciplinary actions.  Accord Murray v. Town of N. Hempstead, 853 F. Supp. 2d 247, 273 (E.D.N.Y. 2012) (listing cases in the Second Circuit in which courts have found that "[a] greater than three month gap, unsupported by any other allegation showing plausible retaliation, [was] insufficient to raise an inference of retaliation" and finding in the case before it that a "period of four months" was not sufficient for "finding of a causal connection as a matter of law"); Da Ros, 777 F. Supp. 2d at 356 (noting that "district courts within the Second Circuit consistently have found that lapses of more than two or three months between protected activity and allegedly retaliatory actions do not support inferences of causation"); Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 212 (N.D.N.Y. 2002) (citing cases for proposition that "temporal proximity . . . merit[s] the inference of a causal connection sufficient to defeat an employer's motion for summary judgment" when gap is no more than 3 months).[18]  Accordingly, absent an inference of causation

---

[17]    These disciplinary actions pre-date the other instances of protected speech that Fasoli identifies in the Amended Complaint and thus there can be no causal connection between them.

[18] Fasoli concedes that applicable case law holds temporal proximity must be "very close" in order to be sufficient for establishing causality for purposes of his prima facie case, and that even "very close" temporal proximity may not be enough if the particular facts and circumstances do not warrant an inference of causation.  Pl.'s Opp. Memo. [Doc. 189] at 11-12.  And although Fasoli also cites to Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009), wherein the Second Circuit found that a passage of six months between a prisoner's protected activity and prison guards' alleged beating

based on temporal proximity, or any other evidence demonstrating a causal link between the speech and the employment actions, the Court finds as a matter of law that Fasoli has failed to meet the required causal element between these alleged adverse employment actions and his asserted protected speech; he thus has not met his burden of establishing a prima facie case of retaliation on these grounds.

### 2.) Transfer to Scofieldtown Yard

The same is true with regard to Fasoli's claim that Orgera's transfer of him to Scofieldtown Yard on January 4, 2010 was done in retaliation for his April 2008 speech on behalf of McArthur, which is the only arguably protected speech Fasoli identifies in his Amended Complaint as preceding this transfer.[19]   Given that this transfer occurred nearly two years after that speech, there can be no temporal connection between them, see subpart A.1.   And because Fasoli has not identified any other evidence indicating Orgera had any retaliatory animus when he made the transfer, see, e.g., Fasoli Dep. [Doc. 198] at 733:7-18, the Court finds as a matter of law that Fasoli cannot establish the third element of causal connection on this subset of his retaliation claim, either.[20, 21]

---

of him was sufficient to support an inference of causation because it was plausible that the officers waited to exact their retaliation at an opportune time (i.e., when the prisoner was engaged in an altercation with another inmate), Fasoli has not made any argument that the facts and circumstances in his case parallel in any way the same controlled and unique environment of a prison, wherein the actions of prison guards and prisoners alike are under constant surveillance and scrutiny.

[19]   On August 26, 2009, Fasoli filed a complaint alleging age discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO complaint"), infra. However, he does not allege in his Amended Complaint, nor has he otherwise argued in this litigation, cf. [Doc. 173-59] at 4, that the CHRO complaint constitutes protected speech within the meaning of the statutes in Counts One through Five of his Amended Complaint, and the Court does not consider that potential issue.

[20]   The Court notes that Fasoli has submitted an affidavit by Tarzia, [Doc. 176-24], in which Tarzia denies that – as Orgera has recounted – he asked Orgera to transfer Fasoli from

3.)  Denial of Overtime

Fasoli submits another alleged adverse employment action is the denial of overtime during his time at Scofieldtown Yard (from approximately January 19 to October 31, 2010).  Specifically, Fasoli claims that he was offered overtime by his immediate supervisor there but that Scacco "vetoed" it in retaliation for his speaking out on matters of public concern.  This claim fails as a technical matter because Scacco denies that he was ever consulted about whether or not Fasoli could work overtime, Scacco Aff. [Doc. 173-5] at ¶ 109, and Fasoli has not produced any evidence demonstrating otherwise, e.g., no supporting testimony from his supervisor at Scofieldtown Yard. Furthermore, it is not disputed that Scacco did not have supervisory authority over Fasoli while he was at Scofieldtown Yard, and that Scacco lacked the discretion or authority to award overtime, even with respect to his immediate staff.  See id. at ¶ 110.  Rather, the record evidence shows that overtime requests were approved by union shop stewards pursuant to an overtime list the stewards maintained and from which the stewards would offer overtime to employees in chronological order.[22]

_____

Vehicle Maintenance to another facility so that Fasoli could avoid disciplinary action against him, i.e., the December 2009 five-day suspension Scacco issued, supra.  Compare Orgera Aff. [Doc. 146] at ¶¶ 4-8, with Tarzia Aff. [Doc. 176-24] at ¶ 12.  Tarzia's affidavit does not create a material dispute, however, because Tarzia's denial only implicates the December 2009 suspension.  Nothing in his affidavit connects Orgera's reason for transferring Fasoli with Fasoli's speech regarding McArthur nearly two years earlier.  Moreover, it is undisputed that after being transferred to Scofieldtown Yard, Fasoli did not serve the five-day suspension.  See Orgera Dep. [Doc. 179-13] at 45:24-46:1; Fasoli Dep. [Doc. 198] at 718:16-721:15.

[21]     Fasoli conceded at  his deposition that he has no evidence Scacco had anything to do with this transfer.  Fasoli Dep. [Doc. 198] at 355:18-356:7.

[22]     Although Orgera testified that Fasoli's pay remained on the Vehicle Maintenance budget even after he was transferred to Scofieldtown Yard, Orgera Dep. [Doc. 179-13] at 49:1-20, this does not contradict Scacco's assertion that he was never asked to approve overtime for Fasoli, and that he did not possess any authority or discretion to veto any such request, as Scacco lacked the authority to do so even with respect to his own staff, Scacco Aff. [Doc. 173-5] at ¶ 110.

23

Id.  Moreover, Fasoli concedes that he does not know what budgeting or approval procedures apply to overtime requests.  Fasoli Dep. [Doc. 198] at 356:8-359:22.  For these reasons, the Court finds that Fasoli has failed as a matter of law to establish an inference of an adverse employment action with respect to overtime.

4.)  Disparaging Remarks

Fasoli also avers that his "whistle-blowing" regarding the scrap metal caused the Board of Finance to vote, in May 2010, to hire an outside auditor to conduct a forensic audit of the Operations Department, which, in turn, caused rumors to be circulated among City employees that Fasoli had provided the information that led to the Metals Audit.  As a result, Fasoli asserts that, from April 2010 through October 2010, he was the subject of disparaging remarks by City employees, including being called a "rat" and a "whistle-blower," sometimes over the Operation Department's two-way vehicle radio system.

Defendants have, in pertinent part, denied these allegations, Orgera Answ. [Doc. 33] at ¶ 68; Orgera Aff. [Doc. 146] at ¶¶ 12, 14; Scacco Answ. [Doc. 197] at ¶ 68;  City Answ.  [Doc. 199] at ¶ 68, and Fasoli has not produced any evidence demonstrating that Defendants made, knew of, or orchestrated any such disparaging remarks about him.  See, e.g., Fasoli Dep. [Doc. 198] at 786:4-787:2, 788:16-791:8.  Moreover, there is no genuine dispute that neither Orgera nor Scacco had any significant contact with Fasoli during this time as Fasoli was working in a different facility and was not under the daily supervision of either men.

Fasoli also has not come forward with any evidence to rebut Orgera and Scacco's assertions that they had no knowledge of Fasoli's asserted role in the Metals Audit during this period in time, Orgera Aff. [Doc. 146] at ¶¶ 11-13; Scacco Aff. [Doc. 173-5] at ¶¶ 98-101.  Although a plaintiff may

24

satisfy the knowledge requirement simply by pointing to general corporate knowledge of the protected activity, Gordon, 232 F.3d at 116, Fasoli has not done so here. At deposition and in his affidavit [Doc. 179-1], he maintains that newspaper articles identify him as the source of the Metals Audit, yet none of the newspaper articles submitted reflect this attribution (not to mention that they were all published after October 2010). See [Docs. 179-17 – 179-21.] Further, the report produced in connection with the Metals Audit [Doc. 179-4] also does not expressly identify Fasoli as playing any role in its initiation (and it, too, was published well after October 2010). Finally, Fasoli makes no argument for treating either Tarzia or Gabriele, then both members of the City's legislature, as synonymous with or acting on behalf of the City corporate entity. More to the point, Fasoli readily concedes that his communications with both men on these issues were strictly confidential, which precludes any attribution of knowledge to Defendants. Accord Gordon, 232 F.3d at 116 (implying communication to corporate entity, though general, must still disclose identity of speaker before such knowledge may be attributed to the corporate entity). Fasoli further fails to provide substantiation for his assertion that he was rumored among City employees to be the source behind the Metals Audit.[23] See Mangiafico v. Blumenthal, No. 04 CV 74 (MRK), 2007 WL 283115, at *7 (D. Conn. Jan. 30, 2007) (finding plaintiff's argument that defendants would have learned of his intent to sue through workplace "rumor mills" to be "speculative"). Accordingly, the Court finds that no inference is warranted of a causal connection between any Defendant and the disparaging remarks Fasoli alleges were made by "City employee[s.]"

---

[23]   This assertion is also belied by the Metals Audit Report, which only identifies three confidential informants. [Doc. 176-12.]

5.) <u>Inflation of Fasoli's Hourly Rate</u>

Fasoli also claims as an adverse employment action that Scacco "fraudulently" inflated his hourly labor rate during his remarks at an Operations Committee Meeting on May 19, 2010, concerning Vehicle Maintenance's purchase in late 2008 of several used Mack trucks.  Specifically, Fasoli avers that during the meeting,[24] Scacco presented false figures that purported to show that Fasoli's work as a mechanic cost the Department more than any other employee, and that Scacco did this to discredit Fasoli's complaints about the Department's purchase of the Mack trucks.

Scacco denies this, Scacco Answ. [Doc. 197] at ¶¶ 40-41, and, apart from bald allegations, Fasoli has not produced any evidence – <u>e.g.</u>, proposed witness testimony or the documentary material he claims Scacco presented at the meeting – to warrant an inference that Scacco actually did what Fasoli claims he did, much less that Scacco did so in connection with Fasoli's purported whistleblowing in connection with the trucks or anything else.  <u>Accord</u> Fasoli Dep. [Doc. 198] at 155:5-162:8.  Underscoring this omission is the fact that the meeting minutes also do not reflect any discussion of Fasoli's labor rate.  <u>See</u> Committee Report [Doc. 173-55] at 4-5.

6.) <u>Scacco's Ethics Complaint Against Tarzia, Gabrielle, and Kolenberg</u>

Another adverse action cited by Fasoli concerns an ethics complaint that Scacco filed the day after the aforementioned board meeting.  In that complaint, Scacco alleged that Tarzia, Gabriele, and Robert Kolenberg ("Kolenberg"), abused their powers as public officials by leading a campaign of

---

[24] Fasoli attended the meeting ostensibly as "a member of the public who came to observe the meeting[.]" Committee Report [Doc. 173-59] at 4.  His presence was not required nor requested; nevertheless, he wanted "to see what was going on, what was going to come out about these trucks[.]"  Fasoli Dep. [Doc. 198] at 148:16-17.  At some point, Fasoli "asked the Chair for permission to make a statement."  [Doc. 173-59] at 4.  Fasoli told the committee members, among other things, that the purchase invoices for the used Mack trucks were not accurate and that the City did not have clear title to the vehicles.  <u>See</u> <u>id.</u>

harassment and retaliation against him as a result of his efforts to address Fasoli's poor job performance, which he claimed was a major obstacle to the productivity of the Operations Department and the safety of the City's fleet.  [Doc. 173-34.]  Specifically, Scacco claimed that the three men had harassed him since he issued Fasoli the disciplinary report in February 2008,[36] in that they referred his department to the FBI for a criminal investigation and placed requests for access to his personnel file, mileage reports, Kronos time and attendance records, and information about the purchases of new and used vehicles, auction procedures, utilization of the maintenance facility, and his use of a shredder.  Id.  Scacco further alleged that Tarzia and Kolenberg wanted to close the vehicle maintenance facility and out-source all of the work because Kolenberg operated an automotive business, and had indicated to Scacco that such privatization was a business opportunity for himself and his partners.  Id.  In sum, Scacco believed that Tarzia, Gabriele, and Kolenberg's actions were designed to prompt his peers and supervisors to question his credibility and integrity, thus jeopardizing his position for their own pecuniary gain.  Id.

Even though Fasoli had no involvement whatsoever in the ethics complaint or with its allegations, Fasoli nevertheless maintains that Scacco filed the complaint in retaliation for his speech regarding waste and mismanagement in Scacco's department and the theft of City metals, and to intimidate him, along with Tarzia, Gabriele, and other employees and elected officials, and to prevent them from conducting future inquiries into his department and the Office of Operations.

Because Fasoli's speech at the committee meeting was so "very close" to Scacco's ethics complaint, the Court infers the existence of the required element of causal connection.  Nonetheless,

---

[36]  Based on the record evidence, e.g., Scacco did not begin his employment with the City until March 2008, it appears that the date should in fact read:  2/4/2009.

27

Fasoli has failed to demonstrate that Scacco's ethics complaint constitutes an adverse employment action against him, which is the second element of his prima facie case.

It is well-settled in the Second Circuit that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.  See, e.g., Wrobel v. County of Erie, 692 F.3d 22, 31 (2d Cir. 2012) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225-26 (2d Cir. 2006)).  Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.  Zelnik, 464 F.3d at 225-26.  This list is not exhaustive and even less significant actions, such as negative evaluation letters and express accusations by an employer that an employee has lied, may be considered adverse employment actions.  Id.  Ultimately, "whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination[,]" Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002), and usually should not be adjudicated on summary judgment.

Here, however, it is undisputed that Scacco did not file the ethics complaint against Fasoli. And even assuming that Fasoli is a friend and political ally of Tarzia, Gabriele, and Kolenberg – and thus on that basis Scacco's complaint could be perceived as also being aimed at Fasoli, even if indirectly –  Fasoli has not alleged or introduced any evidence showing that the complaint caused the conditions of his employment to change in any way, much less in a way that "would [have] deter[red] a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[,]" Wrobel, 692 F.3d at 31; see also Radolf v. Univ. of Conn., 364 F. Supp. 2d 204, 225 (D. Conn. 2005) (rejecting plaintiff's "contention that merely being the subject of an internal investigation . . . constitutes an adverse employment action sufficient to support an

employee's First Amendment retaliation claim against his employer" where plaintiff did not produce any evidence of "attendant material disadvantage in employment terms"); <u>Boylan v. Arruda</u>, 42 F. Supp. 2d 352, 356-58 (S.D.N.Y. 1999) (concluding plaintiff suffered no employment consequences as a result of allegedly unfounded criminal investigation other than possible reputational injury); <u>accord</u> <u>Everitt v. DeMarco</u>, 704 F. Supp. 2d 122, 133-34 (D. Conn. 2010) (recognizing that whether an action would "deter a similarly situated individual of ordinary firmness from exercising his . . . constitutional rights" hinges on whether there is evidence that the action in question caused a "materially adverse change in the terms and conditions of [plaintiff's] employment").[37]

7.) <u>Fasoli's Personnel File</u>

Fasoli also maintains that Scacco intentionally and illicitly disclosed portions of his personnel file to the Ethics Board and maintained a separate file on him for the purpose of harassing and retaliating against him, and created self-serving documents that cast him in a false light and eventually were included in his official personnel file.  Fasoli also avers that the City improperly handled his personnel file, by intentionally and purposefully leaving it in a common area of the Stamford municipal building.  Both Scacco and the City have denied these allegations, Scacco Answ. [Doc. 197] at ¶¶ 131-132; City Answ. [Doc. 199] at ¶¶ 131-132.  And because Fasoli has failed to

---

[37] Also in connection with Scacco's ethics complaint, Fasoli alleges that Scacco and Orgera "conducted a pattern of intimidation and retaliation in order to discourage and/or discredit [him] . . . . [and] dissuade [him] from providi[ng] testimony . . . as a witness in the ethics complaint . . . [,]" Am. Compl. [Doc. 31] at ¶ 76, and that they "threatened [him] with terminat[ion] and/or suspen[sion] without pay for vague accusations of 'poor work performance' and for not working on the clock," <u>id.</u> at ¶ 81.  Fasoli has produced no evidence whatsoever to support these allegations, all of which Defendants deny.  Moreover, Fasoli concedes that he was never informed that he would be called as a witness at the hearing, which ultimately never occurred.  <u>See</u> [Docs. 173-58 & 173-59.] No basis exists, then, for inferring that Fasoli engaged in protected speech, or was precluded from doing so, in this respect.  For all of these reasons, the Court summarily dismisses these allegations, as well.

provide any evidence – e.g., proof of the "separate file" he claims Scacco created, or any evidence that his personnel file was ever improperly accessed or disclosed, accord Fasoli Dep. [Doc. 198] at 608:15-616:12 – the Court finds as a matter of law that no inference is warranted that any Defendant committed these acts, much less did so in retaliation for Fasoli's protected speech.

8.) Statement by Fasoli's Co-Worker

Another adverse action cited by Fasoli concerns statements made by his co-worker, Richard Valentine ("Valentine"), in September 2010, who stated at a workers' meeting that Fasoli should be thrown out of the union because he was a "rat." See generally, Fasoli Dep. [Doc. 198] at 62:24-64:15, 71:7-9, 95:11-14, 637:8-21, 824:3-10, 853:4-13.  I accept the factual accuracy of Fasoli's account of this incident, but the incident itself is not relevant to Fasoli's claims against the Defendants, given the total absence of any evidence that Orgera, Scacco, or any other City employee, knew of, orchestrated, or condoned Valentine's alleged derogatory statement, see, e.g., Fasoli Dep. Tr. [Doc. 198] at 763:6-11, much less any evidence that Valentine's statement was made in retaliation for any protected speech by Fasoli.

9.) Transfer Back to Vehicle Maintenance

Fasoli's assertion that his transfer from Scofieldtown Yard back to Vehicle Maintenance in October 2010 constitutes an adverse employment action fails for the simple reason that he makes no causal connection between it and any temporally proximate speech.  Specifically, there is no genuine dispute that the transfer occurred five months after Fasoli's last instance of protected speech, i.e., his speech at the May 2010 committee meeting about the purchase of the six Mack trucks; thus, the transfer is too temporally remote from such speech to support an inference of a causal connection, see supra p. 21-22.  Fasoli has also failed to produce any evidence of retaliatory motive for the

30

transfer.[38]   In contrast, Orgera has come forward with a legitimate, nonretaliatory reason for transferring Fasoli back to Vehicle Maintenance:  a lack of manpower due to the death of another mechanic there, Orgera Dep. [Doc. 173-31] at 51:9-53:24.  Moreover, Orgera maintains that he would have made the transfer regardless of any other whistleblowing or other protected speech by Fasoli.   Org. Aff. [Doc. 146] at ¶ 13.   Fasoli has not argued nor produced any evidence demonstrating otherwise.

10.)  Intimidation and Retaliation After Returning to Vehicle Maintenance

There is similarly no merit to Fasoli's claims that shortly after returning to work at Vehicle Maintenance on November 1, 2010, he was made the subject of intimidation and retaliation within the Department, consisting of anonymous sexually explicit innuendos written on the lunchroom whiteboard pertaining to "whistleblowers" and "rats"[39]; (2) leaving replica rats on his toolbox; and (3) that several of his co-workers called him a "rat" on numerous occasions, including at meetings.

Defendants have all denied having prior knowledge of these incidents or of condoning them at any time, Orgera Answ. [Doc. 33] at ¶ 80; Orgera Aff. [Doc. 14];  Scacco Answ. [Doc. 197] at ¶ 80; Scacco Aff. [173-5] at ¶¶ 68-78; City Answ. [Doc. 199] at ¶ 80.  Scacco even maintains that

---

[38]   Sometime in late July 2011,  shortly after the release of the Metals Audit report, see [Doc. 179-4], Orgera was suspended by the Mayor of Stamford for three weeks in connection with the sale of City scrap metal, Orgera Dep. [Doc. 179-13] at 166:25-167:11; Stamford Advocate Article [Doc. 179-17], dated July 31, 2011. But Fasoli may not rely on such evidence as circumstantial proof of a causal connection with respect to his transfer back to Vehicle Maintenance in October 2010, since both the audit report and Orgera's suspension occurred afterward. And, as stated, there is no evidence in the record for finding that Orgera or any other Defendant had knowledge of Fasoli's role in the scrap metal investigation concurrent with the adverse events of which Fasoli complains (but see Alleged Adversary Employment Action # 12, infra).

[39]   According to Fasoli,  the whiteboard comment was "something to th[e] effect [of]": "they used to call them rats, now they call them whistleblowers, just whose whistle are they blowing anyway[?]" Fasoli Dep. [Doc. 198] at 368:3-7.

he never actually saw the whiteboard comments.  Scacco Aff. [Doc. 173-5] at ¶ 68.  Because Fasoli

has not produced any evidence to demonstrate otherwise, see, e.g., Fasoli Dep. [Doc. 198] at 367:13-

368:25, 375:4-376:17, no inference is warranted that Defendants were connected to any of those acts

of retaliation.  Thus, the Court finds as a matter of law that Fasoli has failed to establish the third

element of his prima facie case on this part of his claim.

11.)  Stamford Advocate Reporter and Another Toy Rat

Here, too, Fasoli's claim of adverse action is based on pure speculation and founders for lack

of any valid evidentiary support, let alone any connection to protected speech.  According to Fasoli,

in March 2011, a Stamford Advocate reporter contacted Barnes to ask questions about her

involvement in the hiring of her brother for the TVO position, and the next morning he arrived at

work to find a plastic rat on his toolbox.  He viewed this as retaliation for the reporter's inquiry and

it caused him to call in sick the next day.

Upon his return to work, Fasoli was summoned to Scacco's office and was confronted by

Barnes and Scacco, both of whom, he claims, wrongly accused him of failing to perform his job and

not working for an hour.  During the meeting, at which Orazio Cierello, who was Fasoli's union

representative, and Frycz, the department foreman, were also present, Fasoli became highly agitated

and felt he was having a heart attack.  He was admitted to the hospital for testing and was absent

from work for the next two days.

On or about March 24, following his release from the hospital, and having returned to work,

Fasoli received a pre-disciplinary notice from Scacco, advising him that a hearing would be held the

next week.  According to Fasoli, the notice falsely alleged that he had violated the time and

attendance policy and had not satisfactorily performed his work, which, according to Fasoli, Scacco

issued because he failed to call in sick while he was hospitalized.  Fasoli further maintains that this was pretext because both Scacco and Human Resources knew he had just been hospitalized for an apparent heart attack.  Fasoli was ultimately suspended for five days.  And adding insult to injury, at least from his perspective, Fasoli's pay was cut for the days he was hospitalized, as well as for additional days he took for doctor's appointments, despite the fact that he had sick and personal days available to cover those absences.

Even though Fasoli does not expressly allege this, the Court presumes that Fasoli is claiming all of the foregoing was in retaliation for protected speech –  presumably his comments about the Mack trucks, which last occurred at the committee meeting ten months earlier, in May 2010.  But those remarks and any purportedly protected speech before that was too temporally remote as a matter of law to infer a causal connection with these events.  The only other instance of prior speech on which Fasoli might rely is the telephone inquiry allegedly made by the Stamford Advocate reporter to Barnes, questioning her about the hiring of her brother, which, according to Fasoli, occurred just days before these events.  Although he does not expressly allege this, Fasoli seems to view the reporter's inquiry as a proxy for his own speech regarding the hiring of Barnes's brother. That is, despite being quite a stretch, Fasoli apparently sees himself as the impetus for the reporter's inquiry, given that he conveyed his suspicions about the hiring to Tarzia and Gabriele in February 2010.  See Am. Compl. [Doc. 31] at ¶¶ 85-90, 100, 102; Fasoli Dep. [Doc. 198] at 347:18-352:14. But Fasoli has no evidence to connect the reporter's phone call to Fasoli's communication with Tarzia and Gabriele, which occurred nearly one year earlier.  See id.  Moreover, Scacco stated that he was not then aware that Fasoli had any concerns about the hiring of Barnes's brother, Scacco Aff. [Doc. 173-5] at ¶ 111, and thus would not have had any reason to attribute the reporter's phone call to

Fasoli, accord Fasoli Dep. [Doc. 198] at 347:1-352:23, 600:14-601:25.  Accordingly, because in the complete absence of any evidentiary basis for treating the reporter's call to Barnes as a proxy for Fasoli's speech, the Court finds Fasoli has not met his prima facie burdens on the first or third elements respecting protected speech and causal connection.[40, 41]

There are numerous additional reasons for not inferring the necessary causal connection. They include Scacco's contention that he did not believe Fasoli had anything to do with the scrap metal investigation even after Fasoli claimed to be the source, Scacco Aff. [Doc. 173-5] at ¶ 92; the fact that the scrap metal investigation only implicated the Highways Department, not Scacco's Vehicle Maintenance, see Fasoil Dep. [Doc. 198] at 62:7-63:10; see also Metals Audit Report [Doc. 176-12] at 1-2; and Fasoli's concession that he has no evidence that Scacco did anything wrong in connection with the improper sale of scrap metal, Fasoli Dep. [Doc. 198] at 70:6-18.  Moreover, and significantly, Scacco has proffered a legitimate, nonretaliatory reason for issuing Fasoli's five-day suspension and Fasoli does not offer any evidence demonstrating otherwise.  Specifically, Scacco maintains that on the day the Stamford Advocate reporter allegedly called Barnes about the hiring of her brother, he documented that Fasoli was spending an excessive amount of time walking around

---

[40]   Fasoli makes much of the fact that, after he reported to Scacco that he had found a toy rat on his toolbox, Scacco placed the toy on his computer monitor.  Scacco admits to doing this. Scacco Aff. [Doc. 173-5] at ¶ 75.  Fasoli also states that the toy was then visible to Fasoli and presumably others on the shop room floor, which he submits qualifies as an adverse employment action.  Even assuming this is so, it does not alter the Court's conclusion that Fasoli has failed to meet the third element of his prima facie case, i.e., he has not produced evidence sufficient to warrant an inference that Scacco took disciplinary action against him on account of his protected speech because he has not identified any such speech as being temporally proximate to these events.

[41]   Scacco states in his affidavit that he "had no knowledge that Fasoli claimed to be involved in the disclosures relating to scrap metal until [he] met [with Fasoli] on March 2, 2011." Scacco Aff. [Doc. 173-5] at ¶¶ 92, 99.

the shop, talking on the telephone.  Scacco Aff. [Doc. 173-5] at ¶ 74.

Also, the next day, Scacco made a note that Fasoli complained to him about finding a plastic rat on his toolbox, and then abruptly punched out and left work for the day, only five minutes after he had punched in.  Id. at ¶ 75.  Again, on March 18, Scacco noted that Fasoli called out sick.  Id. at ¶ 76.  At some point thereafter, one of Fasoli's co-workers told Scacco that he had observed Fasoli taking photographs of the toy mouse on Scacco's computer and that Fasoli had said it was evidence for this case.[42]  Id. at ¶ 77.  Then, on the day that Fasoli says he was summoned to Scacco's office, Scacco states that he had:

> assigned Fasoli to do a safety check on a vehicle . . . . [but] Fasoli [instead] spent an hour on the computer . . . . [and then] spent another thirty minutes talking to another employee.  [Scacco thus] felt that it was necessary to initiate discipline against Fasoli due to the deteriorating work environment, his numerous absences, and recent escalating events . . . . [and] [Scacco] wanted a Human Resources Representative to be present when [he] gave Fasoli notice of his pre-disciplinary hearing . . . . [thus,] Tania Barnes, a human resources assistant, came down [to his office].  Also present were Orazio Cierello, Fasoli's union reprsentative, and Steve Frycz.  Barnes told Fasoli that the purpose of the meeting was to schedule a pre-disciplinary hearing.  [Scacco] [maintains he] did not say anything offensive or menacing to Fasoli.  Fasoli immediately started screaming at Barnes, accusing her, [ ] Orgera, and [Scacco] of being corrupt.  [He] said he felt sick, and was having chest pains, and wanted to go home.  Barnes insisted . . . he should go to the hospital . . . . [and] [a]n ambulance [was called] . . . .

Id. at ¶¶ 79-80.  Then, according to Scacco, on the following day, March 22, Fasoli did not report to work and failed to call to advise him that he would be out.  Scacco later learned from Fasoli's union that Fasoli had been admitted to the hospital overnight.  Id. at ¶ 81.  And on March 23, Fasoli

---

[42]  Fasoli does not claim that this constitutes an instance of protected speech by him.

called just ten minutes before the start of his shift to say he would be taking a vacation day, id. at ¶ 82.  Scacco rejected Fasoli's request for vacation time since Fasoli had not made the request in advance, nor had the time off been pre-approved by Scacco.  Rather, Scacco told Fasoli that he would record his absence as a sick day, at which point, according to Scacco, Fasoli responded in "an inappropriate fashion" and "made accusations[.]"  Doc. 152-16.  Fasoli does not materially dispute any of this.  Fasoli Dep. [Doc. 198] at 378:13-384:14.  And although Fasoli's recounting of these events might at times sound dramatic, he has not negated the fundamental bases Scacco gives for issuing the five-day suspension; nor does Fasoli create a genuine dispute that pretext was Scacco's real motive for acting, see Rubinow v. Boehringer Ingelheim Pharms., Inc., 496 F. App'x 117, 119 (2d Cir. 2012), or that Scacco would not have taken the same action if not for protected speech by Fasoli.

        12.)  Brake Job Incident

        Finally, the Court finds no merit to Fasoli's claim that, after he commenced this suit in May 2011, Scacco concocted a scheme to discipline him in connection with a brake repair on a City truck.  As an initial matter, although this alleged adverse employment action is temporally proximate to Fasoli's filing of the instant complaint –  there having been a gap of just one month between the two events –  such temporal proximity, as noted, is not always sufficient, by itself, to establish the necessary causal connection unless the facts and circumstances underlying the event also support such an inference.  Such is not the case here.

        As an initial matter, Scacco denies taking this action in retaliation for any protected speech, Scacco Answ. [Doc. 197] at ¶¶ 134-135, and Fasoli concedes that he does not know what would motivate Scacco to falsely accuse him of using a defective part, Fasoli Dep. [Doc. 198] at 393:9-21.

But even assuming that Fasoli's filing of this lawsuit per se constitutes circumstantial evidence of Scacco's retaliatory animus, Scacco has come forward with a legitimate, nonretaliatory reason for disciplining Fasoli, see Scacco Aff. [Doc. 173-5] at ¶¶ 86, 134; see also Frycz Aff. [Doc. 173-7] at ¶ 55, which Fasoli has not rebutted with any evidence creating a genuine dispute that Scacco's reason was pretextual or that Scacco would not have taken the same action if not for Fasoli's filing of this action, see Fasoli Dep. [Doc. 198] at 387:14-389:4. Accord Rubinow, 496 F. App'x at 119 (finding plaintiff's contention that employer "fabricated" its explanation for taking adverse action did not create a triable issue of fact as plaintiff's statement was conclusory and "not fundamentally [in] dispute [with her employer's] [ ] specific accounts of her insubordination"). Thus, this claim fails as a matter of law.

* * * * *

Two additional points merit discussion here, though Fasoli has not explicitly raised them. The first is that the Court would have reached the same result even if aspects of Fasoli's Amended Complaint were construed as also alleging Defendants retaliated against him on the basis of his association with Tarzia, Gabriele, and Kolenberg. This is because the standards by which a court is to evaluate a claim premised on political affiliation is generally the same one the Court has applied to Fasoli's speech retaliation claims. Quagliani, 889 F. Supp. 2d at 351 n.2. But see Da Ros, 777 F. Supp. 2d at 359 (reasoning that political affiliation, unlike speech, usually does not consist of discrete acts).

The second point has to do with the implication in Fasoli's Amended Complaint, deposition testimony, and briefing, that, even if not individually, the adverse employment actions he alleges amount to speech retaliation when viewed in the aggregate. But that approach would impart an

additional dimension to his claims that is neither supported by the case law – as it would nearly eviscerate the causal connection requirement – nor the evidence Fasoli has produced – which shows that even though he engaged in multiple instances of speech, his speech was nevertheless episodic and ran the gamut of subject matter.  Ultimately, and as noted at the outset, it is for Fasoli to provide the Court with "some tangible proof to demonstrate that his version of what occurred was not imaginary[,]" Quagliani, 889 F. Supp. 2d at 358; but he may not do so by compressing the time line of events reasonably drawn from his allegations and the record evidence.  And although the Court does not dispute Fasoli's sincerity in claiming that Defendants, inter alia, unlawfully retaliated against him, subjective belief does not, as a matter of law, constitute objective evidence.[43]

## B.  § 1983 Conspiracy Claim

As part of his § 1983 claim, Fasoli alleges that:  "[i]n retaliation for [his] engaging in free speech on matters of public concern, . . . Scacco, as the [Vehicle] Maintenance Supervisor, [ ] Orgera, as the Director of Operations, [ ] Larobina, as the head [of the] Office of Legal Affairs Personnel Division, and [ ] Barnes, as a Human Resources Generalist in the Personnel Division . . . . . conspired to violate [his] rights in violation of, inter alia, [ ] § 1983."  Am. Compl. [Doc. 31] at ¶ 145 (emphasis added).  Specifically, Fasoli maintains that even though Defendants, Larobina, and Barnes "were all aware of the retaliatory acts against [him], [and] had a duty to protect him from this illegal harassment and retaliation, [they] ignored his complaints, failed to discipline the City employees involved, and/or encouraged the aforesaid conduct, and/or participated in the aforesaid

---

[43]   Having found Defendants are each entitled to summary judgment on Fasoli's protected speech claims, the Court need not address the City's Monell argument, [Doc. 152-2] at 20-23.  For the same reason, the Defendants' qualified immunity defenses do not require consideration either.

conduct, and purposely failed to conduct an investigation [regarding] [his] complaints[.]" Id. But for the reasons below, this claim also fails as a matter of law.

"The elements of a § 1983 conspiracy are: '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" Bartels v. Inc. Vill. of Lloyd, 751 F. Supp. 2d 387, 402 (E.D.N.Y. 2010) (quoting Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)). However, "[u]nder the intra-corporate conspiracy doctrine, officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." Id. (citing cases).

In this case, Orgera, Scacco, Larobina and Barnes were all City employees, and, in his Amended Complaint, Fasoli expressly states that each was acting in his or her ordinary course of employment. In pertinent part, Fasoli does not allege that either Orgera or Scacco was acting out of a personal interest to retaliate against him apart from any interest held by the City. See Bond v. Bd. of Educ. of the City of New York, No. 97 CV 1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999) (finding that even though complaint included allegation that defendant wanted to "get rid of" plaintiff, "personal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine"). As such, Fasoli fails to assert a viable claim of conspiracy in violation of § 1983 and Defendants are entitled to summary judgment on this subpart of Fasoli's Count One claim.

## C.  ADEA Retaliation Claim

In Count Six of his Amended Complaint, Fasoli avers that the City retaliated against him in

violation of the ADEA, 29 U.S.C. § 623(d).  Specifically, Fasoli claims after he complained to Human Resources about being discriminated against on the basis of his age, and then filing a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on August 25, 2009, his work environment "worsened" and the City did nothing to remedy this.  The City has, in pertinent part, denied these allegations.  City Answ. [Doc. 199] at ¶¶ 172-187.[44]

The ADEA prohibits employers from retaliating against an employee for engaging in speech alleging age discrimination.  See Kessler v. Westchester Cnty. Dept. of Soc. Servs., 308 F. App'x 528, 529 (2d Cir. 2009) (citing Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990)).  "[A] plaintiff bringing a . . . claim pursuant to the ADEA must prove, by a preponderance of the evidence, [inter alia,] that age was the 'but for' cause of the challenged adverse employment action."  Gross v. FBL Fin. Servs., 557 U.S. 167, 180 (2009).  A plaintiff must also show that: "(1) he was engaged in a protected activity; (2) his employer was aware of that activity; and (3) he was subject

---

[44]    The  Court  rejects the City's arguments that it is entitled to summary judgment on the ADEA retaliation claim on account of Fasoli's purported failure (1) to exhaust administrative remedies, and (2) to raise the retaliation claim in his CHRO complaint.  See [Doc. 152-2] at 27-29. Contrary to the City's assertion, an ADEA plaintiff need only first file such a claim with the relevant state agency and wait 60 days before commencing an action in federal court.  29 U.S.C. § 626(d)(1); Oscar Mayer & Co. v. Evans, 441 U.S. 750, 761 (1979) ("Section [626(d)(1)] does not stipulate an exhaustion requirement.  The section is intended only to give state agencies a limited opportunity to settle the grievances of ADEA claimants in a voluntary and localized manner so that the grievants thereafter have no need or desire for independent federal relief."); accord Joo v. Capitol Switch, Inc., 231 Conn. 328, 334-38 (1994) (discussing holding in Oscar Mayer and finding no requirement that state administrative remedies must be exhausted before a federal age discrimination claim can be brought to state court).  Moreover, in paragraphs 25 to 29 of his CHRO complaint [Doc. 152-17], Fasoli expressly references retaliation.  In particular, he claimed "retaliation for [ ] having opposed [such] discriminatory conduct[,]" id. at ¶ 29.  Accord Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) (stating that "[a] claim 'alleging retaliation by an employer against an employee for filing' a discrimination charge is one type of claim we have recognized as 'reasonably related' to the underlying discrimination charge").

to [an] adverse employment action[.]" Kessler, 308 F. App'x at 529.  As with Fasoli's claims, supra, his ADEA retaliation claim is analyzed under McDonnell Douglas's burden-shifting framework. Gorzynski, 596 F.3d at 110 ("Retaliation claims under . . . the ADEA are [ ] analyzed under the McDonnell Douglas burden-shifting test").

Here, the Court assumes that Fasoli has produced sufficient evidence to satisfy the first three elements of his ADEA retaliation claim.  That is, Fasoli filed a CHRO complaint alleging age discrimination in August 2009 and alleges subsequent adverse employment action by the City in that he was: (1) issued a five-day suspension by Scacco in December 2009; (2) transferred from Fleet Maintenance to Scofieldtown Yard by Orgera in January 2010; and (3) transferred from Scofieldtown Yard back to Fleet Maintenance, also by Orgera, in November 2010.  Fasoli Dep. [Doc. 198] at 838:8-845:5.  But, as noted, in order to defeat the City's instant motion for summary judgment on his ADEA retaliation claim, Fasoli must also produce evidence warranting the inference, as a matter of law, that age was the "but for" cause of these actions.  Gross, 557 U.S. at 180.

Fasoli has not met this burden.  Rather, Fasoli testified that he believes the CHRO complaint "was [only] one of the things [the City] didn't like . . . . [but] not that [it] specifically retaliated [against him] for [that] one thing[.]"  Fasoli Dep. [Doc. 198] at 840:3-16.  In other words, Fasoli concedes that the filing of his CHRO complaint, nor any other speech by him alleging age discrimination, was *not* the "but-for" cause of the adverse employment actions he complains of, but was perhaps only one of several possible reasons.  The City is therefore entitled to summary judgment on his ADEA retaliation claim.  Accord Gross, 557 U.S. at 180 (concluding that absent "but-for" showing by plaintiff in ADEA case, "burden of persuasion does not shift to employer to

41

show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision"); see also id. at 177 (reasoning that plaintiff's "but-for" burden of persuasion holds for all subsets of ADEA cases); id. at 175 (finding that "ADEA . . . [does not] authorize a mixed-motives age [ ] claim").

## D. **Age Discrimination Claims**

In Counts Seven and Eight of his Amended Complaint, Fasoli alleges that the City discriminated against him on the basis of his age in violation of the ADEA, 29 U.S.C. § 623(a)(1), and the CFEPA, Conn. Gen. Stat. § 46a-60(a)(1).  Although his age discrimination claims comprise state statutory law, the Second Circuit has recognized that "Connecticut law in relevant part follows the ADEA[,]" Rubinow, 496 F. App'x at 117, and therefore this Court will apply the same but-for analysis from Gross, to both of Fasoli's age discrimination claims.[45]

It thus follows that in order to defeat the City's instant motion for summary judgment on his discrimination claims, Fasoli must first establish a prima facie case, using the McDonnell Douglas framework, with evidence warranting the inference that:  (1) he falls within the protected age group; (2) he was subject to an adverse employment action; and (3) his age was the "but-for" cause of the

---

[45]   Although "[i]t is well established that CFEPA claims proceed under the same analysis as ADEA claims[,] . . . . [t]he Court notes that [neither the Connecticut Supreme Court nor the Appellate Court] . . . ha[s] yet addressed if and how Gross['s] ["but-for" causation requirement] impacts the CFEPA analysis[,]" Herbert v. Nat'l Amusements, Inc., 833 F. Supp. 2d 192, 202 (D. Conn. 2011) (citing (Craine v. Trinity Coll., 259 Conn. 625, 637 n.6 (2002)); but because "the Second Circuit has, on multiple occasions, applied the 'but-for' standard to such claims[,]" Gonska v. Highland View Manor, Inc., CV126030032S, 2014 WL 3893100, at *7 (Conn. Super. Ct. June 25, 2014) (citing cases), the Court continues to do so here until a Connecticut appellate court rules otherwise.  Accord Irizarry v. United Parcel Serv., Inc., No. 11 CV 1658 (JCH), 2014 WL 1246684, at *11 (D. Conn. Mar. 24, 2014) (applying Gross's "but-for" analysis to age discrimination claim under the ADEA and CFEPA).

adverse employment action.  Gross, 557 U.S. at 180; Gorzynski, 596 F.3d at 106 (stating that "[the

court] remain[s] bound by, and indeed see[s] no reason to jettison, the [McDonnell Douglas] burden-

shifting framework for ADEA cases that has been consistently employed in [this] Circuit").

Because Fasoli is over forty years old, it is clear that he has met his burden as to the first

element.  However, as to the second element, the Court finds that Fasoli has not produced sufficient

evidence –  documentary or otherwise –  to warrant an inference as a matter of law that the adverse

actions he alleges actually occurred.

In particular, Fasoli alleges that Scacco: (1) harassed, intimidated and ridiculed him, and

treated him differently because of his age; (2) created false performance reports about him because

of his age; (3) made false statements about him because of his age; (4) unreasonably refused his

requests for overtime because of his age; (5) "singled [him] out for mistreatment"; and (6)

intentionally misrepresented his labor cost as being at a higher rate than all other employees in the

Department.  Am. Compl. [Doc. 31] at ¶¶ 190-199.  Fasoli further alleges that the City discriminated

against him because of his age by refusing to promote him when he applied for the manager position

now held by Scacco.  Id. at ¶ 198; Fasoli Dep. [Doc. 198] at 492:17-493:2.

To begin with, although he claims that Scacco fraudulently calculated his labor cost at a rate

higher than all other employees in the  Department, Fasoli has failed to produce any evidence to

support this allegation, even though he has testified that, for at least some time, he supposedly had

in his possession a "chart" and other material showing this, Fasoli Dep. [Doc. 198] at 155:10-163:15,

170:9-175:3, 183:2-185:20, 556:10-566:1.  Nor has Fasoli produced corroborating witness testimony

on this issue, even though he claims that Scacco presented the fraudulent information at the May

2010 committee meeting, where others, such as Tarzia and Gabriele, were present.  Id. at 170:9-

175:3, 556:10-566:1; see also generally Gabriele Aff. [Doc. 176-23]; Tarzia Aff. [Doc. 176-24].

Similarly, Fasoli has not stated with any specificity what "false statements" Scacco purportedly made about him, much less when they were made or that they were made because of his age. And Fasoli's own deposition testimony defeats his allegations that Scacco unreasonably refused his requests for overtime because of his age,[46] and that Scacco singled him out for mistreatment because of his age, since, as discussed supra, Fasoli conceded that he does not know how overtime is authorized,[47] Fasoli Dep. [Doc. 198] at 356:8-359:22, and that his co-workers are required to do work of the same or similar exertion level as he, regardless of age, id. at 507:19-515:25.

Fasoli also has failed to produce any evidence that the City discriminated against him on the basis of his age by refusing to promote and "ignor[ing]" his application for the manager position (which Scacco ultimately filled), as he has not alleged, much less produced any evidence demonstrating, that he was even minimally qualified for the position, see, e.g., id. at 680:11-694:6; accord, e.g., Byrnie v. Town of Cromwell, Bd. Of Educ., 243 F.3d 93, 101 (2d Cir. 2001) requiring, as part of plaintiff's prima facie ADEA discrimination case, evidence "that plaintiff applied for a position for which he was qualified"); see also Gross, 557 U.S. at 180 (rejecting mixed-motives standard and requiring "but-for" causation by plaintiff alleging ADEA claim). Having failed to demonstrate that he suffered an adverse employment action, which, as noted, is the second requisite element of his prima facie case, the City is entitled to summary judgment on Fasoli's age

---

[46]   Fasoli also claims that other Defendants, apart from Scacco, "unreasonably refused [his] request for overtime because of his age[,]" Am. Compl. [Doc. 31] at ¶ 197, but he does not specify any person.  The record contains no other allegations or evidence pointing to anyone else.

[47]   Nor has he rebutted Scacco's assertion that authorizing overtime falls under the exclusive authority of the union shop stewards.

discrimination claims.[48]

## E.  **Remaining Claims**

The remaining claims in Fasoli's Amended Complaint also must be summarily dismissed. In Count Nine, Fasoli alleges that Scacco and the City invaded his privacy when they published portions of his personnel files without his knowledge or permission.  As already discussed, Defendants have denied this and Fasoli has not produced, even after the benefit of discovery, any evidence to support the allegation that his personnel file was impermissibly accessed or otherwise published.

In Count Ten, Fasoli avers that Defendants intended to inflict emotional distress on him or that they knew or should have known that emotional distress was the likely result of their conduct.[49] Fasoli concedes that, pursuant to Connecticut law, in order to withstand summary judgment on his intentional infliction of emotional distress claim, he must produce evidence demonstrating that: (1) Defendants intended to cause him emotional harm, or knew or should have known that such harm was likely to result; (2) Defendants' conduct was "extreme and outrageous," (3) Defendants' conduct was the cause of Plaintiff's distress, and (4) the emotional harm Plaintiff sustained was "severe." See

---

[48]  Fasoli puts substantial weight on various age-related comments made by Larobina and Scacco, which he maintains, are indicia of discriminatory animus.  Fasoli Dep. [Doc. 198] at 492:17-24; 493:25-497:9; 498:11-499:9.  Even if this is so, it does not alter the Court's finding that Fasoli has failed to show he suffered an adverse employment action that might be causally connected. Thus, even giving the comments the weight Fasoli urges, his age discrimination claims nevertheless fail as a matter of law.

[49]  The Court rejects the City's argument that Fasoli's intentional infliction of emotional distress claim is precluded by force of his union's collective bargaining agreement, to which Fasoli is subject.  See [Doc. 173-1] at 66-68.  In pertinent part, the City has failed to show in any way that the collective bargaining agreement defines "grievance" in a way that encompasses the tortious conduct Fasoli alleges in Count Ten.  See id.

Pl.'s Opp. Mem. [Doc. 179] at 20 (quoting <u>Petyan v. Ellis</u>, 200 Conn. 243 (1986)).  Fasoli also concedes that only conduct "exceeding all bounds usually tolerated by decent society" and is "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind" is actionable.  <u>Id.</u> (quoting <u>DeLaurentis v. City of New Haven</u>, 220 Conn. 225 (Conn. 1991)).  And as Fasoli further recognizes, offensive conduct does not include, for example, insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings.  <u>Id.</u> (quoting <u>Miner v. Town of Cheshire</u>, 126 F. Supp. 2d 184, 195 (D. Conn. 2000)).  In a similar vein, this Court has held that "routine employment actions[,]" such as "unfair disciplinary actions, unfair work assignments, [and] negative performance reviews" do not rise to the level of extreme or outrageous behavior.  <u>Williams v. Deloitte Servs. LP</u>, No. 09 CV 17 (JCH), 2009 WL 3571365, at *3 (D. Conn. Oct. 26, 2009).

Thus, even taking the entirety of the Amended Complaint as true, nothing Fasoli has alleged reaches the level of conduct required for a claim of intentional infliction of emotional distress.  The majority of Fasoli's allegations fall under the rubric of "routine employment actions," which he concedes are not actionable.  Similarly, Fasoli's claims regarding the plastic toy rats, name-calling, and sexual innuendos anonymously written on the lunchroom whiteboard cannot be viewed as anything more than verbal taunts, indignities, annoyances, and petty oppressions, which he also concedes are not a sufficient basis for sustaining an intentional infliction of emotional distress claim.  <u>See</u> Pl.'s Opp. Mem. [Doc. 179] at 20.

Nevertheless, Fasoli attempts to avoid this result by urging the Court to adopt the conclusion in <u>Davis v. City of Hartford</u>, 601 F. Supp. 2d 488, 495 (D. Conn. 2009), in which the plaintiff, a teacher's aide at a city school, survived summary dismissal of her intentional infliction of emotional

distress claim on the court's rationale that:

> [even though] Defendants [we]re correct that some of the conduct [the plaintiff] recount[ed] f[e]ll[ ] short of being actionable in isolation . . . . a jury could find that[,] [in] . . . the larger context[,] [and based on] . . . . her affidavit, deposition testimony, and other correspondence, [the plaintiff] was subjected to constant harassment targeted at her professional competence and socioeconomic status . . . . [and that the defendants] publicly insulted [the plaintiff] in highly personal ways . . . . [and even stole the plaintiff's own] documentation of her mistreatment . . . from her personal belongings inside a locked room.

Id. at 494-95.  The Davis court further reasoned that "a jury could find [ ] all this takes on new and more extreme meaning when considering [the defendant] (the authority figure) [wa]s white and [the plaintiff] (the harassed subordinate) [wa]s black."  Id. at 495.  But, here, even when viewed in the aggregate, the record evidence shows that Defendants' alleged conduct falls appreciably below the level of severity of the conduct in Davis and amounts to no more than routine employment actions or petty indignities.  This is particularly so as Fasoli has not produced evidence demonstrating that the actions he complains of were constant or based on a disparity in status (other than the one inherent to the employment relationship).  Cf. id. 494-95.  Accordingly, it cannot be said as a matter of law that a jury, "upon hearing a recitation of the facts, [even as Fasoli has alleged them,] would resent [any] [D]efendant and call his [ ] conduct 'outrageous[,]'" id. at 495, because though perhaps unpleasant, nothing in the record, whether viewed individually or taken in the aggregate, points to the kind of "extreme and outrageous" conduct that "exceed[s] all bounds usually tolerated by decent society[.]"  Accordingly, summary judgment for Defendants is granted on Count Ten.

Finally, in Count Eleven, Fasoli seeks compensatory damages.  His complaint also makes passing reference to punitive damages.  Having granted summary judgment in favor of Defendants

on the entirety of Fasoli's Amended Complaint, no basis exists for awarding any damages.[50]

## IV.  CONCLUSION

For the above reasons, Defendants' respective motions for summary judgment [Docs. 146, 152 & 173] are GRANTED.

The Clerk is directed to dismiss this action with prejudice, and to close the file.

It is SO ORDERED.

Dated: New Haven, Connecticut
       November 24, 2014

                              /s/Charles S. Haight, Jr.
                              CHARLES S. HAIGHT, JR.
                              Senior United States District Judge

---

[50] The Court likewise denies Fasoli's prayer for relief.